1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 19-1502 |
| Plaintiff, | COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America; UNITED STATES OF AMERICA; United States DEPARTMENT OF THE TREASURY; STEVEN T. MNUCHIN, in his official capacity as United States Secretary of the Treasury; United States DEPARTMENT OF DEFENSE; MARK T. ESPER, in his official capacity as United States Secretary of Defense; RYAN D. MCCARTHY, in his official capacity as Acting United States Secretary of the Army; RICHARD V. SPENCER, in his official capacity as United States Secretary of the Navy; MATTHEW DONOVAN, in his official capacity as Acting United States Secretary of the Air Force; United States DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, in his official capacity as United States Secretary of the Interior; United States DEPARTMENT OF HOMELAND | |

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1  SECURITY; KEVIN MCALEENAN, in his
2  official capacity as Acting United States
   Secretary of Homeland Security,
3
                        Defendants.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

COMPLAINT FOR DECLARATORY                ii
JUDGMENT AND INJUNCTIVE RELIEF

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................... 3

III.    PARTIES ............................................................................................. 4

IV.     FACTUAL ALLEGATIONS ............................................................... 6

        A.   Donald Trump Runs for President on Promises to Build a Border Wall .................. 6

        B.   Congress Refuses to Fund Construction of a Border Wall. ....................................... 7

        C.   In the Run-Up to the 2018 Midterm Elections, President Trump Sends Troops to the Southern Border. ............................................................................... 10

        D.   President Trump's Renewed Demand for a Wall Leads to a Government Shutdown. ........................................................................................ 13

        E.   To Gain Leverage in his Negotiations with Congressional Leaders, President Trump Begins Floating a National Emergency Declaration to Build a Wall. ......... 15

        F.   When Congress Refuses to Fund President Trump's Wall, He Declares a National Emergency. ................................................................................. 18

        G.   The President's Declaration of a National Emergency Requiring the Use of Armed Forces Is Wholly Untethered to the Facts .................................................... 22

        H.   The President Vetoes Congress' Resolution Terminating his National Emergency. ....................................................................................... 25

        I.   Nearly Seven Months After the President Declares an Emergency, the Department of Defense Acts to Seize Military Construction Funds to Build the President's Wall. .............................................................................. 26

        J.   Defendants Seek to Seize Funding Appropriated by Congress to Build the Bangor Pier and Maintenance Facility to Support the Pacific Submarine Fleet. .... 27

        K.   The National Emergencies Act Applies Only to True National Emergencies. ....... 28

        L.   10 U.S.C. § 2808 Does Not Permit the President to Build His Wall in Defiance of Congress ............................................................................... 29

             1.   The Current Situation at our Southern Border Is Not a "National Emergency" that "Requires the Use of the Armed Forces." ........................... 30

             2.   A Border Wall Is Not a Military Construction Project Within the Meaning of Section 2808. ......................................................................... 34

             3.   A Border Wall Is Not Necessary to Support the Use of Armed Forces. .......... 35

V.      CAUSES OF ACTION ...................................................................... 36

VI.     PRAYER FOR RELIEF ..................................................................... 41

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

iii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

## I.    INTRODUCTION

1.      The State of Washington brings this action to protect the State and its residents against unlawful actions of the President and his Administration.

2.      The Constitution grants Congress the exclusive power to appropriate federal funds. President Trump's Proclamation of a Declaration of a National Emergency (Proclamation, attached hereto as Exhibit A), and Defendants' seizure of military construction funds, constitute an abuse of power and a violation of separation of powers. Since his inauguration, President Trump has lobbied Congress to fund a border wall. Congress has repeatedly chosen <u>not</u> to appropriate such funds.

3.      Notwithstanding Congress' refusal to fund the President's Wall, on February 15, 2019, President Trump announced his intent to spend billions of dollars to build a wall at the southern border without congressional approval. He is diverting $600 million from the Treasury Department's drug forfeiture fund, and $2.5 billion from the Defense Department's drug interdiction program pursuant to 10 U.S.C. § 284. He also declared a national emergency at the southern border between the United States and Mexico. He purported to invoke powers under 10 U.S.C. § 2808 to direct the diversion of $3.6 billion from the Defense Department's military construction budget towards construction of a border wall.

4.      Then, on September 4, 2019, nearly seven months after the President declared a supposed emergency, the Department of Defense finally confirmed it was seizing military construction funds to build a border wall. Among the funds targeted by the Department are $88.96 million appropriated by Congress for a naval construction project at Bangor Base on the Kitsap Peninsula in Washington State.

5.      The President's Proclamation, and his Administration's seizure of funds appropriated by Congress for military construction projects, are unlawful and unconstitutional.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

6.      The statute on which Defendants rely to reprogram military construction funds—10 U.S.C. § 2808—does not permit Defendants to use military construction funds for a border wall. That statute provides that "in the event of . . . declaration by the President of a national emergency . . . that requires use of the armed forces," the Secretary of Defense may "undertake military construction projects . . . that are necessary to support such use of the armed forces."

7.      But "military construction project," as used in the statute, does not include border walls. Instead, it is limited to projects closely related to military installations. As one court already concluded, "it is unclear how border barrier construction could reasonably constitute a 'military construction project' such that Defendants' invocation of Section 2808 would be lawful." *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 919 (N.D. Cal. 2019) (on appeal on other grounds).

8.      Moreover, Defendants' authority to invoke Section 2808 is limited to projects "that are necessary to support [the] use of the armed forces." The President's border wall, however, is a civilian project serving purely law enforcement ends.

9.      Consequently, Defendants' efforts to use Section 2808 to seize billions of dollars in congressional appropriations for a border wall Congress refused to fund is "not in accordance with law" and "in excess of [Defendants'] statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the Administrative Procedure Act. 5 U.S.C. § 706.

10.     Defendants' effort to seize funds appropriated by Congress for specific military construction projects also violates the Constitutional separation of powers.

11.     Under our Constitution, Congress has the sole power to make laws and appropriate funds. The President is limited to "tak[ing] Care that the Laws [are] faithfully executed." U.S. Const. Art. II, Sec. 3.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

12.     Unable to persuade Congress through the political process, President Trump may not constitutionally usurp Congress' spending power through a declaration of national emergency that he *admits* is unnecessary.

13.     The National Emergencies Act gives the president flexibility to access certain powers in extraordinary circumstances where immediate action is required but there is no time for Congress to act. *See* 50 U.S.C. § 1601, *et seq*. It does not give the President authority to seize funds Congress refuses to appropriate simply because he disagrees with Congress. It does not give the President authority to declare a national emergency that is contrary to the facts. And it does not give the President the authority to declare a pretextual emergency that he admits he "didn't need to" declare.

14.     In short, the President's declaration of a national emergency, and his Administration's efforts to seize funds pursuant to that declaration, violate the Presentment Clause of Article I, Section 7, Congress' power of the purse enshrined in Article I, Section 9, and the Take Care Clause of Article II, Section 3 of the U.S. Constitution.

15.     The State of Washington and its people are injured by the Defendants' unlawful actions. Congress funded the Bangor Base project to support the critical mission of the United States Pacific Fleet of submarines, and the Defendants have no authority to undermine Congress' funding decision.

16.     The Court should enjoin Defendants' efforts to seize military construction funding contrary to 10 U.S.C. § 2808 and in violation of Congress' constitutional authority to appropriate funds.

## II.     JURISDICTION AND VENUE

17.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

18.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are the United States of America and United States agencies or officers sued in their official capacities. The State of Washington is a resident of this judicial district, and

a substantial part of the events or omissions giving rise to this Complaint occurred or will imminently occur within the Western District of Washington. In particular, the unauthorized redirection of military construction funds toward the border wall and away from Western Washington will negatively impact the State of Washington.

### III.    PARTIES

19.    Plaintiff the State of Washington is represented by its Attorney General, who is the State's chief legal advisor. The powers and duties of the Attorney General include acting in federal court on matters of public concern to the State.

20.    Washington brings this action to redress harms to its sovereign, proprietary, and quasi-sovereign interests caused by the Defendants' unlawful diversion of military construction funds that Congress authorized for projects in Washington State.

21.    Washington will be harmed by Defendants' efforts to reallocate funds to build a border wall because Defendants seek to reallocate $88.96 million in military construction funding specifically appropriated for Washington projects.

22.    The State of Washington has an interest in preventing duly-appropriated military construction funding from being diverted away from the State. The diversion of millions of dollars in funding away from Washington will harm the economy by reducing economic activity and employment. It will also reduce tax revenues for the State and municipalities associated with military construction and follow-on economic activities.

23.    The State of Washington has an interest in protecting the security and well-being of its residents by ensuring that military construction projects necessary to protect Washington from foreign and domestic threats not be cancelled or delayed.

24.    Defendant Donald J. Trump is the President of the United States of America. He is sued in his official capacity.

25.    Defendant United States of America includes government agencies and departments responsible for the implementation of congressional appropriations.

4

1       26.     Defendant United States Department of Treasury is a department of the executive

2   branch of the United States government.

3       27.     Defendant Steven T. Mnuchin is the Secretary of the Treasury. He is sued in his

4   official capacity.

5       28.     Defendant United States Department of Defense (DoD) is a department of the

6   executive branch of the United States government.

7       29.     Defendant Mark T. Esper is the United States Secretary of Defense. He is sued in

8   his official capacity.

9       30.     Defendant Ryan D. McCarthy is the Acting United States Secretary of the Army.

10  He is sued in his official capacity.

11      31.     Defendant Richard V. Spencer is the United States Secretary of the Navy. He is

12  sued in his official capacity.

13      32.     Defendant Matthew Donovan is the Acting United States Secretary of the Air

14  Force. He is sued in his official capacity.

15      33.     Defendant United States Department of the Interior is a department of the

16  executive branch of the United States government.

17      34.     Defendant David Bernhardt is the Secretary of the Interior. He is sued in his

18  official capacity.

19      35.     Defendant United States Department of Homeland Security is a department of the

20  executive branch of the United States government.

21      36.     Defendant Kevin McAleenan is the Acting United States Secretary of Homeland

22  Security. He is sued in his official capacity.

23

24

25

26

COMPLAINT FOR DECLARATORY         5         ATTORNEY GENERAL OF WASHINGTON
JUDGMENT AND INJUNCTIVE RELIEF             Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

## IV.    FACTUAL ALLEGATIONS

**A.    Donald Trump Runs for President on Promises to Build a Border Wall.**

37.    Donald Trump launched his presidential campaign in June 2015 claiming that, if elected, he would build a continuous wall along the Southwestern border that Mexico would pay for:

> I will build a great wall—and nobody builds walls better than me, believe me—and I'll build them very inexpensively. I will build a great, great wall on our southern border, and I will make Mexico pay for that wall. Mark my words.[1]

38.    Mr. Trump insisted that only a wall at the border could stop an "invasion" of migrants who he consistently characterized as criminals, human traffickers, drug traffickers and rapists:

> [W]hen Mexico sends its people, they're not sending their best. They're not sending you. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people.[2]

39.    To support his claim that border immigration also posed a threat to national security, Mr. Trump further asserted that terrorists were travelling with immigrant caravans.[3]

40.    After the election, President Trump quickly signaled that he intended to build the wall even without the support of Congress. Two days after the election, advisor Rudy Giuliani

---

[1] Z. Byron Wolf, *Trump Basically Called Mexicans Rapists Again*, CNN, (April 6, 2018), https://www.cnn.com/2018/04/06/politics/trump-mexico-rapists/index.html; *see also* August 2015 immigration plan, stating that "[t]here must be a wall across the southern border . . . Mexico must pay for the wall."]. Donald J. Trump for President, Inc., *Immigration Reform That Will Make America Great Again*, https://web.archive.org/web/20150908181305/https://www.donaldjtrump.com/positions/immigration-reform (Sept. 8, 2016).

[2] Donald Trump, *Presidential Announcement Speech* (June 16, 2015), https://www.c-span.org/video/?326473-1/donald-trump-presidential-campaign-announcement

[3] Donald Trump (@realDonaldTrump), Twitter (Nov. 19, 2015, 5:11 AM PST), https://twitter.com/realdonaldtrump/status/667329429912338432 ("Eight Syrians were just caught on the southern border trying to get into the U.S. ISIS maybe? I told you so. WE NEED A BIG & BEAUTIFUL WALL!").

Mr. Trump's tweet was misleading. The eight Syrians approached the United States through a Port of Entry and requested asylum. Dylan Baddour, *Greg Abbot claims Syrians 'caught' at Mexico border, a reminder of needed vigilance*, Politifact (Nov. 20, 2015), https://www.politifact.com/texas/statements/2015/nov/20/greg-abbott/greg-abbott-claims-syrians-caught-mexico-border-re/ .

stated in a CNN interview that President-elect Trump did not need the support of Congress and could instead use executive powers to fund the wall:

> The wall is going to take a while. Obviously he's going to build it. It's a campaign promise. He's not going to break a campaign promise . . . he can do it by executive order by just reprogramming money within the, within the immigration service . . . And not only that, they have actually approved a wall for certain portions of the border that hasn't even been built yet. So you could take a year building that out, with what has been approved.[4]

41.     Just five days after his inauguration, President Trump signed his third executive order, instructing the Secretary of the Department of Homeland Security to begin construction of the wall. The executive order instructed the Department of Homeland Security to, among other things, "divert[] all possible funding to pay for the wall."[5]

**B.      Congress Refuses to Fund Construction of a Border Wall.**

42.     Congress alone controls the power of the purse. Article 1, section 9 of the U.S. Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." The Framers of the Constitution agreed that spending power should be controlled by Congress, as representatives of the People, and viewed such control as a critical check on executive power.

43.     Congress funds the activities of the federal government through yearly appropriation bills. Since the 1980s, Congress has also passed continuing resolutions allowing federal agencies to operate at prior-year funding levels in the event that Congress does not complete its appropriations. Without such appropriations bills or continuing resolutions, federal money cannot be spent.

44.     Since he took office, President Trump has aggressively pressured Congress to fund a border wall. Despite unified Republican control of government during the first two years

---

[4] Z. Byron Wolf, *Trump doesn't need Congress to start building wall, Giuliani says*, CNN (Nov. 10, 2016), https://www.cnn.com/2016/11/10/politics/donald-trump-wall-congress-rudy-giuliani/
[5] Exec. Order No. 13767, 82 FR 8793 (Jan. 25, 2017), https://www.whitehouse.gov/presidential-actions/executive-order-border-security-immigration-enforcement-improvements/.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

of President Trump's administration, Congress has steadfastly refused to appropriate the funds the President has demanded for new wall construction.

45.     Within the first 100 days of his presidency, President Trump demanded immediate funding for a border wall in connection with Congress' first spending bill during his administration.[6] He faced bipartisan resistance to his demand.[7] Members of his own party publicly questioned whether construction of a border wall was cost-effective, or even a viable option for securing the border.[8]

46.     Facing a revolt from his own party, and with the threat of a government shutdown looming, President Trump backed down from his demand. Congress thereafter passed a short-term continuing resolution in April 2017, with zero funding for a border wall. President Trump signed the bill into law, but afterwards threatened: "Our country needs a good 'shutdown' in September to fix mess!"[9]

47.     Since that first unsuccessful budget showdown, President Trump has faced bipartisan resistance to every subsequent demand on Congress to fund construction of a border wall. In June 2017, Congress passed a $1.1 trillion omnibus spending package to fund the federal government through the end of September 2017. This second spending package also did not include funding for a border wall.

48.     In the run-up to the next spending bill, in August 2017, President Trump again threatened: "believe me, if we have to close down our government, we're building that wall."[10]

---

[6] Philip Elliot, *President Trump Open to Kicking Border Wall Fight to Fall*, TIME (April 25, 2017), http://time.com/4753623/trump-100-days-border-wall-fall/.
[7] Manu Raju, *Hill Republicans revolt over Trump's plans to build border wall*, CNN (Feb. 6, 2017), https://www.cnn.com/2017/02/03/politics/border-wall-republicans/.
[8] Philip Elliot, *President Trump Open to Kicking Border Wall Fight to Fall*, TIME (April 25, 2017), http://time.com/4753623/trump-100-days-border-wall-fall/.
[9] Erin Kelly, *Congress passes short-term funding bill to avoid government shutdown*, USA TODAY (April 28, 2017), https://www.usatoday.com/story/news/politics/2017/04/28/house-passes-short-term-funding-bill-avoid-shutdown-senate-expected-follow-suit/101018580/; Donald Trump (@realDonaldTrump), Twitter (May 2, 2017 6:07 AM PST), https://twitter.com/realdonaldtrump/status/859393829505552385.
[10] Sarah Kimmorley Paul Colgan, *TRUMP: 'If we have to close down our government, we're building that wall'*, Business Insider (Aug. 23, 2017), https://www.businessinsider.com.au/trump-government-shutdown-border-wall-2017-8#EkG8kv3aBDkdlFZt.99.

Despite his threats, in September 2017, Congress passed another short-term continuing resolution without wall funding, which President Trump later signed into law.[11]

49.    On December 8, 2017, and again in January 2018, President Trump signed short-term spending bills that did not include funding for the border wall.[12]

50.    In January 2018, President Trump rejected a compromise that would have funded border wall construction in exchange for President Trump's support for protections for Deferred Action for Childhood Arrivals (DACA) recipients. This resulted in a short shutdown.[13]

51.    Four days later, Congress passed a short-term continuing resolution to reopen the Government, without addressing DACA or President Trump's border wall demands.[14] In February 2018, a group of Senators announced a bipartisan DACA deal that would also address border security.[15] President Trump rejected the deal, leading Congress to pass another short-term continuing resolution without funding for a border wall.

52.    After negotiations over the bipartisan deal fell apart, in March 2018, Congress passed an omnibus spending bill that included approximately $1.6 billion in funding for border security upgrades, including $892 million for new fencing. Consolidated Appropriations Act, 2018, Pub. Law. No. 115-141, § 230 (2018). The Act limited the use of such funds to specifically designated "fencing" in San Diego and Texas, and only for designs deployed as of 2017. *Id.*

---

[11] Leigh Ann Caldwell and Alex Moe, *Trump Signs Disaster Aid, and His Deal With Dems, Into Law*, NBC News (Sept. 8, 2017), https://www.nbcnews.com/politics/congress/house-passes-disaster-relief-sending-trump-sign-n799796.

[12] Richard Cowan and Roberta Rampton, *Trump Signs Temporary Spending Bill as Budget Talks Intensify*, Reuters (Dec. 8, 2017), https://www.reuters.com/article/us-usa-congress-shutdown/trump-signs-temporary-spending-bill-as-budget-talks-intensify-idUSKBN1E22B6 ; Kevin Breuninger, *Bipartisan group of senators says it has a DACA deal*, CNBC (Feb. 14, 2018), https://www.cnbc.com/2018/02/14/bipartisan-group-of-senators-say-they-have-a-daca-deal.html.

[13] Erin Kelly and Eliza Collins, *The government shuts down after Senate blocks short-term spending bill*, USA TODAY (Jan. 19, 2018), https://www.usatoday.com/story/news/politics/2018/01/19/senate-blocks-bill-avoid-shutdown-mcconnell-scrambles-last-ditch-deal-democrats/1049878001.

[14] Sheryl Gay Stolberg and Thomas Kaplan, *Government Shutdown Ends After 3 Days of Recriminations*, The New York Times (Jan. 22, 2018), https://www.nytimes.com/2018/01/22/us/politics/congress-votes-to-end-government-shutdown.html.

[15] Kevin Breuninger, *Bipartisan group of senators says it has a DACA deal*, CNBC (Feb. 14 2018), https://www.cnbc.com/2018/02/14/bipartisan-group-of-senators-say-they-have-a-daca-deal.html.

President Trump initially threatened to veto the bill due to lack of funding for a border wall. He later backed down and signed the bill into law. After he was excoriated by right-wing media figures, President Trump publicly threatened: "I will never sign another bill like this again — I'm not going to do it again."[16]

53.     President Trump later signed a Farm Bill passed by Congress without funding for the wall after Congress failed to advance a bill that authorized border wall funding. Growing increasingly frustrated, in July 2018, President Trump threatened to shut down the government "if the Democrats do not give us the votes for Border Security, which includes the Wall!"[17]

54.     In September 2018, President Trump again threatened a government shutdown if Congress declined to appropriate funding for border wall construction. He later capitulated, and once again signed a short-term continuing resolution without funding for a border wall.[18]

## C.    In the Run-Up to the 2018 Midterm Elections, President Trump Sends Troops to the Southern Border.

55.     In the run-up to the 2018 congressional mid-term elections, President Trump began stoking public fear against a so-called "caravan" of migrants, consisting mostly of impoverished women and children traveling by foot from Central American countries to escape rampant violence. President Trump railed against the caravan at campaign events and on Twitter as an "invasion," filled with "tough fighters" who had fought "viciously against Mexico at Northern Border before breaking through" and who had "hurt" Mexican soldiers.[19] He also

---

[16] Julie Hirschfeld Davis and Michael D. Shear, *Trump Signs Spending Bill, Reversing Veto Threat and Avoiding Government Shutdown*, The New York Times (March 23, 2018), www.nytimes.com/2018/03/23/us/politics/trump-veto-spending-bill.html.

[17] Donald Trump (@realDonaldTrump), Twitter (July 29, 2018 6:13 AM PST), https://twitter.com/realDonaldTrump/status/1023557246628900864 ("I would be willing to 'shut down' government if the Democrats do not give us the votes for Border Security, which includes the Wall! Must get rid of Lottery, Catch & Release etc. and finally go to system of Immigration based on MERIT! We need great people coming into our Country!").

[18] Tucker Higgins and Jacob Pramuk, *Trump signs spending bill to avoid government shutdown, despite frustrations over border wall* funding, CNBC (Sep. 28, 2018), https://www.cnbc.com/2018/09/28/trump-signs-spending-bill-to-avert-shutdown-despite-border-wall-frustration.html.

[19] Donald Trump (@realDonaldTrump), Twitter (Oct. 31, 2018 5:38 AM PST), https://twitter.com/realdonaldtrump/status/1057612657665171457.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

tweeted that there was an "assault on our country at our Southern Border, including the Criminal elements and DRUGS pouring in."[20] He falsely claimed that the caravan was filled with "gang members and some very bad people."[21] There have been multiple so-called caravans of immigrants in the past 10 years, none of which have overwhelmed Customs and Border Patrol or threatened national security.[22]

56. As the mid-term elections heated up, President Trump escalated his rhetoric, threatening to cut off all aid to Honduras, El Salvador, and Guatemala and to "call up the U.S. Military and CLOSE OUR SOUTHERN BORDER!."[23] He even issued a campaign ad linking immigrants coming over the border with a horrific crime perpetrated by an immigrant, which news organizations refused to run because it was racist.[24]

57. President Trump's campaign against the caravan culminated in the final week before the mid-term elections when he ordered 5,000 active-duty troops to the Mexican border.[25] At the time of the deployment, the "caravan" had already shrunk by half, and was expected to

---

[20] Donald Trump (@realDonaldTrump), Twitter (Oct. 18, 2018 4:45 AM PST), https://twitter.com/realdonaldtrump/status/1052888451199262725.

[21] Donald Trump (@realDonaldTrump), Twitter (Oct. 29, 2018 7:41 AM PST), https://twitter.com/realdonaldtrump/status/1056919064906469376 ("Many Gang Members and some very bad people are mixed into the Caravan heading to our Southern Border. Please go back, you will not be admitted into the United States unless you go through the legal process. This is an invasion of our Country and our Military is waiting for you!").

[22] Sandra Dibble, *Caravan through Mexico is one of the largest in 10-year trek history*, The San Diego Tribune (April 3, 2018), http://www.sandiegouniontribune.com/news/border-baja-california/sd-me-refugee-caravan-20180403-story.html; Miriam Jordan, *This Isn't the First Migrant Caravan to Approach the U.S. What Happened to the Last One?*, The New York Times (Oct. 23, 2018), https://www.nytimes.com/2018/10/23/us/migrant-caravan-border.html; Ellen Cranley, *Thousands of migrants have been marching to the US border in 'caravans' for years – here's why this one is different*, Insider (Oct. 23, 2018), https://www.thisisinsider.com/migrant-caravan-coming-to-us-border-history-size-2018-10; Wikipedia (last accessed Sept. 9, 2019), https://en.wikipedia.org/wiki/Central_American_migrant_caravans.

[23] Donald Trump (@realDonaldTrump), Twitter (Oct. 18, 2018), https://twitter.com/realdonaldtrump/status/1052885781675687936.

[24] Matthew Choi, *NBC, Fox, Facebook pull Trump immigration ad that CNN called 'racist'*, Politico (Nov. 5, 2018), https://www.politico.com/story/2018/11/05/nbc-pulls-racist-trump-ad-961965.

[25] Michael Shear and Thomas Gibbons-Neff, *Trump Sending 5,200 Troops to the Border in an Election-Season Response to Migrants*, The New York Times (Oct. 29, 2018), https://www.nytimes.com/2018/10/29/us/politics/border-security-troops-trump.html.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

dwindle drastically as individuals continued to walk hundreds of additional miles before reaching the southern border.

58.     President's Trump deployment of troops to the border precipitated criticism from former military commanders for politicizing the U.S. military.[26]

59.     President Trump's troop deployment also raised significant constitutional questions when then-Chief of Staff John Kelly issued a "cabinet memo" authorizing the troops to use "lethal force" in protecting federal law enforcement and engaging in "crowd control, temporary detention and cursory search." The memo also directed the Secretary of Defense to consult with the Attorney General and the Secretary of Homeland Security before withdrawing troops. Military and national security experts decried the order as a violation of the Posse Comitatus Act, which prohibits active-duty military personnel from engaging in law enforcement activities domestically. Before the memo issued, White House counsel Emmet Flood reportedly warned the administration that the memo was likely unconstitutional.[27]

60.     The Pentagon estimated that the troop deployment was expected to cost more than $200 million.

61.     The troops' activities were limited because of the restrictions of the Posse Comitatus Act. The Chairman of the Joint Chiefs of Staff, Gen. Joseph Dunford, confirmed that, pursuant to the Act, the U.S. military would not be "involved in the actual mission of denying people entry to the United States." Instead, deployed personnel primarily performed functions such as stringing concertina wire, building barriers, and transporting Border Patrol agents.[28]

---

[26] Maggie Haberman and Mark Landler, *Trump has only tweeted once about migrant caravan since midterms – despite obsessive immigration posting during election campaign*, Independent (Nov. 14, 2018), https://www.independent.co.uk/news/world/americas/trump-migrant-caravan-twitter-immigration-midterm-elections-tweets-republican-a8634191.html (quoting Admiral James G. Stavridis: "Now that the political utility of troops on the southern border to face a fictitious caravan invasion threat is over, let's hope the president will stand down the troops so they can be with their families — especially over the holidays.").

[27] Tara Copp and Aaron Mehta, *Constitutional questions emerge about expanding role of troops on US soil*, MilitaryTimes (Nov. 23, 2018), https://www.militarytimes.com/2018/11/23/constitutional-questions-emerge-about-expanding-role-of-troops-on-us-soil/.

[28] Missy Ryan and Paul Sonne, *Troops approved to use force at the border, but Mattis says the mission hasn't changed*, The Washington Post (Nov. 21, 2018), https://www.washingtonpost.com/world/national-

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

62.     In November 2018, Democrats regained control of the House of Representatives for the first time in President Trump's tenure. After the mid-term elections, President Trump virtually ceased all references to the caravan, underscoring that his threats regarding the caravan were primarily a political ploy.

63.     Between October 16 and November 6, 2018, before the mid-term elections, President Donald Trump sent 45 tweets mentioning the "border" between the United States and Mexico and nine tweets referring to the "caravan" of migrants making their way across Mexico between October 16 and October 31. In the eight days after the mid-term elections, President Trump did not send a single tweet mentioning the caravan.[29]

**D.     President Trump's Renewed Demand for a Wall Leads to a Government Shutdown.**

64.     Shortly after the election, President Trump renewed his demands for a border wall, and threatened again to shut down the government if he did not get his way.

65.     On November 19, 2018, the President told reporters it "would be a very good time to do a shutdown" if Congress refused to fund a border wall.[30] He repeated similar demands over the next several weeks, specifically demanding over $5 billion from Congress.[31]

---

security/troops-approved-to-use-force-at-the-border-but-mattis-says-the-mission-hasnt-changed/2018/11/21/7b9e5e34-edbc-11e8-96d4-0d23f2aaad09_story.html.
[29] Chris Cillizza, *What Trump has stopped talking about since Election Day*, CNN (Nov. 14, 2018), https://www.cnn.com/2018/11/14/politics/donald-trump-caravan/index.html.
[30] Veronica Stracqualursi, *Trump says 'good time' for a government shutdown if no money for border wall*, CNN (Nov. 17, 2018), https://www.cnn.com/2018/11/17/politics/trump-southern-border-government-shutdown/index.html.
[31] Clare Foran, *Shutdown threat looms as Trump calls for border wall funding*, CNN (Nov. 26, 2018), https://www.cnn.com/2018/11/26/politics/trump-border-wall-government-shutdown-congress/index.html; Associated Press, *It's 'time for action' on a border wall, Trump says*, PBS (Nov. 23, 2018), https://www.pbs.org/newshour/politics/its-time-for-action-on-a-border-wall-trump-says; Donald Trump (@realDonaldTrump), Twitter (Nov. 26, 2018 3:19 AM PST), https://twitter.com/realDonaldTrump/status/1067015026995879937 ("Mexico should move the flag waving Migrants, many of whom are stone cold criminals, back to their countries. Do it by plane, do it by bus, do it anyway you want, but they are NOT coming into the U.S.A. We will close the Border permanently if need be. Congress, fund the WALL!"); John Parkinson, *Shutdown looms as Nancy Pelosi rejects Trump's demand for border wall*, ABC News (Dec. 6, 2018), https://abcnews.go.com/beta-story-container/Politics/shutdown-looms-nancy-pelosi-rejects-trumps-demand-border/story?id=59652105.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF
13
ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

66.    During a December 11, 2018, meeting with House Speaker Nancy Pelosi and Senator Chuck Schumer concerning a potential border wall, the President declared that if he did not get funding for his wall, "I will take the mantle. I will be the one to shut [the government] down."[32]

67.    Despite his threats, the President reportedly supported a December 19, 2018, continuing resolution to fund the government through February 8, 2019, with no funding for a border wall. With the President's support, the Senate unanimously approved the continuing resolution.[33]

68.    But then, following criticism from right-wing media figures including Ann Coulter, Rush Limbaugh, and Fox & Friends, the President reversed his position, declaring he would not sign the continuing resolution.[34] He insisted he would not sign any spending bill unless it appropriated $5.7 billion for the border wall.

69.    Despite the President's demands, Congress continued to refuse the President's demand for a wall. With the parties unable to agree on a proposal to continue funding the government, a partial shutdown began at 12 a.m. on December 22, 2018.[35]

---

[32] Matthew Daly and Catherine Lucey, *Trump threatens shutdown in wild encounter with Democrats*, AP (Dec. 11, 2018), https://apnews.com/9518d24c6bbe41238b8c82f092393284.

[33] Jacob Pramuk, *Shutdown talks collapse: Trump won't sign spending bill without wall money*, CNBC (Dec. 20, 2018), https://www.cnbc.com/2018/12/20/ryan-says-trump-will-not-sign-senate-passed-bill-to-avoid-government-shutdown.html.

[34] *Id.*; Christina Zhao, *Rush Limbaugh Furious About Border Wall: Trump Got 'Less Than Nothing' and 'Democrats Get Everything!'*, Newsweek (Dec. 19, 2018), https://www.newsweek.com/rush-limbaugh-angrily-rants-about-border-wall-trump-got-less-nothing-and-1265987; Ewan Palmer, *'Dead, Dead, Dead': Ann Coulter Says Donald Trump Is 'Dead In the Water If He Doesn't Build That Wall'*, Newsweek (Jan. 16, 2019), https://www.newsweek.com/ann-coulter-donald-trump-dead-build-wall-1293341; Jon Levine, *'Fox & Friends' Turns on Trump, Kellyanne Conway for 'Softening' on Border Wall Funding*, The Wrap (Dec. 19, 2018), https://www.thewrap.com/fox-friends-turns-on-kellyanne-conway-over-wall-funding-trump-is-softening-his-stance/.

[35] Lisa Mascaro, *Federal shutdown begins after lawmakers fail to reach deal*, AP (Dec. 21, 2018), https://apnews.com/1ccfe0de023c4ef986a396707e4d83ac. While the President cannot shut down government by himself, Senate Majority Leader Mitch McConnell refused to allow the Senate to vote on legislation the President would support. Matt Shuham, *Collins Wants Vote To End Shutdown: 'Bring The House-Passed Bills To The Senate Floor'*, TalkingPointsMemo (Jan. 6, 2019), https://talkingpointsmemo.com/news/collins-wants-vote-to-end-shutdown-bring-the-house-passed-bills-to-the-senate-floor.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

**E.    To Gain Leverage in his Negotiations with Congressional Leaders, President Trump Begins Floating a National Emergency Declaration to Build a Wall.**

70.    President Trump has explicitly used the threat of a national emergency declaration as a bargaining chip in his negotiations with congressional leaders.

71.    Starting around December 2018, President Trump began referring to a national emergency declaration as an "easier route" for obtaining congressional funding for the border wall, without congressional approval.

72.    On December 11, 2018, the President promised that " . . . If the Democrats do not give us the votes to secure our Country, the Military will build the remaining sections of the Wall."[36]

73.    On January 4, 2019, he stated he did not need congressional approval to build the wall because he "can use [emergency powers] — absolutely, we can call a national emergency because of the security of our country. Absolutely. No, we can do it. I haven't done it. I may do it. I may do it. But we can call a national emergency and build it very quickly. And it's another way of doing it. But if we can do it through a negotiated process, we're giving that a shot."[37]

74.    On January 6, 2019, the President told reporters he "may declare a national emergency dependent on what's going to happen over the next few days," referring to planned negotiations with congressional leaders.[38] At the time, an anonymous "White House official" said the President was "inclined" to declare a national emergency to build his border wall because it "provide[d] a way out" of his impasse with Congress.[39]

---

[36]    Donald Trump (@realDonaldTrump), Twitter (Dec. 11, 2018 4:42 AM PST), https://twitter.com/realDonaldTrump/status/1072471575956504576 ("…People do not yet realize how much of the Wall, including really effective renovation, has already been built. If the Democrats do not give us the votes to secure our Country, the Military will build the remaining sections of the Wall. They know how important it is!").

[37] Remarks by President Trump During Roundtable Discussion with State, Local, and Community Leaders on Border Security and Safe Communities (Jan. 12, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-congressional-leadership-border-security/.

[38] Eli Watkins, *Trump: 'May declare a national emergency' to build wall*, CNN (Jan. 7, 2019), https://www.cnn.com/2019/01/06/politics/adam-schiff-trump-wall-cnntv/index.html.

[39] Boris Sanchez, *Trump inclined to declare national emergency if talks continue to stall*, CNN (Jan. 6, 2019), https://www.cnn.com/2019/01/05/politics/trump-national-emergency-border-wall-shutdown/index.html.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

75.    On January 9, 2019, the same day President Trump "storm[ed] out" of a meeting with congressional leaders over their continued refusal to pay for his wall, he told reporters he had the "absolute right to do a national emergency if I want," and if he and Congress didn't "work a deal" to fund a wall, he "may go that route."[40]

76.    The following day, President Trump issued some of his most explicit threats yet to declare a national emergency if Congress did not give him what he wanted. Once again, he claimed he had "the absolute right to declare a national emergency," and said he would "probably" and "almost . . . definitely" declare an emergency if Congress refused to fund a border wall. Asked by a reporter why "[i]f it's a true national emergency," he has not "declared a national emergency already," the President responded that he "would like to do the deal through Congress, . . . because it makes sense to do it through Congress. But the easy route for me would have been call a national emergency and do it." Nonetheless, he said that if he and Congress "don't make a deal, I would say it would be very surprising to me that I would not declare a national emergency and just fund it through the various mechanisms." Asked "[h]ow much longer is this shutdown going to last," the President responded, "We have to get a win or I'll have to go national security. One or the other. . . . So we're either going to have a win, . . . [o]r I will declare a national emergency."[41]

77.    The next day, January 11, 2019, President Trump described a national emergency declaration as "the easy way out" of his dispute with Congress. "But," he continued, "this is up to Congress, and it should be up to Congress and they should do it. And if they can't do it . . . [w]e'll start thinking about another alternative." Later, in the same remarks, the President

---

[40] Richard Cowan and Alexandra Alper, *Trump storms out of talks on shutdown, bemoans 'total waste of time'*, Yahoo!News (Jan. 9, 2019), https://news.yahoo.com/u-house-democrats-test-republicans-trump-wall-demand-060836458--business.html; Remarks by President Trump in Signing Ceremony for S. 1862, the "Trafficking Victims Protection Reauthorization Act" (Jan. 9, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-signing-ceremony-s-1862-trafficking-victims-protection-reauthorization-act/.

[41] Remarks by President Trump Before Marine One Departure (Jan. 10, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-30/.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    declared: "And Congress should do this. If they can't do it — if, at some point, they just can't

2    do it — this is a 15-minute meeting. If they can't do it, I will declare a national emergency."[42]

3        78.    As the President stepped up his threats in the second week of January 2019,

4    criticism of his national emergency threats grew, including from many in the President's own

5    party. For example, Senator Susan Collins opined that declaring a national emergency "would

6    be a very dubious move from a constitutional perspective. . . . Without congressional

7    authorization is not what I think is intended by the National Emergency Act."[43]

8        79.    As the shutdown dragged on, the President came under increasing, widespread

9    scrutiny for holding the government hostage over his campaign promise to build a wall.

10        80.    For example, the President was widely criticized for his refusal to fund the

11    Department of Homeland Security, the FBI, the Coast Guard, and other agencies performing

12    national security functions unless he received funding for border construction.[44]

13        [42] Remarks by President Trump During Roundtable Discussion with State, Local, and Community Leaders
14    on Border Security and Safe Communities (Jan. 12, 2019), https://www.whitehouse.gov/briefings-
     statements/remarks-president-trump-roundtable-discussion-state-local-community-leaders-border-security-safe-
15    communities/.
        [43] Naomi Lim, *Republican senator: Trump declaring national emergency at border 'very dubious move'*,
16    Washington Examiner (Jan. 9, 2019), https://www.washingtonexaminer.com/news/susan-collins-trump-declaring-
     national-emergency-very-dubious-move; *see also* Liz Ruskin, *Build a wall with military funds? Murkowski says no*,
17    Alaska Public Media (Jan. 8, 2019), https://www.alaskapublic.org/2019/01/08/build-a-wall-with-military-funds-
     murkowski-says-no/ (Senator Lisa Murkowski: "I have very serious concerns about why we would be seeking to
18    take funding from those accounts that we have already identified as enhancing our national security."); Berkeley
     Lovelace, Jr., *Sen. Marco Rubio warns Trump a border emergency could embolden a future Dem president on
19    climate change*, CNBC (Jan. 9, 2019), https://www.cnbc.com/2019/01/09/sen-rubio-trump-declaring-a-national-
     emergency-over-border-security-is-a-slippery-slope.html (Senator Marco Rubio: "We have to be very careful about
20    endorsing broad uses of executive power."); Claire Foran, Ashley Killough, and Ted Barrett, *Democrats raise
     alarm, Republicans sound wary as Trump floats declaring national emergency*, CNN (Jan. 9, 2019),
21    https://www.cnn.com/2019/01/09/politics/trump-national-emergency-congress-border-wall/index.html (Senator
     Roger Wicker: "I think [declaring a national emergency] would be a mistake."); Jennifer Robin, *Emergency: Trump
22    splits the GOP*, the Washington Post (Jan. 11, 2019),
     https://www.washingtonpost.com/opinions/2019/01/11/emergency-trump-splits-gop/ (Representative Mac
23    Thornbery: "[B]order security . . . is not a responsibility of the Department of Defense" and Senator Rob Portman:
     "It my hope is that the president doesn't go the national-emergency route because of the precedent it sets.");
24    Matthew Belvedere, *'It's a bad precedent' – GOP Sen. Grassley wants Trump not to declare a national emergency
     to get his border wall*, CNBC (Jan. 11, 2019), https://www.cnbc.com/2019/01/11/sen-charles-grassley-warns-
     trump-not-to-declare-emergency-over-wall.html (Senator Chuck Grassley: "[I]t's a bad precedent. And it
25    contravenes the power of the purse that comes from the elected representatives of the people.").
        [44] Lev Sugarman, *FBI Agents Association Argues Shutdown Hurts National Security*, Lawfare Blog (Jan.
26    23, 2019), https://www.lawfareblog.com/fbi-agents-association-argues-shutdown-hurts-national-security; Dan
     Lamothe, *'Unacceptable': Coast Guard's top officer criticizes lack of payment in government shutdown*, the

81.    Public opposition to the shutdown increased as approximately 800,000 federal government workers stopped receiving paychecks, even as many were required to continue working.[45] To survive the shutdown, many federal workers had to resort to the use of food banks, second jobs, payday loans, pawnshops, and GoFundMe campaigns.[46]

**F.    When Congress Refuses to Fund President Trump's Wall, He Declares a National Emergency.**

82.    On January 25, 2019, the President finally conceded defeat and announced a reprieve that would reopen the government upon one condition: Congress would spend the next 21 days "negotiating" border wall funding. The President was clear that only one result would prevent another shutdown on February 15 or the declaration of a national emergency. Congress had to provide funding for new border wall construction. Concluding a televised address, he said: "So let me be very clear: We really have no choice but to build a powerful wall or steel barrier. If we don't get a fair deal from Congress, the government will either shut down on February 15, again, or I will use the powers afforded to me under the laws and the Constitution of the United States to address this emergency."[47]

---

Washington Post (Jan. 22, 2019), https://www.washingtonpost.com/national-security/2019/01/23/unacceptable-coast-guards-top-officer-criticizes-lack-payment-government-shutdown/; Ashley Halsey III and Michael Laris, *Number of TSA checkpoint agents calling out during shutdown stresses major airports*, the Washington Post (Jan. 20, 2019), https://www.washingtonpost.com/local/trafficandcommuting/number-of-tsa-security-checkpoint-agents-calling-out-during-shutdown-stresses-major-airports/2019/01/20/3da09b20-1cd2-11e9-8e21-59a09ff1e2a1_story.html; *Government shutdown brings on scary security implications*, WIS News (Jan. 25, 2019), http://www.wistv.com/2019/01/25/government-shutdown-brings-scary-security-implications/.

[45] Cheyenne Haslett, *On Day 25 of longest-ever government shutdown, 800,000 federal employees are without pay*, ABC News (Jan. 15, 2019), https://abcnews.go.com/beta-story-container/Politics/day-walkup-recaps-tightly-top-things-stand-breaks.

[46] Darran Simon, *Federal employees turn to food banks to feed their families during shutdown*, CNN (Jan. 20, 2019), https://www.cnn.com/2019/01/17/us/government-employees-shutdown-food-banks/index.html; Jordan Gass-Poore, *GoFundMe Campaigns. Payday Loans. McDonald's Shifts. The Painful Reality of Surviving Trump's Shutdown*, Mother Jones (Jan. 23, 2019), https://www.motherjones.com/politics/2019/01/surviving-trump-shutdown-federal-workers-contractors-podcast/; *Federal workers seek loans, second jobs as shutdown lingers*, WLOX (Jan. 10, 2019), http://www.wlox.com/2019/01/10/payday-without-pay-hits-federal-workers-shutdown-drags/; Mihir Zaveri, *Federal Employees Turn to Pawnshops Amid Shutdown's Financial Pinch*, the New York Times (Jan. 19, 2019), https://www.nytimes.com/2019/01/19/us/politics/federal-workers-pawnshops-government-shutdown.html.

[47] Remarks by President Trump on the Government Shutdown (Jan. 25, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-government-shutdown/.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

83.     On January 27, 2019, President Trump's Acting Chief of Staff, Mick Mulvaney, appeared on "Fox News Sunday" and said the President would act on a wall "with or without Congress."[48]

84.     The next day, then-Press Secretary Sarah Sanders was asked why, if the President truly believed there was a national emergency, he did not just declare one. In response, she told reporters that "the best fix is to be able to do it legislatively." "But," she continued, "if Congress doesn't do their job, then the President will be forced to make up for all of their shortcomings."[49]

85.     Even after the bipartisan committee formally convened, the President continued his threats on a near-daily basis.[50]

86.     The bipartisan committee ultimately agreed to a compromise bill to improve border security and avert another costly government shutdown. The bill, the Consolidated Appropriations Act, 2019, included several provisions meant to strengthen border security, including funding for new Border Patrol officers, funding for surveillance technology, and funding to strengthen ports of entry. Consolidated Appropriations Act, 2019, Pub. Law. No. 116-6 (2019).[51]

87.     As a concession to the President and his allies, it also included $1.375 billion for 55 miles of new fencing in Texas' Rio Grande Valley. *Id.* at § 230. This funding came with

---

[48] Robert Costa and Felicia Sonmez, *Trump is again considering invoking emergency powers to build border wall without congressional approval*, Chicago Tribune (Jan. 27, 2019), http://www.chicagotribune.com/news/nationworld/politics/ct-trump-border-wall-funding-20190127-story.html.

[49] Press Briefing by Press Secretary Sarah Sanders (Jan. 28, 2019), https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sarah-sanders-012819/.

[50] *See, e.g.*, Erica Werner, Seung Kim and John Wagner, *Trump predicts failure by congressional committee charged with resolving border stalemate*, the Washington Post (Jan. 31, 2019), https://www.washingtonpost.com/politics/trump-cites-an-increase-in-mexicos-murder-rate-as-he-insists-a-border-wall-will-be-built/2019/01/31/8f3d2f5a-2549-11e9-ad53-824486280311_story.html; Rebecca Morin, *Trump on national emergency: 'There's a good chance we'll have to do that'*, Politico (Feb. 1, 2019), https://www.politico.com/story/2019/02/01/trump-national-emergency-border-wall-1143364; Remarks by President Trump in Cabinet Meeting (Jan. 2, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-cabinet-meeting-13.

[51] Mike DeBonis, *What's in the 1,169-page border-security bill to avert a government shutdown*, The Washington Post (Feb. 14, 2019), https://www.washingtonpost.com/politics/whats-in-the-1169-page-border-security-bill-to-avert-a-government-shutdown/2019/02/14/fb422a96-3068-11e9-8781-763619f12cb4_story.html

---

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

conditions, however, including prohibitions on its use in certain areas and for certain designs, and a requirement that the Department of Homeland Security consult with local officials before constructing anything. *Id.* at § 230–232.

88.      Despite getting a significant amount of money for border security, the President was unsatisfied. On February 14, 2019, the day before the deadline to avert a shutdown, President Trump announced that he would declare a national emergency to seize additional funds to construct new portions of a wall at the border.

89.      On the morning of February 15, 2019, the White House announced its plans to use executive actions to commandeer approximately $6.1 billion additional dollars to build the President's wall. Specifically, the White House announced the President would use executive orders to take $600 million from the Treasury Forfeiture Fund, $2.5 billion from the Department of Defense's drug interdiction program, and use an emergency declaration to seize $3.6 billion from the Department of Defense's military construction budget.[52]

90.      The White House admitted that the President was declaring an emergency only because Congress refused to allocate funds to his border wall proposal. As Acting Chief of Staff Mick Mulvaney explained:

> I think everybody knows the past history of why we're doing this. We've been through a shutdown. We've now been through three weeks of allowing Congress to try and work their will, and they're simply incapable of providing the amount of money necessary, in the President's eyes, to address the current situation at the border.[53]

91.      The President echoed these comments in his announcement of the national emergency, admitting that he "didn't need to" declare a national emergency, but that he wanted to circumvent Congress' appropriations decisions:

---

[52] Kathryn Watson, *Trump issues national emergency declaration over border*, CBS News (Feb. 15, 2019), https://www.cbsnews.com/live-news/trump-rose-garden-expected-to-make-national-emergency-announcement-live-stream-today-2019-02-15/.

[53] Press Release, White House, Background Press Call by Senior Administration Officials on President Trump's Remarks on the National Security and Humanitarian Crisis on Our Southern Border (Feb. 15, 2019), https://tinyurl.com/WHPressCall.

Look, I went through Congress. I made a deal. I got almost $1.4 billion when I wasn't supposed to get one dollar — not one dollar. . . .So I did — I was successful, in that sense, but I want to do it faster. *I could do the wall over a longer period of time. I didn't need to do this. But I'd rather do it much faster.* And I don't have to do it for the election. I've already done a lot of wall, for the election — 2020. And the only reason we're up here talking about this is because of the election, because they want to try and win an election, which it looks like they're not going to be able to do. And this is one of the ways they think they can possibly win, is by obstruction and a lot of other nonsense.

*And I think that I just want to get it done faster, that's all.*[54]

92.     On February 15, 2019, the President issued a "Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States," declaring a national emergency at the southern border. Proclamation No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019), Exhibit A. In his Proclamation, the President claimed "[t]he southern border is a major entry point for criminals, gang members, and illicit narcotics." The Proclamation admits this "problem of large-scale unlawful migration through the southern border is long-standing"—i.e., not an emergency requiring extraordinary action. *Id.* The Proclamation thus appears to ground the "emergency" on the claim that "the situation has worsened in certain respects in recent years," as "sharp increases in the number of family units entering and seeking entry to the United States" have been met with "an inability to provide detention space for many of these aliens while their removal proceedings are pending," leading to difficulties in removing deportable immigrants. *Id.* Thus, according to the Proclamation, the "emergency" is essentially that the immigration system is not doing a good enough job of removing deportable immigrants.

93.     Based on this claim, the President purported to invoke two statutory emergency powers: (1) the power to call up to 1,000,000 ready reserve troops to the border, pursuant to 10 U.S.C. § 12302; and (2) the power to redirect military construction funds, pursuant to 10 U.S.C. § 2808.

---

[54] Background Press Call on President Trump's Remarks on the National Security and Humanitarian Crisis on Our Southern Border (Feb. 15, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-security-humanitarian-crisis-southern-border/ (emphasis added).

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

94.     Although his Proclamation is vague, his intent is clear: to circumvent Congress and build the wall it has repeatedly refused to fund.

95.     Hours after declaring a national emergency, the President flew to Florida for a weekend of golf at his Mar-a-Lago Club.

**G.    The President's Declaration of a National Emergency Requiring the Use of Armed Forces Is Wholly Untethered to the Facts.**

96.     While the President used the threat of an emergency declaration for months in an effort to strong-arm Congress, there was never any actual emergency at the border requiring the use of armed forces.

97.     Both at the time the President declared his emergency and today, the facts on the ground have contravened the alleged factual basis for the Proclamation.

98.     A border wall is intended to affect the rate of crossings *between* ports of entry. But multi-decade trends compiled using U.S. Customs and Border Protection data show that such apprehensions were near historic lows in the months and years preceding the emergency declaration.[55] Notably, the number of migrants apprehended at the southern border has declined by two-thirds since 2000.[56] There was a spike in southwest border apprehensions *after* the president issued his declaration, peaking in May 2019.[57] But the numbers have continued to drop since then, including a more than 20 percent drop from July to August 2019 (during which time the Administration has not built *any* new border wall).[58]

---

[55] *See* Stephanie Leutert, *Who's Really Crossing the U.S. Border, and Why They're Coming*, LawFare (June 23, 2018), https://www.lawfareblog.com/whos-really-crossing-us-border-and-why-theyre-coming; Salvador Rizzo, *Fact-checking President Trump's Oval Office address on immigration*, the Washington Post (Jan. 9, 2019), https://www.washingtonpost.com/politics/2019/01/09/fact-checking-president-trumps-oval-office-address-immigration/ (in 2017, apprehensions at the border were at the lowest level in 45 years).

[56] Samuel Granados, *Why Trump's wall contradicts today's immigration trends*, the Washington Post (Apr. 12, 2017), https://www.washingtonpost.com/graphics/national/overstay-ports-of-entry/?tid=a_inl_manual&utm_term=.c0b04e5ce6a2I.

[57] U.S. Customs and Border Protection, *Southwest Border Migration FY* 2019, https://www.cbp.gov/newsroom/stats/sw-border-migration.

[58] *Id.*; Salvador Rizzo, *More than two years later, Trump's wall remains unbuilt*, The Washington Post (Sept. 6, 2019), https://www.washingtonpost.com/politics/2019/09/06/more-than-two-years-later-trumps-wall-remains-unbuilt/.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

99.     Those undocumented immigrants who are arriving are increasingly doing so not between ports of entry, where a border wall might otherwise deter them, but *through* ports of entry. Since 2012, arriving migrants have elected to present themselves at ports of entry, rather than try to cross between ports of entry where a border wall would be.[59] Similarly, for the past eight years now, visa overstays have exceeded border crossings as the chief method of undocumented immigration.[60] As one former INS commissioner put it, President Trump is "fighting yesterday's battles," not the "facts as we know them."[61]

100.    Although the President's Proclamation states that "[t]he southern border is a major entry point for criminals, gang members, and illicit narcotics," this vague and misleading statement does not demonstrate a national security emergency.

101.    First, the number of arrests of "criminal aliens" has steadily fallen from 2016 to 2018, and is on track to fall again in 2019.[62]

102.    Second, the number of border patrol apprehensions of persons with gang affiliations has remained steady at under 1,000 per year from 2015 to the present.[63] By contrast, the Department of Homeland Security stated that it *removed* nearly 6,000 known or suspected

---

[59] *See* Samuel Granados, *Why Trump's wall contradicts today's immigration trends*, the Washington Post (Apr. 12, 2017), https://www.washingtonpost.com/graphics/national/overstay-ports-of-entry/?tid=a_inl_manual&utm_term=.c0b04e5ce6a2 (Chief of U.S. Customs and Border Protection from 2014-17 stated that increasing numbers of immigrants have been presenting themselves at official crossings since 2012).

[60] Richard Gonzales, *For 7th Consecutive Year, Visa Overstays Exceeded Illegal Border Crossings*, NPR (Jan. 16, 2019), https://www.npr.org/2019/01/16/686056668/for-seventh-consecutive-year-visa-overstays-exceeded-illegal-border-crossings; U.S. Customs and Border Protection, *Southwest Border Migration FY* 2019, https://www.cbp.gov/newsroom/stats/sw-border-migration (2018 apprehensions were 521,090), Dept. of Homeland Security, *Fiscal Year 2018 Entry/Exit Overstay Report*, https://www.dhs.gov/sites/default/files/publications/19_0417_fy18-entry-and-exit-overstay-report.pdf (2018 overstays calculated at 666,582).

[61] Samuel Granados, *Why Trump's wall contradicts today's immigration trends*, the Washington Post (Apr. 12, 2017), https://www.washingtonpost.com/graphics/national/overstay-ports-of-entry/?tid=a_inl_manual&utm_term=.c0b04e5ce6a2.

[62] U.S. Customs and Border Protection, *Criminal Alien Statistics Fiscal Year 2019*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/criminal-alien-statistics.

[63] U.S. Customs and Border Protection, *CBP Enforcement Statistics FY 2019*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF
23
ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

gang members in the last fiscal year, suggesting that many more gang members are being removed than are arriving over the border.[64]

103.    Third, the amount of drugs seized by U.S. Border Patrol nationwide (i.e., not just the southern border), has not shifted dramatically in the past five years.[65] Moreover, according to the Drug Enforcement Administration, cartels "transport the bulk of their drugs over the Southwest Border through ports of entry (POEs) using passenger vehicles or tractor trailers."[66] "The drugs are typically secreted in hidden compartments when transported in passenger vehicles or comingled with legitimate goods when transported in tractor trailers."[67] Out of 120 seizures cited in Customs and Border Patrol news releases since November 2018, only 24 occurred between ports of entry, and nearly all of those involved marijuana. In one case, a package of meth was dropped across the border from an ultralight aircraft, which a border wall would do nothing to prevent.[68]

104.    The Administration's dissemination of inaccurate and misleading information in the lead-up to the emergency declaration highlights the pretextual nature of this manufactured "emergency." For example, in his January 4, 2019 letter to Congress, the President claimed that "[i]n fiscal year (FY) 2018, 17,000 adults at the border with existing criminal records were arrested by Customs and Border Protection (CBP) and border agents."[69] But in fact, "[i]n the 11-month period through August 2018, U.S. Customs and Border Protection encountered 16,831

---

[64] U.S. Immigration and Customs Enforcement, *ERO FY18 By The Numbers*, https://www.ice.gov/features/ERO-2018.

[65] U.S. Customs and Border Protection, *CBP Enforcement Statistics FY 2019*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics.

[66] Eugene Kiely, *Will Trump's Wall Stop Drug Smuggling?*, FactCheck.Org (Aug. 30, 2017), https://www.factcheck.org/2017/08/will-trumps-wall-stop-drug-smuggling/.

[67] Nicole Lewis, *President Trump's claim that a wall will 'stop much of the drugs from pouring into this country'*, The Washington Post (Sept. 11, 2017), https://www.washingtonpost.com/news/fact-checker/wp/2017/09/11/president-trumps-claim-that-a-wall-will-stop-much-of-the-drugs-from-pouring-into-this-country.

[68] Philip Bump, *Want to know where most drugs cross the border? Look at the Border Patrol's news releases.*, The Washington Post (Feb. 1, 2019), https://www.washingtonpost.com/politics/2019/02/01/want-know-where-most-drugs-cross-border-look-border-patrols-press-releases/.

[69] President Trump Sends a Letter on Border Security to Congress (Jan. 4, 2019), https://www.whitehouse.gov/articles/president-trump-sends-letter-border-security/.

24

people convicted of crimes in the United States or abroad, but 63 percent of them showed up at ports of entry," such as airports, rather than at the border.[70] Moreover, nearly half of all convictions were for illegal entry or reentry. *Id.*

105.    President Trump's claims regarding human trafficking are also largely false. According to the Justice Department's own data, about two-thirds of human trafficking victims are in fact U.S. citizens, not migrants. Joint Declaration of Former United States Government Officials, 165 Cong. Rec. S1412 (daily ed. Feb. 25, 2019) (hereafter "Joint Declaration"), attached hereto as Exhibit B. And of the minority who are migrants, "most . . . arrive in the country on valid visas" rather than coming through the border. *Id.*

106.    No wonder, then, that shortly after the emergency declaration, 58 former government officials, representing a bipartisan consensus of national security professionals, jointly declared that "[t]he President's actions are at odds with the overwhelming evidence in the public record, including the administration's own data and estimates. . . . [U]nder no plausible assessment of the evidence is there a national emergency today that entitles the President to tap into funds appropriated for other purposes to build a wall at the southern border." Exhibit B at 1411.

**H.    The President Vetoes Congress' Resolution Terminating his National Emergency.**

107.    Shortly after the President declared his national emergency, both the House and Senate voted, on a bipartisan basis, to terminate his Proclamation.[71] In voting for the resolution, many legislators, including those in the President's own party, described the President's action as an unprecedented usurpation of Congress' constitutional powers. For example, Senator Lamar Alexander (R-TN) explained: "Never before has a president asked for funding, Congress has not

---

[70] Salvador Rizzo, *The Trump administration's misleading spin on immigration, crime and terrorism*, The Washington Post (Jan. 7, 2019), https://www.washingtonpost.com/politics/2019/01/07/trump-administrations-misleading-spin-immigration-crime-terrorism/.

[71] Susan Davis, *Trump Vows Veto After Congress Blocks His Order To Build Border Wall*, NPR (March 14, 2019) https://www.npr.org/2019/03/14/703379399/congress-overturns-trumps-national-emergency-declaration-to-build-the-wall.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

provided it, and the president then has used the National Emergencies Act of 1976 to spend the money anyway."[72]

108.    Despite the bipartisan rebuke, the President forged ahead, issuing his first ever veto to nullify the resolution.[73]

**I.    Nearly Seven Months After the President Declares an Emergency, the Department of Defense Acts to Seize Military Construction Funds to Build the President's Wall.**

109.    On September 3, 2019, nearly seven months after President Trump declared an emergency at the border, Secretary of Defense Mark Esper announced the seizure of $3.6 billion in funds Congress allocated for specific military construction projects, to use instead to build more wall at the border. *See* Sep. 3, 2019 Letter from Secretary Esper to Senator James Inhofe (Letter), attached hereto as Exhibit C.

110.    According to his letter, Secretary Esper determined that 11 separate border wall projects "are necessary to support the use of the armed forces in connection with the national emergency" because the "projects will deter illegal entry, increase the vanishing time of those illegally crossing the border, and channel migrants to ports of entry." *Id.* Secretary Esper claimed this would "reduce the demand for DoD personnel and assets at the locations where the barriers are constructed and allow the redeployment of DoD personnel and assets to other high-traffic areas on the border without barriers." *Id.*

111.    The following day, Secretary Esper released a list of 127 congressionally-approved projects he intended to defund, including 64 in the United States.[74] The list of U.S. projects is attached hereto as Exhibit D.

---

[72] *Id.*

[73] Michael Tackett, *Trump Issues First Veto After Congress Rejects Border Emergency*, the New York Times (March 15, 2019), https://www.nytimes.com/2019/03/15/us/politics/trump-veto-national-emergency.html.

[74] Meghann Myers, *Here's everything the Pentagon is putting on hold to concentrate on building the border wall*, MilitaryTimes (Sept. 5, 2019), https://www.militarytimes.com/news/your-military/2019/09/04/heres-everything-the-pentagon-is-putting-on-hold-to-concentrate-on-building-the-border-wall/.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

J.    **Defendants Seek to Seize Funding Appropriated by Congress to Build the Bangor Pier and Maintenance Facility to Support the Pacific Submarine Fleet.**

112.    Among the projects whose funding the Secretary is stripping is an $88.96 million Bangor Pier and Maintenance Facility at Naval Base Kitsap on the Kitsap Peninsula in Washington.

113.    Naval Base Kitsap is the home of the U.S. Pacific Fleet of Trident Ballistic Missile submarines. It is the sole Trident submarine base on the West Coast.

114.    As part of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (McCain NDAA), Congress specifically authorized the use of appropriated funds to construct the Bangor Pier and Maintenance Facility to address key deficiencies at this critically strategically important base. Pub. L. No. 115-232, § 2201, 132 Stat. 1636 (2018).

115.    The Bangor Pier and Maintenance Facility project includes a pier for two 250-foot blocking vessels, a boat shop capable of supporting 30 vessels, and a small-craft fueling station and storage tank. According to the Department of Defense, these "[f]acilities are required to support the Maritime Force Protection Unit (MFPU) Bangor's operational mission to provide security escort for submarines through protection by presence and defense by force during transit between homeport and the surface/dive points in the Strait of Juan de Fuca and test range. This mission supports the stand-up of the Nuclear Weapons Security (NWS) Program mission as mandated by National Security Presidential Directive and Instructions."[75]

116.    Currently, "[m]ission requirements have outpaced the ability to provide adequate facilities to support the [transit protection] mission at Bangor." When no pier space is available, sailors are subject to "extensive berth shifts and unnecessary days spent away from homeport." The DoD advises that if the pier is not provided, "[f]ull operational capability of the [transit protection] mission cannot be executed. NWS posture will continue to fall short of DoD directives and requirements. The 250-foot [blocking vessels] will remain in a nomadic state with

---

[75] Department of the Navy Fiscal Year (FY) 2019 Budget Estimates: Justification of Estimates at 194—95, https://www.secnav.navy.mil/fmc/fmb/Documents/19pres/MCON_Book.pdf.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1  continued berth shifts and days spent away from homeport, due to lack of adequate, dedicated

2  pier space."[76]

3      117.    Small craft maintenance at Bangor is currently provided at three separate facilities

4  with inadequate capacity. Additionally, diesel fuel is currently provided to small craft via a

5  converted barge, which is costly to operate and carries environmental risks. If these projects are

6  not built, "[i]nadequately sized facilities will continue to negatively impact maintenance

7  schedules, which jeopardizes the readiness conditions of escort vessels, create operational

8  inefficiencies, and compound shortfalls," and "MFPU will continue fueling operations using a

9  converted fuel system that was designed for temporary use."[77]

10      118.    Washington now stands to lose this incredibly valuable, strategically important

11  military construction project as a result of Defendants' seizure of funds in contravention of

12  Congress.

13  **K.    The National Emergencies Act Applies Only to True National Emergencies.**

14      119.    Passed in 1976, the National Emergencies Act, 50 U.S.C. § 1601, et seq., was

15  meant to ensure that executive emergency powers "could be utilized only when emergencies

16  actually exist." S. REP. 94-1168, 2, 1976 U.S.C.C.A.N. 2288, 2289.

17      120.    Under the Act, "[r]eliance on emergency authority, intended for use in crisis

18  situations [is] no longer . . . available in non-crisis situations." *Id.* "At a time when governments

19  throughout the world are turning with increasing desperation to an all-powerful executive, this

20  legislation [was] designed to insure that the United States travels a road marked by carefully

21  constructed legal safeguards." *Id.*

22      121.    50 U.S.C. § 1621 provides: "With respect to Acts of Congress authorizing the

23  exercise, during the period of a national emergency, of any special or extraordinary power, the

24  President is authorized to declare such national emergency."

25  _____

26      [76] *Id.* at 196.
        [77] *Id.* at 196–97.

122.    Since the National Emergencies Act became law in 1976, only two domestic incidents have been declared national emergencies: the September 11th terrorist attacks and the H1N1 influenza pandemic.[78]

123.    As one respected commentator has explained, "emergency powers are designed for situations in which Congress has no time to act. If Congress does have time, then there is no justification for bypassing the ordinary legislative process."[79]

124.    By the same token, President Trump's hesitation to act, "belies his claim that there is an emergency at the border. Presidents don't dawdle in the face of real emergencies. President George W. Bush did not spend weeks scratching his head about whether to issue an emergency declaration after the terrorist attacks of 9/11."[80]

**L.    10 U.S.C. § 2808 Does Not Permit the President to Build His Wall in Defiance of Congress.**

125.    The National Emergencies Act (NEA) does not, by itself, afford the President any substantive power. Instead, "[t]he circumstances authorizing a declaration of national emergency are defined by the statutes giving the President the extraordinary powers to use in the case of a national emergency." S. REP. 94-1168, 4, 1976 U.S.C.C.A.N. 2288, 2290-91.

126.    In his Proclamation, the President purports to invoke "the construction authority provided in" 10 U.S.C. § 2808 as authority to seize billions of dollars to build a border wall that Congress has repeatedly refused to fund. The President has failed to satisfy the requirements of that statute.

127.    Section 2808 authorizes the Secretary of Defense to "undertake military construction projects, and [] authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law." 10 U.S.C. § 2808(a). Invoking

---

[78]    Brennan Center for Justice, *A Guide to Emergency Powers and Their Use* (Sept. 4, 2019), https://www.brennancenter.org/analysis/emergency-powers

[79]    Elizabeth Goitein, *Trump Is Destroying His Own Case for a National Emergency*, The Atlantic (Jan. 28, 2019), https://www.theatlantic.com/ideas/archive/2019/01/trump-has-no-case-national-emergency/581356/.

[80]    *Id.*

29

Section 2808, however, first requires that the President declare a national emergency under the NEA "that requires use of the armed forces." *Id.* Section 2808 then limits the Secretary of Defense to using funds only for "military construction projects . . . that are necessary to support such use of the armed forces." *Id.*

128.   So, for example, where a national emergency requires the deployment of U.S. armed forces, Section 2808 provides the Department of Defense the authority to build things like tents, barracks, or similar necessary military construction to support that deployment.

129.   Section 2808 has never before been relied on as authority to build a massive civil construction project, on U.S. soil, in peacetime, which Congress has refused to fund.

130.   Defendants' reliance on Section 2808 here is contrary to the statute.

**1.   The Current Situation at our Southern Border Is Not a "National Emergency" that "Requires the Use of the Armed Forces."**

131.   Section 2808 permits the President to assert extraordinary powers only where there is a "national emergency" that "requires use of the armed forces." 10 U.S.C. § 2808. This standard is not met here, for two reasons.

132.   First, the President's Proclamation was patently pretextual. The President dangled the threat of a national emergency for months, explicitly using it as a bargaining cudgel against Congress.

133.   The President only—indeed, explicitly—declared a national emergency because Congress declined to fund his desired border wall. In finally announcing his Proclamation, the President admitted he "didn't need to" declare an emergency, but he was unhappy with Congress' lawmaking on the subject.

134.   The fact that the Administration did not divert Section 2808 "emergency funds" for seven months after the President's Proclamation further confirms that this is not a national emergency.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

135.    Further highlighting the pretextual nature of the President's Proclamation is the fact that circumstances at the southern border had in fact improved markedly in the years preceding his Proclamation. As explained by 58 former national security officials, at the time the President declared his emergency, his Proclamation was "at odds with the overwhelming evidence in the public record, including the administration's own data and estimates. . . . [U]nder no plausible assessment of the evidence is there a national emergency today that entitles the President to tap into funds appropriated for other purposes to build a wall at the southern border." Ex. B at S1411.

136.    And while the current situation at our southern border is certainly problematic—largely due to Defendants' own policies regarding asylum-seekers and other migrants—the specific problems identified by the President in his Proclamation are not the sort of sudden, unforeseen circumstances justifying an emergency declaration.

137.    In his Proclamation, the President claimed there is a "crisis" at our border that "threatens core national security interests and constitutes a national emergency," pointing specifically to his belief that "[t]he southern border is a major entry point for criminals, gang members, and illicit narcotics." Ex. A at 1.

138.    But even were this true, nothing the President identifies in his Proclamation constitutes an emergency, i.e., a sudden event or unforeseen change requiring immediate action. *See* EMERGENCY, Black's Law Dictionary (10th ed. 2014) (defining "emergency" as either "[a] sudden and serious event or an unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm" or **"**[a]n urgent need for relief or help"). As described above, unauthorized immigration at our southern border has declined dramatically over the past two decades, especially the type of border crossings—between ports of entry—that might be affected by a border wall. Even by the President's own admission, the supposed "problem" he identifies "is long-standing," not emergent. Ex. A at 1.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

139.    For the same reason, there is no basis for the President to claim any "urgent need for relief or help" at the border. In truth, as discussed above, the "facts" he has relied on to justify his claims of urgency have by and large been shown to be false or misleading at best.

140.    In short, President Trump's claims of changed circumstances are not true, and cannot justify his emergency declaration. Instead, it is clear—largely because the President said so—that the President's Proclamation was a tactic to obtain what Congress elected not to give him.

141.    The President's pretextual declaration of a national emergency cannot support his seizure of lawmaking powers that our Constitution reserves for Congress.

142.    Furthermore, even assuming there were an emergency, it is not one that "requires the use of the armed forces." The Proclamation merely asserts that "it is necessary for the Armed Forces to provide additional support to address the crisis" at the border. The President does not explain what "support" he claims the armed forces need to provide. This failure to identify any role for armed forces undermines the President's claim that armed forces are necessary.

143.    The failure to identify a role for the armed forces is particularly problematic because the armed forces are by and large prohibited from taking action to prevent migrants from crossing the border or detaining those who do cross.

144.    Under the Posse Comitatus Act, 18 U.S.C. § 1385, armed forces are prohibited from carrying out law enforcement functions, except where explicitly approved by Congress.

145.    Another statute, 10 U.S.C. § 275, directs the Secretary of Defense to "prescribe such regulations as may be necessary to ensure that any [military] activity (including the provision of any equipment or facility or the assignment or detail of any personnel) . . . does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law."

146.    Pursuant to the Posse Comitatus Act and Section 275, the Department of Defense has promulgated Directive 3025.21, which prohibits service members "from providing the following forms of direct civilian law enforcement assistance" unless specifically authorized by Congress:

a)  Interdiction of a vehicle, vessel, aircraft, or other similar activity.

b)  A search or seizure.

c)  An arrest; apprehension; stop and frisk; engaging in interviews, interrogations, canvassing, or questioning of potential witnesses or suspects; or similar activity.

d)  Using force or physical violence, brandishing a weapon, discharging or using a weapon, or threatening to discharge or use a weapon except in self-defense, in defense of other DoD persons in the vicinity, or in defense of non-DoD persons, including civilian law enforcement personnel, in the vicinity when directly related to an assigned activity or mission.

e)  Evidence collection; security functions; crowd and traffic control; and operating, manning, or staffing checkpoints.

f)  Surveillance or pursuit of individuals, vehicles, items, transactions, or physical locations, or acting as undercover agents, informants, investigators, or interrogators.

g)  Forensic investigations or other testing of evidence obtained from a suspect for use in a civilian law enforcement investigation in the United States unless there is a DoD nexus (e.g., the victim is a member of the Military Services or the crime occurred on an installation under exclusive DoD jurisdiction) or the responsible civilian law enforcement official requesting such testing declares in writing that the evidence to be examined was obtained by consent.

147.    No statute permits the armed forces to carry out law enforcement functions at the border. To the contrary, 6 U.S.C. § 211 explicitly provides that the U.S. Border Patrol—not the military—"shall serve as the law enforcement office of U.S. Customs and Border Protection with

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

33

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

primary responsibility for interdicting persons attempting to illegally enter or exit the United States or goods being illegally imported into or exported from the United States at a place other than a designated port of entry; deter and prevent the illegal entry of terrorists, terrorist weapons, persons, and contraband; and carry out other duties and powers prescribed by the Commissioner." (Numbering omitted.)

148.    Because the armed forces cannot legally be used to carry out law enforcement functions at the border, the troops deployed there since the 2018 mid-term election have been limited to non-military labor. Indeed, the Pentagon has repeatedly emphasized that "it's not a war zone along the border," the troops at the border "are not on emergency footing," and that "[n]one of the capabilities that [deployed troops] are providing are combat capabilities."[81] Only CBP personnel use "force protection, physical security and perform . . . law enforcement duties."[82]

149.    Thus, even were there an emergency at our Southern Border, there is no legitimate argument that it "requires the use of the armed forces."

### 2.    A Border Wall Is Not a Military Construction Project Within the Meaning of Section 2808.

150.    Section 2808 does not authorize the construction of a standalone border wall meant to assist U.S. Customs and Border Patrol. Instead, Section 2808 only authorizes the Secretary of Defense to undertake "military construction projects."

151.    Under the statute, "military construction" is defined as construction "carried out with respect to a military installation, whether to satisfy temporary or permanent requirements." 10 U.S.C. § 2801(a).[83] "Military installation," in turn, "means a base, camp, post, station, yard,

---

[81] Heather Timmons, *The US border situation isn't a national emergency, Pentagon officials tell Congress*, Quartz (Jan. 29, 2019), https://qz.com/1536879/trump-border-wall-isnt-an-emergency-pentagon-tells-congress/.

[82] Courtney Kube and Carol E. Lee, *Active-duty U.S. troops are now just feet away from migrants in Texas*, NBC News (July 25, 2019), https://www.nbcnews.com/politics/immigration/active-duty-u-s-troops-are-now-just-feet-away-n1034416.

[83] "Military construction" also includes "any acquisition of land or construction of a defense access road." 10 U.S.C. § 2801(a). Building a border wall clearly does not fit under either of these definitions.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF                    34                    ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   center, or other activity under the jurisdiction of the Secretary of a military department." 10

2   U.S.C. § 2801(c)(4).

3       152.   As one Court has already explained, "Defendants make no attempt to characterize

4   the U.S.-Mexico border or a border barrier as a 'base, camp, post, station, yard, [or] center.' Nor

5   could they." *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 920 (N.D. Cal. 2019).

6       153.   To validly invoke Section 2808, then, Defendants would need to show "that

7   border barrier construction is authorized under the catch-all term 'other activity.'" *Id.*

8       154.   Reviewing the statute as a whole, however, and applying ordinary canons of

9   statutory interpretation, it is clear that "nothing demonstrates that Congress ever contemplated

10  that 'other activity' has such an unbounded reading that it would authorize Defendants to invoke

11  Section 2808 to build a barrier on the southern border." *Id.* at 921.

12      155.   Section 2808 is thus limited to construction projects on or associated with military

13  bases, encampments, and the like. It does not permit the President to take funds away from these

14  purposes to build a massive border wall.

15      **3.    A Border Wall Is Not Necessary to Support the Use of Armed Forces.**

16      156.   Section 2808 permits "the Secretaries of the military departments to undertake

17  military construction projects" only when those projects "are necessary to support such use of

18  the armed forces."

19      157.   A massive border wall is not necessary to support the extremely limited use of

20  armed forces at our Southern Border. Instead, the Defendants' proposed new border wall

21  projects—like every other border wall project built pursuant to congressional authorization—are

22  civilian projects aimed at supporting Customs and Border Patrol's mission in policing the

23  Southern Border. *See* 6 U.S.C. § 211(e)(3) ("The U.S. Border Patrol shall . . . serve as the law

24  enforcement office of U.S. Customs and Border Protection" and "shall . . . deter and prevent the

25  illegal entry of . . . persons . . .").

26

158.    Indeed, in his Letter announcing the border wall projects, Secretary Esper specifically relies on law enforcement justification for the wall, claiming the wall will "deter illegal entry, increase the vanishing time of those illegally crossing the border, and channel migrants to ports of entry." Ex. C at 1. These are functions that the U.S. military does not, and as a matter of law cannot, undertake.

159.    Section 2808 does not permit the President or Secretary of Defense to authorize massive construction projects where, as here, they are not necessary to support the use of armed forces.

160.    For the foregoing reasons, the Defendants' proposed commandeering of $3.6 billion in Department of Defense construction funds is not permitted under 10 U.S.C. § 2808.

## V.     CAUSES OF ACTION

## COUNT I

## VIOLATION OF ARTICLE I, SECTION 7 OF THE U.S. CONSTITUTION

161.    Plaintiff realleges the foregoing allegations as if fully set forth herein.

162.    The President's Proclamation asserts an unprecedented power to seize $3.6 billion in federal funds that Congress has allocated for military construction, in order to build part of a border wall that Congress has consistently refused to authorize or fund. The Proclamation contravenes the constitutional process for making federal law and violates core notions of separation of powers.

163.    Article I, Section 1 of the United States Constitution vests "[a]ll legislative Powers . . . in a Congress of the United States."

164.    Under Article 1, Section 7, bills, including appropriations bills, can become law only with majority votes of both chambers of Congress and the signature of the President, or, if the President vetoes a bill, through a two-thirds majority vote of each chamber of Congress. Article I, Section 7 of the Constitution provides "a single, finely wrought and exhaustively

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

36

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

considered, procedure" through which "the legislative power of the Federal government [may] be exercised." I.N.S. v. Chadha, 462 U.S. 919, 951 (1983).

165.    Pursuant to Article I, Section 7, Congress passed the McCain NDAA, and it was signed into law by President Trump.

166.    Congress has not authorized the President's proposed seizure of funds or construction of a border wall pursuant to Article 1, Section 7. To the contrary, in the Consolidated Appropriations Act, 2019, Congress has explicitly limited Defendants' authority to build a border wall.

167.    Nonetheless, the President has directed the Secretary of Defense to seize, and the Secretary of Defense has attempted to seize, $3.6 billion for a border wall Congress has consistently refused to authorize or fund.

168.    Defendants' proposed seizure of duly-appropriated military construction funding to build a border wall is not authorized by any statute on which Defendants purports to rely. Specifically, the President has failed to meet the standard for declaring a national emergency under 50 U.S.C. § 1621 and 10 U.S.C. § 2808, and Defendants have failed to meet the standard for authorizing or reprogramming military construction funding under 10 U.S.C. § 2808.

169.    As a result, the President's Proclamation and Defendant Esper's Letter diverting funds in contravention of Congress' constitutional lawmaking power are unlawful and unconstitutional.

170.    For these reasons, the State of Washington is entitled to a declaration under 28 U.S.C. § 2201, that the Proclamation is invalid, that the Defendants' purported redirection of congressionally appropriated funds is invalid, and that the McCain NDAA, authorizing the appropriation of funds for the Bangor Pier and Maintenance Facility, remains valid law.

171.    Additionally, the State of Washington is entitled to an injunction under 28 U.S.C. § 1651 to forbid Defendants from redirecting funds as demanded by the President's unlawful and unconstitutional Proclamation.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

37

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

## COUNT II

### VIOLATION OF ARTICLE I, SECTION 9 OF THE U.S. CONSTITUTION

172.    Plaintiff realleges the foregoing allegations as if fully set forth herein.

173.    Article I, Section 9 of the U.S. Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."

174.    In the Consolidated Appropriations Act, 2019, Congress appropriated $1.375 billion to build border fencing only in the Rio Grande Valley Sector, subject to certain restrictions. Pub. Law. No. 116-6, §§ 230–232 (2019).

175.    Congress has not authorized Defendants to spend $3.6 billion in military construction funds to build hundreds of miles of additional wall at the southern border.

176.    Defendants have failed to meet the standard for any statute that might authorize them to reprogram funds in contravention of Congress' appropriations, including 10 U.S.C. § 2808.

177.    As a result, Defendants' efforts to seize funds that were never appropriated by Congress are unlawful and unconstitutional.

178.    For these reasons, the State of Washington is entitled to a declaration under 28 U.S.C. § 2201, that the Proclamation is invalid, that the Defendants' purported redirection of congressionally appropriated funds is invalid, and that the McCain NDAA, authorizing the appropriation of funds for the Bangor Pier and Maintenance Facility, remains valid law.

179.    Additionally, the State of Washington is entitled to an injunction under 28 U.S.C. § 1651 to forbid Defendants from redirecting funds as demanded by the President's unlawful and unconstitutional Proclamation.

## COUNT III

### VIOLATION OF THE NONDELEGATION DOCTRINE

180.    Plaintiff realleges the foregoing allegations as if fully set forth herein.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

38

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

181.    The President has repeatedly claimed he has the "absolute right" to declare a national emergency and thereby arrogate legislative powers to the Executive Branch, including the powers to appropriate funds and authorize enormous civilian construction projects.

182.    For the reasons discussed above, the President is incorrect.

183.    But if the President were correct that the National Emergencies Act gives him the absolute right to declare a national emergency and access certain legislative powers, the Act would be unconstitutional under the Nondelegation Doctrine.

184.    "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." Mistretta v. United States, 488 U.S. 361, 371 (1989). Article I, Section 1 of the U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." "'[T]he integrity and maintenance of the system of government ordained by the Constitution' mandate that Congress generally cannot delegate its legislative power to another Branch." Mistretta, 488 U.S. at 371–72 (quoting Field v. Clark, 143 U.S. 649, 692 (1892)).

185.    If 50 U.S.C. § 1621 grants the President "virtually unfettered" discretion to "enact[] laws," such as funding a wall that Congress has repeatedly refused to fund, the statutes would mark "an unconstitutional delegation of legislative power." A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 542 (1935).

186.    In that event, the State of Washington would be entitled to a declaration under 28 U.S.C. § 2201, that 50 U.S.C. § 1621 is unconstitutional, that the Proclamation relying on this statute is invalid, that the Defendants' purported redirection of congressionally appropriated funds pursuant to the Proclamation is invalid, and that the McCain NDAA, authorizing the appropriation of funds for the Bangor Pier and Maintenance Facility, remains valid law, as well as an injunction forbidding Defendants from redirecting funds in violation of the Nondelegation Doctrine.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

39

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

**COUNT IV**

**VIOLATION OF ARTICLE II, SECTION 3 OF THE U.S. CONSTITUTION**

187.    Plaintiff realleges the foregoing allegations as if fully set forth herein.

188.    Article II, Section 3 of the U.S. Constitution provides that the President "shall take Care that the Laws be faithfully executed[.]"

189.    Among other things, the Take Care Clause forbids the President from unilaterally canceling congressional appropriations or suspending provisions of duly-enacted statutes.

190.    By passing the McCain NDAA, Congress authorized the appropriation of $88.96 million to Washington State for the construction of the Bangor Pier and Maintenance Facility.

191.    Likewise, in the Consolidated Appropriations Act, 2019, Congress appropriated only $1.375 billion to construct a border wall, and that construction would be limited to the Rio Grande Valley Sector.

192.    As discussed above, none of the statutes on which the President's Proclamation relies authorize him to redirect duly-appropriated funds to build a wall that Congress refused to fund or authorize.

193.    For these reasons, the State of Washington is entitled to a declaration under 28 U.S.C. § 2201, that the Proclamation is invalid, that the Defendants' purported redirection of congressionally appropriated funds is invalid, and that the McCain NDAA, authorizing the appropriation of funds for the Bangor Pier and Maintenance Facility, remains valid law.

194.    Additionally, the State of Washington is entitled to an injunction under 28 U.S.C. § 1651 to forbid Defendants from redirecting funds as demanded by the President's illegal and unconstitutional Proclamation.

**COUNT V**

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**

195.    Plaintiff realleges the foregoing allegations as if fully set forth herein.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

40

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

196.    Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," that is "contrary to constitutional right[ or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

197.    For the reasons described herein, any implementation by Defendants of the President's Proclamation is contrary to and in excess of authority and limitations in the U.S. Constitution, 50 U.S.C. § 1621, and 10 U.S.C. § 2808. It would also violate the Anti-Deficiency Act, which prohibits "officer[s] or employee[s] of the United States Government" from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation . . . for the expenditure or obligation" and "involv[ing] [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S. Code § 1341. Additionally, it is arbitrary and capricious because, as discussed above, the President's national emergency declaration is pretextual. Moreover, it is arbitrary and capricious because, as discussed above, there is no rational nexus between the harms alleged by Defendants and the construction of a border wall.

198.    As such, the State of Washington is entitled to a declaration that any action taken pursuant to the Proclamation is invalid, and an injunction prohibiting Defendants from implementing the Proclamation or otherwise reprogramming funds under Section 2808. Absent such relief, the State and its residents will continue to be harmed by Defendants' illegal actions.

## VI.    PRAYER FOR RELIEF

WHEREFORE, the State of Washington requests that the Court enter a judgment against Defendants and award the following relief:

199.    A declaration that the Proclamation is invalid, that the Defendants' purported redirection of congressionally appropriated funds is invalid, and that the McCain NDAA, committing funds to the Bangor Pier and Maintenance Facility, remains valid law;

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

41

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    200.    An injunction prohibiting Defendants from diverting funds appropriated by

2    Congress for military construction projects towards construction of a border wall.

3    201.    Award the State of Washington its costs and reasonable attorneys' fees; and

4    202.    Award such additional relief as the interests of justice may require.

5    DATED this 19th day of September, 2019.

6                                         ROBERT W. FERGUSON
                                          Attorney General
7

8                                         */s/ Andrew R.W. Hughes*
                                          MARTHA RODRIGUEZ LOPEZ, WSBA #35466
9                                         ANDREW R.W. HUGHES, WSBA #49515
                                          BRENDAN SELBY, WSBA #55325
10                                        Assistant Attorneys General
                                          TERA HEINTZ*, WSBA #54921
11                                        Deputy Solicitor General
                                          *Application for Admission Forthcoming
12                                        *Attorneys for Plaintiff*

13

14

15

16

17

18

19

20

21

22

23

24

25

26