**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

STATE OF WASHINGTON,

               Plaintiff,

   v.

DONALD J. TRUMP, *et al.*

               Defendants.

No.   2:19-cv-01502-BJR

PLAINTIFF STATE OF
WASHINGTON'S MOTION FOR
SUMMARY JUDGMENT

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................... 1

II.   BACKGROUND ..................................................................................................... 2

      A.   Congress Refuses to Fund Construction of a Border Wall. ....................... 2

      B.   President Trump Threatens to Declare a National Emergency as Leverage
           Against Congress. ..................................................................................... 4

      C.   When Congress Refuses to Fund President Trump's Wall, He Declares a
           National Emergency. .................................................................................. 5

      D.   Pursuant to the President's Proclamation, Defendants Divert Military
           Construction Funding from Washington, Resulting in Significant Economic
           Harm. ......................................................................................................... 7

III.  ARGUMENT ......................................................................................................... 9

      A.   Summary Judgment Standard. .................................................................. 9

      B.   Defendants' Diversion of Military Construction Funds Harms Washington. .......... 9

      C.   Defendants' Efforts to Reprogram Billions of Dollars in Military Construction
           Funding Violate the Administrative Procedure Act. ................................... 11

           1.   10 U.S.C. § 2808 does not permit Defendants to build a border wall ............. 11

           2.   Defendants' proposed seizure of funds violates the Consolidated
                Appropriations Act. ......................................................................... 18

           3.   Defendants violated the APA by entirely failing to weigh the impact of
                cancelling projects like the Bangor Project. ..................................... 21

      D.   Defendants' Efforts to Usurp Congress' Lawmaking and Appropriations
           Power Violate Article I of the Constitution. .............................................. 23

           1.   Defendants' actions violate the Appropriations and Presentment Clauses. ..... 23

           2.   Defendants' seizure of $3.6 billion, in defiance of Congress' will, is not
                authorized by any statute. ............................................................... 25

      E.   This Court Should Enjoin Defendants' Unlawful Conduct. ....................... 27

           1.   Defunding military construction projects will cause unrecoverable losses. .... 27

           2.   No remedy short of injunction can prevent Washington's irreparable
                harms. ............................................................................................ 28

3.   The balance of equities and the public interest favor injunctive relief, rather than letting Defendants' unlawful power grab take effect. .................... 29

4.   The court should enjoin any further use or obligation of the $3.6 billion pool of funds seized by Defendants. ............................................. 29

IV.   CONCLUSION ......................................................................................... 30

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

iii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

Congress has repeatedly refused to fund the President's border wall. But the President declared an "emergency" to circumvent Congress and take the money anyway. Seven months later, the Department of Defense announced the seizure of $3.6 billion in congressional appropriations, including $88.96 million for a naval construction project in Washington. Defendants' actions violate the Administrative Procedure Act for at least three separate reasons.

*First*, Defendants' actions are "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A), (C), because 10 U.S.C. § 2808, the statute Defendants cite for the authority to seize congressionally appropriated funds, is not the blank check Defendants contend. The statute is narrowly written to permit the reprogramming of military funds only for "military construction projects"—that is, projects connected to "a base, camp, post, station, yard, center, or other activity"—"that are necessary to support [the] use of the armed forces." 10 U.S.C. § 2801, 2808. Section 2808 does not permit Defendants to build a wall, unconnected to any military installation, for the law-enforcement purpose of deterring migrants.

*Second*, Defendants' actions are barred by the Consolidated Appropriations Act, 2019 (CAA). Pub. Law. No. 116-6 (2019). Enacted after a protracted government shutdown over the President's funding demands, the Act limits the amount of Treasury funds that can be spent on border wall construction to $1.375 billion for 55 miles of new fencing in Texas' Rio Grande Valley. *Id.* at § 230. To prevent exactly the sort of end-run Defendants are attempting here, Section 739 of the CAA expressly forbids Defendants from going outside the appropriations process to increase funding for projects like the border wall. *Id.* at § 739. Defendants' effort to circumvent these limitations on congressional appropriations is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

*Third*, the Administrative Record (AR) shows that Defendants have acted arbitrarily and capriciously by defunding dozens of congressionally approved military construction projects

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

without meaningfully considering the effect of these cancellations on military preparedness. These projects are supported by detailed statements of need prepared by the military departments and considered by Congress in its funding decisions. Defendants entirely ignore the costs of cancelling these important projects, and thus abuse their discretion.

Defendants' actions also violate the Constitution. Congress alone has the power of the purse, and the President is required to "faithfully execute" congressional appropriations statutes. U.S. Const. Art. I, §§ 7, 9; Art. II, § 3. The President may not seize appropriations power for himself merely because he disagrees with Congress' policy preferences.

For any or all of these reasons, the Court should halt Defendants' unlawful actions and forbid the Administration from seizing military construction funds in violation of congressional and Constitutional authority.

## II.     BACKGROUND

### A.     Congress Refuses to Fund Construction of a Border Wall.

For over two and a half years, Congress has steadfastly refused to appropriate funds for new construction of the border wall envisioned by the President. For the very first spending bill of his Administration, the President demanded wall funding, but, facing the prospect of a shutdown, Congress elected to pass a short-term continuing resolution instead with no such funding, which the President signed into law.[1] A month later, in May 2017, Congress again rejected the President's demands for border wall funding and passed a $1.1 trillion omnibus spending package to fund the government through September 2017, without border wall funding.[2] In September 2017, shortly after the President threatened "to close down our

---

[1] Philip Elliot, *President Trump Open to Kicking Border Wall Fight to Fall*, TIME (April 25, 2017), http://time.com/4753623/trump-100-days-border-wall-fall/; Manu Raju, *Hill Republicans revolt over Trump's plans to build border wall*, CNN (Feb. 6, 2017), https://www.cnn.com/2017/02/03/politics/border-wall-republicans/.; Erin Kelly, *Congress passes short-term funding bill to avoid government shutdown*, USA TODAY (April 28, 2017), https://www.usatoday.com/story/news/politics/2017/04/28/house-passes-short-term-funding-bill-avoid-shutdown-senate-expected-follow-suit/101018580/.

[2] Ryan McCrimmon and Jennifer Shutt, *Omnibus Agreement Details $1 Trillion in FY 2017 Spending*, ROLL CALL (May 1, 2017), https://www.rollcall.com/news/politics/omnibus-spending-bill-budget-trump-agenda.

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

government" if Congress refused to fund his wall, Congress again passed a continuing resolution without wall funding.[3] In December 2017, Congress passed two short-term spending bills to avert a government shutdown, neither of which included border wall funding.[4] In January 2018, disputes over whether to fund a border wall led to a short government shutdown, but Congress ultimately passed another continuing resolution without border wall funds.[5] In March 2018, Congress passed an omnibus spending bill that included $892 million for new border fencing, but specifically limited the use of those funds to designated "fencing" in San Diego and Texas. Consolidated Appropriations Act, 2018, Pub. Law. No. 115-141, 132 Stat 3481, § 230 (2018). In July 2018, President Trump again threatened a government shutdown over border wall funding.[6] But he eventually signed a continuing resolution without such funding.[7]

Between these budget fights, Congress repeatedly rejected bills to fund the President's wall. In 2017 and 2018, Congress considered and rejected at least *ten* additional bills to fund President Trump's wall.[8]

---

[3] Sarah Kimmorley and Paul Colgan, *TRUMP: 'If we have to close down our government, we're building that wall'*, BUSINESS INSIDER (Aug. 23, 2017), https://www.businessinsider.com.au/trump-government-shutdown-border-wall-2017-8#EkG8kv3aBDkdlFZt.99.; Leigh Ann Caldwell and Alex Moe, *Trump Signs Disaster Aid, and His Deal With Dems, Into Law*, NBC NEWS (Sept. 8, 2017), https://www.nbcnews.com/politics/congress/house-passes-disaster-relief-sending-trump-sign-n799796.

[4] Richard Cowan and Roberta Rampton, *Trump Signs Temporary Spending Bill as Budget Talks Intensify*, REUTERS (Dec. 8, 2017), https://www.reuters.com/article/us-usa-congress-shutdown/trump-signs-temporary-spending-bill-as-budget-talks-intensify-idUSKBN1E22B6; Mike DeBonis and Erica Werner, *Senate passes stopgap spending bill, allowing Congress to avert partial government shutdown*, THE WASHINGTON POST (Dec. 21, 2017), https://www.washingtonpost.com/powerpost/after-passing-tax-overhaul-gop-returns-to-infighting-as-shutdown-deadline-looms/2017/12/21/dfad1890-e659-11e7-ab50-621fe0588340_story.html.

[5] Erin Kelly and Eliza Collins, *The government shuts down after Senate blocks short-term spending bill*, USA TODAY (Jan. 19, 2018), https://www.usatoday.com/story/news/politics/2018/01/19/senate-blocks-bill-avoid-shutdown-mcconnell-scrambles-last-ditch-deal-democrats/1049878001; Sheryl Gay Stolberg and Thomas Kaplan, *Government Shutdown Ends After 3 Days of Recriminations*, THE NEW YORK TIMES (Jan. 22, 2018), https://www.nytimes.com/2018/01/22/us/politics/congress-votes-to-end-government-shutdown.html.

[6] Donald Trump (@realDonaldTrump), TWITTER (July 29, 2018 6:13 AM PST), https://twitter.com/realDonaldTrump/status/1023557246628900864 ("I would be willing to 'shut down' government if the Democrats do not give us the votes for Border Security, which includes the Wall! Must get rid of Lottery, Catch & Release etc. and finally go to system of Immigration based on MERIT! We need great people coming into our Country!").

[7] Tucker Higgins and Jacob Pramuk, *Trump signs spending bill to avoid government shutdown, despite frustrations over border wall* funding, CNBC (Sept. 28, 2018), https://www.cnbc.com/2018/09/28/trump-signs-spending-bill-to-avert-shutdown-despite-border-wall-frustration.html.

[8] Further Additional Continuing Appropriations, 2019, H.R. 695, 115th Cong. (2018); The WALL Act of 2018, S. 3713, 115th Cong. (2018); 50 Votes for the Wall Act. H.R. 7073, 115th Cong. (2018); Build the Wall,

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

After the November 2018 election, President Trump again threatened to shut down the government over the border wall, but Congress again declined the President's request.[9] With the parties unable to agree on a proposal to continue funding the government, a partial government shutdown began at 12 a.m. on December 22, 2018.[10]

**B.    President Trump Threatens to Declare a National Emergency as Leverage Against Congress.**

In the lead-up to the shutdown, President Trump began to use the threat of a national emergency declaration as a bargaining chip with Congress, and when the shutdown began, his threats only escalated. For example:

- December 11, 2018: "If the Democrats do not give us the votes to secure our Country, the Military will build the remaining sections of the Wall."[11] And: "If we don't get what we want one way or the other, whether it's through you, through a military, through anything you want to call, I will shut down the government, absolutely."[12]

- January 4, 2019: "[W]e can call a national emergency and build [the border wall] very quickly. And it's another way of doing it. But if we can do it through a negotiated process, we're giving that a shot."[13]

---

Enforce the Law Act of 2018, H.R. 7059, 115th Cong. (2018); Fund and Complete the Border Wall Act, H.R. 6657, 115th Cong. (2018); American Border Act, H.R. 6415, 115th Cong. (2018); Border Security and Immigration Reform Act of 2018, H.R. 6136, 115th Cong. (2018); Securing America's Future Act of 2018, H.R. 4760, 115th Cong. (2018); Border Security and Deferred Action Recipient Relief Act, S. 2199, 115th Cong. (2017); Make America Secure Appropriations Act, H.R. 3219, 115th Cong. (2017).

[9] Matthew Daly and Catherine Lucey, *Trump threatens shutdown in wild encounter with Democrats*, AP (Dec. 11, 2018), https://apnews.com/9518d24c6bbe41238b8c82f092393284.

[10] Lisa Mascaro, *Federal shutdown begins after lawmakers fail to reach deal*, AP (Dec. 21, 2018), https://apnews.com/1ccfe0de023c4ef986a396707e4d83ac.

[11] Donald Trump (@realDonaldTrump), TWITTER (Dec. 11, 2018 4:42 AM PST), https://twitter.com/realDonaldTrump/status/1072471575956504576 ("…People do not yet realize how much of the Wall, including really effective renovation, has already been built. If the Democrats do not give us the votes to secure our Country, the Military will build the remaining sections of the Wall. They know how important it is!").

[12] Aaron Blake, *Trump's extraordinary Oval Office squabble with Chuck Schumer and Nancy Pelosi, annotated*, THE WASHINGTON POST (Dec. 11, 2018), https://www.washingtonpost.com/politics/2018/12/11/trumps-extraordinary-oval-office-squabble-with-chuck-schumer-nancy-pelosi-annotated/.

[13] Remarks by President Trump During Roundtable Discussion with State, Local, and Community Leaders on Border Security and Safe Communities (Jan. 12, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-congressional-leadership-border-security/.

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

- January 6: Referring to ongoing congressional negotiations, the President told reporters he "may declare a national emergency dependent on what's going to happen over the next few days."[14]

- January 9: After an unsuccessful meeting with congressional leaders, he told reporters he had the "absolute right to do national emergency if I want," and if he and Congress didn't "work a deal" to fund a wall, he "may go that route."[15]

- January 10: President Trump said that if he and Congress "don't make a deal, I would say it would be very surprising to me that I would not declare a national emergency and just fund it through the various mechanisms."[16]

- January 11: The President described an emergency declaration as "the easy way out" of his dispute with Congress. In the same remarks, he said: "Congress should do this. . . . If they can't do it, I will declare a national emergency."[17]

**C. When Congress Refuses to Fund President Trump's Wall, He Declares a National Emergency.**

On January 25, 2019, following the longest government shutdown in U.S. history, the President announced he would support a bill to end the shutdown on one condition: Congress had to agree to appropriate $5.7 billion for his wall within the next 21 days or he would resort to another shutdown or a national emergency declaration.[18]

Even as a bipartisan committee sought to negotiate a compromise, the President continued to threaten an emergency declaration.[19] Ultimately, the committee agreed on a

---

[14] Eli Watkins, *Trump: 'May declare a national emergency' to build wall*, CNN (Jan. 7, 2019), https://www.cnn.com/2019/01/06/politics/adam-schiff-trump-wall-cnntv/index.html.

[15] Richard Cowan and Alexandra Alper, *Trump storms out of talks on shutdown, bemoans 'total waste of time'*, YAHOO!NEWS (Jan. 9, 2019), https://news.yahoo.com/u-house-democrats-test-republicans-trump-wall-demand-060836458--business.html; Remarks by President Trump in Signing Ceremony for S. 1862, the "Trafficking Victims Protection Reauthorization Act" (Jan. 9, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-signing-ceremony-s-1862-trafficking-victims-protection-reauthorization-act/.

[16] Remarks by President Trump Before Marine One Departure (Jan. 10, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-30/.

[17] Remarks by President Trump During Roundtable Discussion with State, Local, and Community Leaders on Border Security and Safe Communities (Jan. 12, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-roundtable-discussion-state-local-community-leaders-border-security-safe-communities/.

[18] Remarks by President Trump on the Government Shutdown (Jan. 25, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-government-shutdown/.

[19] Erica Werner, Seung Kim and John Wagner, *Trump predicts failure by congressional committee charged with resolving border stalemate*, THE WASHINGTON POST (Jan. 31, 2019), https://www.washingtonpost.com/politics/trump-cites-an-increase-in-mexicos-murder-rate-as-he-insists-a-border-

5

comprehensive bill to continue funding the government while improving border security: the Consolidated Appropriations Act, 2019 (CAA). Pub. Law. No. 116-6, 133 Stat 13 (2019). The CAA contains several provisions reflecting Congress' considered approach to border security, including funding for new Border Patrol officers, surveillance technology, and strengthened ports of entry. The bill also includes $1.375 billion for 55 miles of new fencing in Texas' Rio Grande Valley. *Id.* at § 230.[20] This funding came with conditions, however, including prohibitions on its use in certain areas and for certain designs, and a requirement that the Department of Homeland Security consult with local officials before construction. *Id.* at § 230– 232. Additionally, Section 739 of the CAA prohibits the executive branch from "increas[ing] … funding for a program, project, or activity as proposed in the President's budget request," such as a border wall, "until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act." *Id.* at § 739.

Not satisfied with Congress' funding decision, on February 15, 2019, the President issued a "Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States." Proclamation 9844 (Feb. 15, 2019), 84 FR 4949 (Proclamation). The Proclamation described the "emergency" as follows:

> The southern border is a major entry point for criminals, gang members, and illicit narcotics. The problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years. In particular, recent years have seen sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending. If not detained, such aliens are often released into the country and are often difficult to remove from the United States because they fail to appear for

wall-will-be-built/2019/01/31/8f3d2f5a-2549-11e9-ad53-824486280311_story.html; Rebecca Morin, *Trump on national emergency: 'There's a good chance we'll have to do that'*, POLITICO (Feb. 1, 2019), https://www.politico.com/story/2019/02/01/trump-national-emergency-border-wall-1143364; Remarks by President Trump in Cabinet Meeting (Jan. 2, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-cabinet-meeting-13.

[20] The Rio Grande Valley contains DHS' highest-priority requests for barrier construction. Dkt. # 9-2 at p. 8.

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

hearings, do not comply with orders of removal, or are otherwise difficult to locate.

The Proclamation purported to invoke the power to redirect military construction funds, pursuant to 10 U.S.C. § 2808 (Section 2808). Although the Proclamation is vague, its intent is clear: to circumvent the congressional appropriations process. The President admitted as much in announcing it:

> Look, I went through Congress. I made a deal. I got almost $1.4 billion when I wasn't supposed to get one dollar — not one dollar. . . . So I did — I was successful, in that sense, but I want to do it faster. ***I could do the wall over a longer period of time. I didn't need to do this. But I'd rather do it much faster.***[21]

## D. Pursuant to the President's Proclamation, Defendants Divert Military Construction Funding from Washington, Resulting in Significant Economic Harm.

On September 3, 2019, Defense Secretary Mark Esper circulated a letter (Letter) to Congress giving notice that, pursuant to the Proclamation, he had "authorized and directed the Acting Secretary of the Army to undertake [11 Border Wall projects]," using "up to $3.6 billion in unobligated military construction funds."[22] The following day, the Department of Defense (DoD) released a list of 127 congressionally authorized projects for which funding will be reprogrammed under Section 2808.[23] The list includes a pier and maintenance facility at the Naval Submarine Base Bangor (Bangor), for which Congress appropriated $88.96 million.

Bangor is part of Naval Base Kitsap on the Kitsap Peninsula. It is home to the U.S. Pacific Fleet of Trident Ballistic Missile submarines.[24] As of September 30, 2017, the base had over 9,000 personnel, including over 6,200 enlisted personnel and over 600 officers.[25] When that

---

[21] Background Press Call on President Trump's Remarks on the National Security and Humanitarian Crisis on Our Southern Border (Feb. 15, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-security-humanitarian-crisis-southern-border/ (emphasis added).

[22] Dkt. #9-2 at p. 16-17.

[23] Dkt. 9-3 at p. 16.

[24] Department of the Navy Fiscal Year (FY) 2019 Budget Estimates: Justification of Estimates at 194—95, https://www.secnav.navy.mil/fmc/fmb/Documents/19pres/MCON_Book.pdf, excerpts attached as Exhibit A to the Declaration of Andrew Hughes (Hughes Decl.).

[25] *Id.* at 191

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

number is expanded to include indirect workers, the figure is approximately 45,532.[26] The Navy states that "[Naval Base Kitsap] and its supported commands produce substantial economic benefits to its surrounding communities."[27] It estimates $129 million in state and local tax revenues annually, and a total contribution to the regional economy of around $4 billion.[28]

Congress authorized funding for the pier and maintenance facility (Bangor Project) as part of the John S. McCain National Defense Authorization Act (McCain NDAA) to address key deficiencies at this strategically important base. Public Law No. 115-232, Sec. 2201 (08/13/2018). The project includes a pier for two 250-foot blocking vessels, a boat shop capable of supporting 30 vessels, a fueling station, and a fuel storage tank. According to the Navy these "[f]acilities are required to support the Maritime Force Protection Unit (MFPU) Bangor's operational mission to provide security escort for submarines" as they move between base and dive points. "This mission supports the stand-up of the Nuclear Weapons Security (NWS) Program mission as mandated by National Security Presidential Directive and Instructions."[29]

According to the Navy, Bangor no longer has "adequate facilities to support the [Transit Protection Service] mission." The current lack of pier space requires vessels to shift berths extensively and sailors to spend unnecessary days away from home. Fueling for small vessels is currently provided by a converted barge, which was meant to be temporary, due to its high operating costs and heightened risk of oil spills. The Navy has said that, without the Bangor Project, "[f]ull operational capability of the Transit Protection Mission cannot be executed." The lack of maintenance space in particular "jeopardizes the readiness conditions of escort vessels." The Bangor Project was expected to be contracted in March 2019 and completed by February

---

[26] *About Us*, CNIC NAVAL BASE KITSAP, https://www.cnic.navy.mil/regions/cnrnw/installations/navbase_kitsap/about.html (last accessed October 23, 2019).

[27] *Welcome to Naval Base Kitsap*, CNIC NAVAL BASE KITSAP, https://www.cnic.navy.mil/regions/cnrnw/installations/navbase_kitsap.html (last accessed October 23, 2019).

[28] Hughes Decl., Ex. B.

[29] Hughes Decl., Ex. A at 195.

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    2021.[30] It is now effectively cancelled.

2        If funding for the Bangor Project is not restored, the Washington State Department of

3 Revenue estimates that the State will lose over $2.6 million in direct tax revenues, with local

4 governments losing an additional $880,000. Declaration of Kathy Oline at ¶¶ 19, 22. These

5 losses do not include indirect economic, environmental, and security benefits from the project.

6        On September 19, 2019, Washington filed suit to enjoin Defendants' seizure of military

7 construction funds. Defendants agreed not to obligate the $88.96 million appropriated by

8 Congress for the Bangor project until February 1, 2020. Dkt. #10. To avoid the irreparable harm

9 that Defendants' conduct will cause, Washington now asks this Court to permanently enjoin

10 Defendants' unlawful and unconstitutional efforts to circumvent Congress.

11 **III.     ARGUMENT**

12 **A.     Summary Judgment Standard.**

13        "[S]ummary judgment is appropriate when 'there is no genuine dispute as to any material

14 fact and the movant is entitled to judgment as a matter of law.'" *Albino v. Baca,* 747 F.3d 1162,

15 1168 (9th Cir. 2014) (*en banc*) (quoting Fed. R. Civ. P. 56(a)). Where, as here, the material facts

16 are not genuinely in dispute and the questions before the Court are purely legal, the Court can

17 resolve APA challenges on summary judgment. *King County v. Azar*, 320 F. Supp. 3d 1167,

18 1171 (W.D. Wash. 2018), *appeal dismissed*, 2018 WL 5310765 (9th Cir. Sept. 20, 2018) (citing

19 *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010)). Similarly,

20 questions of statutory and Constitutional interpretation are questions of law, which may properly

21 be resolved at summary judgment. *See Union Station Associates, LLC. v. Puget Sound Energy,*

22 *Inc.*, 238 F. Supp. 2d 1226, 1229 (W.D. Wash. 2002).

23 **B.     Defendants' Diversion of Military Construction Funds Harms Washington.**

24        To have standing, a plaintiff must show (1) an "injury in fact" that is concrete and

25 particularized; (2) that the injury is fairly traceable to the challenged action; and (3) that the

26           [30] *Id.* at 196–97.

PLAINTIFF'S MOTION                 9            ATTORNEY GENERAL OF WASHINGTON
FOR SUMMARY JUDGMENT                           Complex Litigation Division
2:19-cv-01502-BJR                               800 5th Avenue, Suite 2000
                                               Seattle, WA 98104-3188
                                                 (206) 474-7744

injury will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). In establishing standing, states "are not normal litigants" and are "entitled to special solicitude." *Massachusetts v. EPA*, 549 U.S. 497, 518, 520 (2007).

Washington need not show an economic injury that is discrete and quantifiable, but need only establish "a sufficient likelihood of economic injury." *Clinton v. City of New York*, 524 U.S. 417, 432 (1998); *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1198 (9th Cir. 2004) (holding that lost property and sales tax revenues caused by increased traffic established standing). Here, Washington suffers two distinct proprietary harms: (1) the loss of a federal construction project, and (2) the loss of tax revenues directly traceable to that project.

The loss of the Bangor Project, by itself, is sufficient injury to give Washington standing. The loss of direct benefits from the federal government is among the clearest injuries a state can allege. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 161 (1981). Before Defendants' intervention, Washington was set to receive a significant federal benefit—the Bangor Project. Now it no longer will. This clear injury suffices to establish Washington's standing.

Washington is also harmed by the loss of tax revenues flowing from Defendants' cancellation of the Bangor Project. States may establish standing by showing "a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992); *see Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 110–11 (1979) (holding municipality had standing to challenge realtors' steering practices based on diminished tax base from reduction in property values); *Sausalito*, 386 F.3d at 1199 (holding municipality had standing where it "allege[d] that the aesthetic damage" caused by defendant's actions "will erode its tax revenue"); *see also City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015) ("An expected loss of tax revenue can constitute a sufficient injury for purposes of Article III standing."). Washington will lose around $2.6 million in tax revenues directly associated with the Bangor Project if the seized funds are obligated by Defendants to build a border wall, and local governments will lose an additional $880,000. Oline Decl., ¶¶ 19, 22. This injury suffices to establish Washington's standing. *See El*

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Paso Cty. v. Trump*, EP-19-CV-66-DB, 2019 WL 5092396, at *8 (W.D. Tex. Oct. 11, 2019) (holding that El Paso County, Texas, had standing to challenge Proclamation based on impending loss of funds appropriated for nearby Fort Bliss and associated economic benefits).

Causation and redressability are beyond reasonable dispute. Defendants' misappropriation of military construction funding directly deprives the State of the Bangor Project and its attendant benefits, including the state and local tax revenues the project would have generated. The Court has the power to redress these harms. Invalidating the Proclamation and/or enjoining the Defendants' use of the funds for a border wall would restore the status quo, allowing the Bangor Project to remain on track, with all the attendant benefits to Washington. *See, e.g.*, *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2010) (holding restoration of status quo establishes causation and redressability elements of standing).

## C. Defendants' Efforts to Reprogram Billions of Dollars in Military Construction Funding Violate the Administrative Procedure Act.

Under the Administrative Procedure Act, a court "shall . . . hold unlawful and set aside agency action" that is "arbitrary[ and] capricious," "not in accordance with the law" or that is "in excess of statutory . . . authority . . . or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Defendants' proposed seizure of funds violates the APA for at least three independent reasons, as discussed below.

### 1. 10 U.S.C. § 2808 does not permit Defendants to build a border wall.

Defendants seizure of funds is "in excess of statutory . . . authority" and "short of statutory right" because 10 U.S.C. § 2808 does not give Defendants the power to reprogram $3.6 billion in military construction funding to build a border wall. In the event of a national emergency "that requires use of the armed forces," Section 2808 authorizes the Secretary of Defense to "undertake military construction projects, and [] authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law." The Secretary may only divert funds for "military construction projects . . . that are

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

necessary to support [the] use of the armed forces." Section 2808 does not authorize construction of a border wall, unconnected to military installations, for civil law enforcement purposes.

### a. A border wall is not a "military construction" project under 10 U.S.C. § 2808.

"Military construction" is statutorily defined as construction "carried out with respect to a military installation." 10 U.S.C. § 2801(a).[31] "Military installation," in turn, "means a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department." 10 U.S.C. § 2801(c)(4). Section 2808 is thus limited to construction projects on or associated with military bases, encampments, and the like. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) ("[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.") (quotation omitted).

Defendants make no attempt to connect the border wall to any military installation, with the exception of two projects on the Barry M. Goldwater Range, a live fire aircraft range in Arizona. *See* Hughes Decl., Ex. C, ¶ 10. Nor could they. *First*, the projects on the Goldwater Range are not construction "with respect to" a military installation, because a standalone wall has no functional relation to a live fire range. *See Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 502 (9th Cir. 2005) (the phrase "with respect to" requires more than an "indirect, remote, and tenuous" connection). Rather, Defendants admit that the purpose of the wall is to deter migrants. *See, e.g.*, Dkt. #9-1 at pp. 1, 4, 9. *Second*, there is no plausible argument that any of the other projects has any connection to an existing military installation. For example, Yuma Project 3 includes the southern end of the Cabeza Prieta National Wildlife Refuge, which contains no bases, posts, stations, etc.[32] Dkt. 9-

---

[31] "Military construction" also includes "any acquisition of land or construction of a defense access road." 10 U.S.C. § 2801(a). Building a border wall clearly does not fit under either of these definitions, even if the wall requires the "acquisition of land."

[32] Press Release, Bureau of Land Management, Application for Withdrawal – Yuma 3 Map, https://www.blm.gov/sites/blm.gov/files/press-release/files/Application%20for%20Withdrawal%20Yuma%203%20Map.pdf.

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1 at 11. The remaining eight projects similarly lack even have a remote or tenuous connection

with a military installation. *See id.*

Further, DoD has already effectively conceded elsewhere that the border wall is not a

"military construction" project. Specifically, DoD already authorized the transfer of $2.5 billion

to build other parts of a border wall, using its transfer authority under Section 8005 of the FY 19

DoD Appropriations Act. *See, e.g.*, *State of California v. Trump,* 19-cv-00872-HSG (ECF # 204).

But under Section 8005, DoD may only transfer money "for military functions (*except military*

*construction*)[.]" Pub. L. No 115-245, 132 Stat 2981, § 8005 (2018) (emphasis added). That is,

the funds DoD transferred under Section 8005 *cannot* be used for military construction functions.

DoD's reliance on Section 8005 to fund a border wall is thus an implicit acknowledgement that

border wall projects are *not* "military construction." This Court should reject DoD's attempt to

argue a diametrically opposite position in this litigation. *Cf. Pauley v. BethEnergy Mines, Inc.*,

501 U.S. 680, 698 (1991) ("[T]he case for judicial deference is less compelling with respect to

agency positions that are inconsistent with previously held views.").

That a border wall is not "military construction" is further evident from the fact that

Congress has never appropriated money to the Department of Defense to build border walls.

Instead, Congress made these appropriations to the Attorney General until DHS was created, and

has since made them to DHS.[33] Past practice thus undermines Defendants' claims here.

Nonetheless, Defendants will presumably argue, as they have elsewhere, that the border

wall is a "military construction project" because, once border lands are transferred to DoD

control, they become "military installations" under Section 2801's "other activity" clause. This

argument has already been considered and disapproved of by another district court, however.

*Sierra Club v. Trump*, 379 F. Supp. 3d 883, 919–921 (N.D. Cal. 2019) (on appeal on other

grounds). Although that court ultimately denied plaintiffs' challenge as premature, its analysis

---

[33] Chad C. Haddal et. al., "Border, Security: Barriers Along the U.S. International Border," Congressional Research Service, at 1-11 (Mar. 16, 2009).

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

of the statutory language confirms that "border barrier construction could [not] reasonably constitute a 'military construction project' such that Defendants' invocation of Section 2808 would be lawful." *Id.* at 919. It explained that whether a border wall is military construction turns on whether it is "other activity" within the meaning of Section 2801(c)(4). *Id.* at 920. Applying the canon of *noscitur a sociis*, under which "a word is known by the company it keeps," *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995), the court reasoned that "[t]he term 'other activity' appears after a list of closely related types of discrete and traditional military locations: 'a base, camp, post, station, yard, [and] center.' It is thus proper to construe 'other activity' as referring to similar discrete and traditional military locations. The Court does not readily see how the U.S.-Mexico border could fit this bill." *Sierra Club*, 379 F. Supp. 3d at 921.

The court also relied on *ejusdem generis*, "which counsels that '[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.'" *Id.* (quoting *Wash. State Dept. of Social & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003)). Reading "other activity" to include "everything under the jurisdiction of the secretary of a military department," as Defendants argued, would render surplus the statute's "list of specific, discrete military locations." *Id.* (citation omitted). In sum, the court concluded, "in context and with an eye toward the overall statutory scheme, nothing demonstrates that Congress ever contemplated that 'other activity' has such an unbounded reading that it would authorize Defendants to invoke Section 2808 to build a barrier on the southern border." *Id.*

The court's reasoning is consistent with another core principle of statutory interpretation, namely, that courts "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). There is no reason to suppose Congress ever delegated to the Secretary of Defense the authority to build a multi-billion dollar border wall in peacetime, much less via a

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

single sentence in a statute authorizing emergency military construction projects in times of war or other national emergency. *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) ("Congress . . . does not . . . hide elephants in mouseholes."); *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.") (internal quotation marks omitted). To the contrary, Congress has repeatedly considered and passed laws regarding border wall construction, including in February of this year, when it appropriated $1.375 billion toward border fencing, subject to significant limitations. CAA, §§ 230–232 (2019). Reading Section 2808 to give Defendants nearly untrammeled authority to build a multi-billion dollar border wall, in direct contravention of Congress, defies common sense.

Thus, applying ordinary canons of statutory interpretation, Section 2808 does not permit the Defendants to take military construction funds away from their congressionally designated uses to construct the border wall Congress declined to fund.

### b. A border wall is not "necessary to support [the] use of armed forces" under Section 2808.

Defendants' actions are also not authorized by Section 2808 because Defendants cannot show a border wall is "necessary to support [the] use of the armed forces." Defendants' proposed border wall projects are civilian projects aimed at supporting Customs and Border Patrol's mission in policing the Southern Border, not any military mission. Indeed, in his Letter announcing the border wall projects, Secretary Esper specifically relies on a civil, law enforcement justification, claiming the wall will "deter illegal entry, increase the vanishing time of those illegally crossing the border, and channel migrants to ports of entry." *Id.* at 9; *see also, e.g.*, AR 3–4 (explaining how DHS requested military assistance with building "artificial barriers" with the purpose of "impeding and denying unlawful entry" of migrants).

Under any reasonable reading of the statute, the construction must "support [the] use of the armed forces" *in their capacity as armed forces*. Here military personnel stationed near the

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

border are not acting in a military capacity. Instead, Secretary Esper's stated justification all but concedes that the wall actually serves the mission of DHS and CBP, a civilian law enforcement agency. For example, DoD's analysis—approved by Secretary Esper—claims a wall is necessary to support the armed forces in large part because "[t]he high number of monthly apprehensions places a considerable strain on CBP detention facilities and personnel." Dkt. # 9-1 at p. 42, p. 6. DoD also claims that the wall will "improve[e] CBP force allocation." Dkt. # 9-1 at p. 4. DoD essentially characterizes military personnel at the border as assistant CBP agents, stating that "[a]ccording to DHS, each DoD person deployed in support of DHS 'frees up' a CBP agent to be employed in a direct *law enforcement capacity* in areas of heavy cross-border activity." *Id.* (emphasis added).

This border security rationale cannot satisfy Section 2808's statutory language because "[s]ecuring the border . . . [is], of course, law enforcement"—not military—"activit[y]." *City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000); *see also* 6 U.S.C. § 211 (providing that the U.S. Border Patrol—not the military—is charged with border security in peacetime). Contrary to Secretary Esper's rationale, the Immigration and Naturalization Act provides that where "an actual or imminent mass influx of aliens . . . near a land border, presents urgent circumstances requiring an immediate Federal response," the Attorney General may call upon "State or local law enforcement officer[s]"—not the armed forces—to assist in carrying out DHS' law enforcement functions. *Id.*

The military's ability to engage in law enforcement, including border security, is severely limited by the Posse Comitatus Act, 18 U.S.C. § 1385, under which armed forces are broadly prohibited from carrying out law enforcement functions. Similarly, 10 U.S.C. § 275 directs the Secretary of Defense "to ensure that any [military] activity (including the provision of any equipment or facility or the assignment or detail of any personnel) . . . does not include or permit direct participation by a member of the [the armed forces] in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

law." Pursuant to Section 275, DoD promulgated Directive 3025.21, which prohibits service members from providing most any form of "direct civilian law enforcement assistance," including stopping vehicles, arresting, apprehending, interviewing, or otherwise engaging with suspects, using or threatening the use of force, "security functions," "operating, manning, or staffing checkpoints," and "surveillance or pursuit." *See* DoD Directive 3025.21 Enclosure 3 §1.c (Feb. 27, 2013). Simply put, federal law prohibits the armed forces from engaging in any activity a wall might support.

To circumvent this obvious problem, Secretary Esper tries to convert the wall's law enforcement rationale into a military one by claiming that the border wall will "support [the] use of the armed forces" by "reduc[ing] the demand for DoD personnel and assets at the locations where the barriers are constructed and allow the redeployment of DoD personnel and assets to other high-traffic areas on the border without barriers." Dkt. # 9-1 at p. 9. But the Secretary's reasoning still relies on the law-enforcement rationale of deterring immigrants. Equally problematic, the Secretary's "replacement" rationale is facially paradoxical and self-undermining. It is a bit like saying Orbitz.com "supports the use of" travel agents. Section 2808 permits military construction projects that *complement* armed forces, not those that *replace* them.

Moreover, the Secretary's reasoning is not bounded by any rational principle. If upheld, the Defendants' reading of Section 2808 provides a blueprint for the President to divert appropriated military funding for virtually any civil construction project that Congress has refused to fund. *First*, the President orders his Cabinet to use the military in a civilian capacity as "support' for domestic prerogatives.[34] *Second,* willing agencies make "requests for assistance" for the military to perform such civilian functions. Dkt. # 9-1 at p. 42. *Third*, the President declares that a national emergency requires the use of the armed forces for civilian purposes. *Fourth*, DoD claims that the construction is "necessary" to fulfill the agency's

---

[34] Donald J. Trump, PRESIDENTIAL MEMORANDUM FOR THE SECRETARY OF DEFENSE, THE ATTORNEY GENERAL, AND THE SECRETARY OF HOMELAND SECURITY (Apr. 4, 2018), https://www.whitehouse.gov/presidential-actions/presidential-memorandum-secretary-defense-attorney-general-secretary-homeland-security/

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

domestic policy prerogative and release the military from performing civilian duties. The logic is deviously circular: the mere fact that the military is assisting a civilian agency becomes proof of military necessity. This scheme makes a farce of the military's proper role in our society, and of Congress' unique power to appropriate funds.

### c. Even if there were an ongoing emergency at our southern border, it does not "require[] use of the Armed Forces," under Section 2808.

Defendants' reliance on Section 2808 fails for a third reason. Section 2808 permits Defendants to reprogram military construction funds only where there is a national emergency that "requires use of the armed forces." 10 U.S.C. § 2808. Defendants have failed to demonstrate the situation at our southern border "*requires*" the use of the military and its special capabilities.

In his Proclamation, the President asserts that "it is necessary for the Armed Forces to provide additional support to address the crisis" at the border. Dkt. #9-1 at p. 35. But the President has not even identified what "support" the armed forces are meant to provide, let alone explain how they are *necessary*. Acting Secretary Esper's Letter implementing the President's Proclamation fails to fill in this gap. Because the armed forces cannot legally be used to carry out law enforcement functions at the border, and there are no ongoing military engagements or functions for which troops are required at the southern border, there is no basis for his claim that any so-called emergency "requires the use of the armed forces," under Section 2808.

In sum, because Defendants' proposed reprogramming of $3.6 billion in military construction funds is not permitted under 10 U.S.C. § 2808, Defendants' actions are "not in accordance with law" and "in excess of [Defendants'] statutory . . . authority." 5 U.S.C. § 706.

### 2. Defendants' proposed seizure of funds violates the Consolidated Appropriations Act.

Defendants' efforts to reprogram $3.6 billion via Section 2808 are also "not in accordance with" the CAA, which limits the funds Defendants may use on border wall construction and specifically forbids the Defendants' efforts to increase or reprogram funding outside the ordinary appropriations process. Passed in the wake of a government shutdown over

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

the President's demand for border wall funding, the CAA constrains Defendants' use of congressional appropriations for border wall construction in two ways. First, in passing the CAA, Congress rejected the President's demand for $5.7 billion in wall funding, opting instead to appropriate only $1.375 billion to build 55 miles of new fencing in Texas' Rio Grande Valley. CAA, § 230. Second, in light of the President's threats to declare a national emergency to fund his wall, Congress included Section 739 of the CAA to explicitly prohibit the executive branch from "increas[ing] … funding for a[ny] program, project, or activity as proposed in the President's budget request," such as a border wall, "until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions . . . of [an] appropriations Act." As one District Court has already ruled, Defendants' proposed seizure of funds violates both of these limitations. *El Paso Cty. v. Trump*, EP-19-CV-66-DB, 2019 WL 5092396 (W.D. Tex. Oct. 11, 2019).

>    a.    **Defendants are bound by Congress' decision to limit border wall funding via the CAA.**

Defendants' plan to seize an additional $3.6 billion in military construction funding for a border wall, when Congress specifically appropriated only $1.375 billion, "flouts the cardinal principle that a specific statute controls a general one and violates the CAA." *El Paso Cty.*, 2019 WL 5092396, at *12 (citing *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) and *United States v. MacCollom*, 426 U.S. 317, 321 (1976)). Under this "cardinal principle" of statutory interpretation, "[a]n appropriation for a specific purpose is exclusive of other appropriations in general terms which might be applicable in the absence of the specific appropriation." *Nevada*, 400 F.3d at 16 (holding that a specific appropriation of $1 million to Nevada for "scientific oversight responsibilities" barred any grants to Nevada from a more general $190 million appropriation for "nuclear waste disposal activities").

In passing the CAA, Congress considered and rejected the President's demands for $5.7 billion in border wall funding. Congress specifically appropriated only $1.375 billion for border-

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

wall construction, and limited that construction to certain locations "in the Rio Grande Valley Sector." CAA §§ 230, 231. "But beyond this Congress did not go, and there can be no fair doubt that its restraint was deliberate and purposeful." *Gartner v. United States*, 166 F.2d 728, 730 (9th Cir. 1948). "[T]he fact that Congress appropriated [$1.375 billion] expressly for [border wall construction] indicates that is all Congress intended [border wall construction] to get … from whatever source." *Nevada*, 400 F.3d at 16. Defendants may not rely on the general statutory authority of Section 2808 to overcome the specific statutory limits of the CAA. *El Paso Cty*, 2019 WL 5092396, at *12.[35]

**b.    Section 739 of the CAA prohibits defendants from reprogramming military construction funds to build a border wall.**

If there were any doubt that the CAA precludes Defendants' use of additional funds for construction of border wall, Section 739 of the CAA eliminates it. That Section, as the Texas District Court held, "expressly forbids Defendants' funding plan." *Id.* at *14. It provides:

> None of the funds made available in this or any other appropriations Act may be used to increase . . . funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

CAA at § 739. As the Court explained, "[Section] 739 creates a general rule and an exception. The general rule is that '[n]one of the funds made available' in an 'appropriations Act' … 'may be used to increase funding for a program, project, or activity' that was 'proposed in the President's budget request for a fiscal year.' CAA § 739. The exception is that appropriations may be used to increase such funding if that use is authorized by 'the reprogramming or transfer provisions' of an 'appropriations Act.'" *El Paso Cty.*, 2019 WL 5092396, at *14.

---

[35] In so holding, the W.D. Texas District Court specifically rejected Defendants' arguments that application of the specific-over-general principle violated the statutory interpretation principle disfavoring repeal by implication. *El Paso Cty*, 2019 WL 5092396, at *13. As the Court explained, invalidating Defendants' actions as contrary to the CAA would not impliedly repeal Section 2808. *Id.* at *13–14.

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

The general rule applies here. Defendants seek to use "funds made available in" an "appropriations Act," namely, military construction funds,[36] "to increase funding for a … project," i.e., constructing a border wall, that was "proposed in the President's budget request for fiscal year 2019 'for construction of a steel barrier for the Southwest border.'") (citing Letter from Russell T. Vought to Richard Shelby, January 6, 2019 (attached as Exhibit D to the Hughes Decl.)).

The rule's exception does not apply. Defendants' reprogramming is not "made pursuant to the reprogramming or transfer provisions of … any … appropriations Act," but rather pursuant to Section 2808. "Under federal law, an 'appropriations Act' is an Act whose title begins: 'An Act making appropriations.' 2 U.S.C. § 622(5); 1 U.S.C. § 105." *Id*. Section 2808 does not begin with (or include) this language. Instead, "[Section] 2808 is a provision of the Military Construction Codification Act, Pub. L. No. 97-124, 96 Stat. 153 (1982), which says nothing about appropriations in its title, nor makes any appropriations in its body." *Id.* Therefore, Section 739 of the CAA forbids Defendants' seizure of duly appropriated military construction funds.

### 3. Defendants violated the APA by entirely failing to weigh the impact of cancelling projects like the Bangor Project.

Defendants' actions are also arbitrary and capricious, in violation of the APA. Agency action is arbitrary and capricious when the agency "entirely fail[s] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In reviewing agency action, a court "should not attempt itself to make up for such [a deficiency]" because the agency must provide a reasoned basis for its own decisions. *Id.* Accordingly, "[c]onclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential

---

[36] The Bangor Project funds were appropriated in the Energy and Water, Legislative Branch, and Military Construction and Veterans Affairs Appropriations Act, 2019, Pub. L. No. 115-244, 132 Stat 2897 (2018), and authorized in the McCain NDAA.

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

standards" of arbitrary and capriciousness review. *AT&T Wireless Servs., Inc. v. F.C.C.*, 270 F.3d 959, 968 (D.C. Cir. 2001).

As Defendants acknowledge, the Secretary of Defense must determine any wall projects "are necessary to support the use of the armed forces in connection with the national emergency requiring use of the armed forces." Dkt. #9-1 at p. 39. Because the Secretary seeks to divert funds away from congressionally approved projects, this determination must necessarily weigh the cost of cancelling the projects against the expected benefits from the "emergency" projects. *See Mingo Logan Coal Co. v. Envtl. Prot. Agency*, 829 F.3d 710, 733 (D.C. Cir. 2016) ("[C]onsideration of costs is an essential component of reasoned decisionmaking under the Administrative Procedure Act."). But the Administrative Record does not indicate that the Secretary made even a cursory attempt to conduct this important analysis. Rather, the Secretary signed off on a decision memo that merely stated that: (1) the Office of the Under Secretary of Defense (Comptroller) provided a list of "existing MILCON projects that the Department *could* defer" (emphasis added); (2) projects with award dates in fiscal year 2020 or later were prioritized; and (3) the deferral of the projects "would have a minimal effect on Component readiness." Dkt. #9-1 at p. 5. There is no evidence in the record of what, if any, consideration went into the conclusory determination that deferral would have a minimal effect on readiness, let alone what "minimal effect" even means in this context. There is not even evidence the Secretary specifically considered the projects he now seeks to defund.

By failing to consider the individual importance of the cancelled projects and whether they truly "would have a minimal effect on Component readiness," the Secretary ignored "considerable evidence in conflict" with his conclusory determination. *AT&T Wireless Servs.*, 270 F.3d at 968. Here, the "considerable evidence" comes from DoD itself. To take just one example, the Navy has stressed that the Bangor Project will provide essential infrastructure to support the critical mission of escorting submarines that carry ballistic missiles as they move between base and dive points. In seeking congressional funding, DoD represented that Bangor

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

does not have adequate facilities to support this mission, that the mission "cannot be executed" at full operational capacity without the Bangor Project, and that the lack of maintenance space for escort vessels "jeopardizes" their readiness condition.[37] It is hard to think of a more "essential" mission than providing security escorts for submarines carrying nuclear weapons. Yet, having made these representations at appropriations time—representations Congress apparently accepted—DoD now lumps the Bangor Project together with dozens of other projects—many of which may be similarly urgent—and asserts, with no supporting analysis or documentation, that the deferral of *all of them* will have "minimal effect on Component readiness," and that the supposed "national security" need for supporting CPB's domestic law enforcement mission trumps them all. Because the record as a whole does not provide *any* evidence or reasoning concerning why the border wall projects are "necessary" in light of the projects that have been cancelled, it fails to meet the APA's standard for reasoned decision-making. *See People of State of Cal. v. F.C.C.*, 4 F.3d 1505, 1511 (9th Cir. 1993).

In sum, Defendants' proposed seizure of military construction funds violates the APA in at least three separate ways. Thus, irrespective of the legality of the Proclamation or any constitutional arguments, Washington is entitled to judgment that Defendants' efforts to reprogram military construction funding is unlawful.

**D.      Defendants' Efforts to Usurp Congress' Lawmaking and Appropriations Power Violate Article I of the Constitution.**

**1.      Defendants' actions violate the Appropriations and Presentment Clauses.**

On top of their clear APA violations, Defendants' actions also violate the Constitution. (Such violation also makes Defendants' actions "contrary to constitutional right, power, privilege, or immunity" under the APA, 5 U.S.C. § 706.) "The United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). Article I, Section 9 of the U.S.

---

[37] Hughes Decl., Ex. A.

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." An appropriation is "made by Law" when it is passed pursuant to Article I, Section 7 of the Constitution, setting forth the process of bicameralism and presentment. *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983) (explaining that Article I, Section 7 provides "a single, finely wrought and exhaustively considered, procedure" through which "that the legislative power of the Federal government [may] be exercised").

Pursuant to its powers under Article I, Section 9, and consistent with Article I, Section 7, Congress passed (and the President signed) the McCain NDAA, authorizing appropriations for the Bangor Project. By contrast, Congress has not authorized the funding the President seeks for his border wall. Instead, Congress made a limited appropriation in the CAA of only $1.375 billion toward building border fencing in the Rio Grande Valley Sector. CAA, §§ 230–232. At the same time, Congress expressly limited Defendants' authority to transfer funds, precluding them from using non-appropriations statutes such as Section 2808 to increase appropriations. By granting Defendants the limited authority to spend funds on a border wall, while denying them the broader spending authority sought by the President, "Congress has expressed its will to withhold this power from the President as though it had said so in so many words." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 602 (1952) (Frankfurter, J., concurring); *see also U.S. Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) ("[A]ll uses of appropriated funds must be affirmatively approved by Congress; the mere absence of a prohibition is not sufficient."). The Proclamation, and Defendants' diversion of $3.6 billion in military construction funding, is contrary to Congress' funding decisions in the McCain NDAA, contrary to Congress' repeated refusal to appropriate billions of dollars for the wall, contrary to the CAA, not authorized by 10 U.S.C. § 2808, and thus contrary to Article I, Sections 7 and 9 of the Constitution.

**2.      Defendants' seizure of $3.6 billion, in defiance of Congress' will, is not authorized by any statute.**

Defendants will no doubt argue that their seizure of funds is consistent with Article I of the Constitution because Congress authorized it. They will be incorrect. As explained above, Defendants' actions are not authorized by Section 2808, and are in fact expressly forbidden by the CAA. As a result, their seizure of funds violates Article I, Sections 7 and 9.

Defendants' claim to statutory authorization also fails because the Proclamation is unlawful under the National Emergencies Act (NEA), 50 U.S.C. § 1601, et seq. Congress passed the NEA to ensure that executive emergency powers "could be utilized only when emergencies actually exist." S. REP. 94-1168, 2, 1976 U.S.C.C.A.N. 2288, 2289. Under the Act, "[r]eliance on emergency authority, intended for use in crisis situations [is] no longer . . . available in non-crisis situations." *Id.* Passed in the wake of Watergate and set against the rising tide of communism, the NEA's drafters wrote: "At a time when governments throughout the world are turning with increasing desperation to an all-powerful executive, this legislation is designed to insure that the United States travels a road marked by carefully constructed legal safeguards." *Id.* The Act provides that, "during the period of a national emergency, . . . the President is authorized to declare such national emergency." 50 U.S.C. § 1621. By declaring a national emergency, the President may be entitled to access certain "special or extraordinary power[s]" necessary to meet the emergency. *Id.*

Contrary to the President's repeated claims, the NEA does not grant him the "absolute right" to declare a national emergency. Although the President has discretion to determine whether facts on the ground justify an emergency declaration, this discretion is subject, at a bare minimum, to review for good faith. *See, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972) (negative exercise of power to exclude aliens requires "bona fide reason" to merit deference); U.S. Const. Art. II, Sec. 3 (the President "shall take Care that the Laws be faithfully executed"). Here, the Proclamation is clearly—indeed, admittedly—pretextual.

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

The President declared a national emergency simply because Congress refused to give him the money he wanted. In declaring his emergency, the President *expressly admitted* that he "didn't need to do this," but he "just want[ed] to get [the wall] done faster" than Congress would allow.[38] This admission by the President followed months in which he dangled the threat of an emergency as a bargaining chip against Congress. These tactics leave no doubt that the Proclamation is based not on a good-faith assessment of the evidence, but by a desire to bypass the legislative process to achieve domestic policy objectives.[39] As the Supreme Court recently observed in rejecting another pretextual rationale proffered by this Administration, courts "are not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (quotation omitted).

The legal insufficiency of the Proclamation is underscored by the passage of two congressional joint resolutions to terminate the emergency, including *after* the announcement of the diversion of funds at issue here. *See* H.R.J. Res. 46, 116th Cong. (2019); S.J. Res. 54, 116th Cong. (2019); 165 Cong. Rec. H8061-71 (daily ed. Sept. 27, 2019). Although Congress has thus far been unable to muster the supermajority required to override the President's veto, the joint resolutions are a clear expression of Congress' judgment that no emergency exists requiring the use of the armed forces. In determining what, if any, deference to give to the President's justification, the Court should consider Justice Jackson's admonition that "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). Here, Congress "has the exclusive power to spend," *San Francisco*, 897 F.3d at 1233, and, at a minimum, has expressed its "implied will" that an emergency does not exist. Therefore, in this specific case at least, Defendants cannot rely on a *pro forma* argument that Congress has delegated limitless discretion

---

[38] Background Press Call on President Trump's Remarks on the National Security and Humanitarian Crisis on Our Southern Border (Feb. 15, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-security-humanitarian-crisis-southern-border/ (emphasis added).

[39] Indeed, the evidence from the President's own Administration undermines the factual claims the President marshals to justify his Proclamation. *See* Dkt. #15 at ¶¶ 102–112, 137–155.

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

to determine whether an emergency exists. Instead, the President must make a good-faith showing that his Proclamation meets the standard of an "emergency . . . that requires use of the armed forces." The President's bad-faith Proclamation does not authorize him to usurp Congress' power of the purse.[40]

### E.     This Court Should Enjoin Defendants' Unlawful Conduct.

A party seeking a permanent injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Where the federal government is the defendant, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Washington satisfies each of these four factors, and an injunction is therefore appropriate.

### 1.     Defunding military construction projects will cause unrecoverable losses.

"[P]laintiffs seeking [injunctive] relief [must] demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "The analysis focuses on irreparability, irrespective of the magnitude of the injury." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018), *cert. denied sub nom. Little Sisters of the Poor Jeanne Jugan Residence v. California*, 139 S. Ct. 2716 (2019) (quotation omitted). "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

Washington will suffer irreparable harm in the absence of an injunction because the Defendants have formally diverted and begun obligating a pool of funds appropriated by Congress for military construction, including the Bangor Project. DoD has characterized the

---

[40] Additionally, any implementation of bad-faith Proclamation is perforce arbitrary and capricious and "not in accordance with law," in violation of the APA. 5 U.S.C. § 706.

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

projects from which funding was taken as "deferred," but in reality, once the funding is obligated, another act of Congress would be required to revive them. The loss of state tax revenues to Washington caused by these "deferrals" is estimated at around $2.6 million, and this does not include other economic losses to the State. *See* Oline Decl. at ¶¶19. The loss of local tax revenue is estimated at $880,000. *Id.* at ¶ 22.

Although "[e]conomic harm is not normally considered irreparable[,] . . . such harm is irreparable here because the state[] will not be able to recover monetary damages[.]" *Azar*, 911 F.3d at 58; *see City of Houston v. HUD*, 24 F.3d 1421, 1427 (D.C. Cir. 1994) ("[O]nce the relevant funds have been obligated, a court cannot reach them in order to award relief."); *see also Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424–25 (1990) (same). Thus, "[t]o avoid having its case mooted," the State has "file[d] its suit before the relevant appropriation lapse[d]" and now "seek[s] [an] injunction preventing the agency from disbursing those funds." *City of Houston*, 24 F.3d at 1427 (emphasis added); *see also Ambach v. Bell,* 686 F.2d 974, 986 (D.C.Cir. 1982) ("Once [appropriated funds] are . . . obligated, they cannot be recouped. It will be impossible in the absence of a preliminary injunction to award the plaintiffs the relief they request if they should eventually prevail on the merits.").

## 2. No remedy short of injunction can prevent Washington's irreparable harms.

The bedrock principle of law forbidding Defendants from seizing military construction funds is the same principle that requires an injunction:  "[N]o money can be taken or drawn from the Treasury except under an appropriation by Congress." *Reeside v. Walker*, 52 U.S. 272, 291 (1850). Just as Defendants cannot commandeer congressional appropriations to build something Congress refused to fund, neither may the Court oblige the Treasury to re-appropriate the seized funds to make Washington whole. *See id.*; *Richmond*, 496 U.S. at 424–25. Instead, as noted above, absent an injunction, Washington's claim for relief will become moot. *See City of Houston*, 24 F.3d at 1427. Washington thus has no adequate remedy at law short of an injunction.

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

### 3. The balance of equities and the public interest favor injunctive relief, rather than letting Defendants' unlawful power grab take effect.

Defendants have no equitable interest in violating the Constitution or laws. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). By contrast, Washington has shown irreparable, concrete harm from the continued obligation of funding, including the complete loss of the Bangor Project. An injunction will preserve the status quo and ensure that Washington is not harmed by Defendants' unlawful conduct. Meanwhile, the number of apprehensions at the southwest border has steadily decreased over the past several months and remains near historical levels.[41] Thus, even if the "long-standing" problem of unlawful migration (Dkt. # 9-1 at p. 35) has not been solved, there is no urgent ongoing national security emergency at the border to the extent that the failure to proceed with the border projects absent a valid congressional appropriation would pose a significant hardship to the Defendants or the nation at large. The balance of harms tips sharply in favor of the State.

### 4. The court should enjoin any further use or obligation of the $3.6 billion pool of funds seized by Defendants.

"The scope of an injunction is dependent as much on the equities of a given case as the substance of the legal issues it presents, and courts must tailor the scope to meet the exigencies of the particular case." *Azar*, 911 F.3d at 584 (citation and internal quotation marks omitted). "[A]n injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit . . . if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987). Here, the relief sought by Washington requires, and the equities strongly support, enjoining any further use of the $3.6 billion of seized funding. First, the Secretary issued a single

---

[41] Secretary Esper has relied on CBP data allegedly showing a high number of migrant apprehensions in FY 2019, as well as CBP's estimate of "another 100,000 apprehensions in August 2019." Dkt. # 9-1 at p. 42. But CBP data from August 2019 onward shows that any "spike" in apprehensions had mostly subsided; in fact only 64,006 people were apprehended at the border in August 2019. https://www.cbp.gov/newsroom/stats/sw-border-migration. In September the number continued to decline to "just over 52,000 – down almost 65 percent from the peak in May of 144,000." Press Briefing by Acting CBP Commissioner Mark Morgan (Oct. 8, 2019), https://www.whitehouse.gov/briefings-statements/press-briefing-acting-cbp-commissioner-mark-morgan/.

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

decision seizing the entire pool of funds at once, so there is no practical way to disaggregate the Bangor Project funds from other projects. Second, there is no practical benefit to attempting to limit the scope of the injunction. There are no "parties" on the other side of this issue except for the federal government, so no parties are being denied the opportunity to litigate, and there is no "wider range of perspectives" likely to emerge beyond the cases already brought. *See Azar*, 911 F.3d at 583. Third, this case is not in a preliminary posture, and the parties agree that the facts are developed to the extent the Court may issue a final decision. *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1030-31 (9th Cir. 2019). Fourth, particularly where the violation has a constitutional dimension, "[t]he nature of the . . . remedy is to be determined by the nature and scope of the . . . violation." (quotation omitted). *See Missouri v. Jenkins*, 515 U.S. 70, 89 (1995). It is manifestly inequitable to allow Defendants to evade their constitutional limitations by continuing to misappropriate funds to build border wall projects based on which affected parties have challenged the overall funding scheme. The Defendants should not be permitted to seize a pot of money and then, as they face cases brought by specific plaintiffs, to simply cordon off money they deem associated with those plaintiffs and claim that they plan to use it "last." Defendants scheme is unlawful and unconstitutional in its entirety and should be stopped in full. *Cf. Clinton v. City of New York*, 524 U.S. 417, 449 (1998) (striking down Line Item Veto Act in its entirety on challenge from a handful of plaintiffs denied funds under the law).

## IV.    CONCLUSION

For the foregoing reasons, the State of Washington respectfully request that this Court grant its Motion for Summary Judgment.

//

//

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

DATED this 25th day of October, 2019.

ROBERT W. FERGUSON
Attorney General


*/s/ Andrew R.W. Hughes*
MARTHA RODRIGUEZ LOPEZ, WSBA #35466
ANDREW R.W. HUGHES, WSBA #49515
BRENDAN SELBY, WSBA #55325
Assistant Attorneys General
TERA HEINTZ, WSBA #54921
Deputy Solicitor General
*Attorneys for Plaintiff*

PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
2:19-cv-01502-BJR

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744