

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                        *Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>                        *Defendants*. | Case No. 2:19-cv-1502-BJR<br><br>**BRIEF OF THE U.S. HOUSE OF REPRESENTATIVES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

AMICUS BRIEF OF THE
U.S. HOUSE OF REPRESENTATIVES
2:19-CV-1502-BJR

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building, Washington, DC, 20515
(202) 225-9700

**INTRODUCTION**

The U.S. House of Representatives (House) submits this amicus curiae brief in support of plaintiff's motion for summary judgment. The House has a compelling institutional interest in this suit, which seeks to enjoin the Administration from spending federal funds without a valid Congressional appropriation and, indeed, in defiance of a clear Congressional refusal to appropriate funds in excess of $1.35 billion for a border wall.[1]

The Appropriations Clause of the Constitution, U.S. Const., Art. I, § 9, cl. 7, vests Congress with "exclusive power over the federal purse," and is "one of the most important authorities allocated to Congress in the Constitution's 'necessary partition of power among the several departments.'" *U.S. Dep't of the Navy v. FLRA*, 665 F.3d 1339, 1346-47 (D.C. Cir. 2012) (quoting *The Federalist No. 51*, at 320 (James Madison) (Clinton Rossiter ed., 1961)).

Notwithstanding this bedrock constitutional principle, the Administration seeks to invoke inapposite general appropriations authorities to circumvent Congress's rejection of President Trump's demand for $5 billion for a border wall. To this point, President Trump recently declared, "We're taking money from all over because as you know the Democrats don't want us to build the wall."[2]

Specifically, plaintiff's motion for summary judgment concerns the Administration's reprogramming of $3.6 billion from Department of Defense (DOD) military construction projects to border wall construction under 10 U.S.C. § 2808. As demonstrated below and in plaintiff's filings, the Administration's invocation of Section 2808 in defense of its unconstitutional spending on the border wall is invalid.[3] Section 2808 does not authorize spending that Congress has

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than amicus curiae and its counsel made a monetary contribution to its preparation or submission.

[2] The White House, *A Message from President Trump on the Border Wall*, YouTube (Sept. 9, 2019), https://www.youtube.com/watch?v=0fEdhud7RJI.

[3] The House fully supports plaintiff's request for summary judgment in this case. The House has focused this brief on the Appropriations Clause issues of greatest concern to the House and does not address all of the arguments raised by plaintiff.

1

AMICUS BRIEF OF THE
U.S. HOUSE OF REPRESENTATIVES
2:19-CV-1502-BJR

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building, Washington, DC, 20515
(202) 225-9700

deliberately refused to provide. And, in any event, Section 2808 only authorizes the reprogramming of military construction funds subject to specific requirements, which the Administration has not met here.

This Court should grant summary judgment to plaintiff on its claims regarding expenditures the Administration purports to make under Section 2808 and should forbid the Administration from spending funds under Section 2808 on the construction of a border wall.

## INTRODUCTION

This dispute grew directly out of a pitched battle that the President and Congress waged over the subject of this litigation: funding for a border wall. Although the President originally requested "$1.6 billion [for fiscal year 2019] to construct approximately 65 miles of border wall,"[4] by the middle of 2018, he was "press[ing] Republicans to give him $5 billion as a down payment on his wall."[5] Near the end of the 115th Congress, he and Congress faced an impasse on the issue.

In December 2018, President Trump held a televised meeting with then-House Minority Leader Nancy Pelosi and Senate Minority Leader Chuck Schumer to negotiate fiscal year 2019 appropriations for a border wall.[6] During that meeting, the President reiterated his demand for $5 billion for a border wall. He warned, "If we don't get what we want one way or the other, whether it's through you, through a military, through anything you want to call it, I will shut down the government."[7]

---

[4] Office of Mgmt. & Budget, *Fiscal Year 2019: Efficient, Effective, Accountable: An American Budget: Budget of the U.S. Government* 58 (2018), https://perma.cc/MD3C-62YP.

[5] Rachael Bade, *Immigration Storm Bears Down on Republicans*, Politico (July 2, 2018), https://perma.cc/D8LJ-DLTK; *see also* Letter from Russell T. Vought, Acting Dir., Office of Mgmt. & Budget, to Sen. Richard Shelby, Chairman, U.S. Senate Comm. on Appropriations (Jan. 6, 2019), https://perma.cc/98MY-3VXF (requesting $5.7 billion for a border wall).

[6] Aaron Blake, *Trump's Extraordinary Oval Office Squabble with Chuck Schumer and Nancy Pelosi, Annotated*, Wash. Post (Dec. 11, 2018), https://perma.cc/2W9K-L2Z6.

[7] *Id.*

2

AMICUS BRIEF OF THE
U.S. HOUSE OF REPRESENTATIVES
2:19-CV-1502-BJR

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building, Washington, DC, 20515
(202) 225-9700

Congress did not yield to that threat, and on December 21, 2018, the longest Federal Government shutdown in history began. More than two weeks later, President Trump addressed the nation from the Oval Office, imploring Congress to "do[] its job" and "pass a bill that ends this crisis."[8] Congress still refused to appropriate the funds he sought for the border wall, and on January 25, 2019, President Trump signed a continuing resolution to fund the government through February 14, 2019.[9] Over the next several weeks, a bipartisan conference committee negotiated a deal to fund the government.[10] While those negotiations were underway, the Acting White House Chief of Staff declared that the southern border wall "is going to get built, with or without Congress."[11]

Ultimately, Congress passed the Consolidated Appropriations Act (CAA), 2019, Pub L. No. 116-6, 133 Stat. 13, which appropriated only $1.375 billion for construction of fencing in the Rio Grande Valley area of the border. *Id.* § 230, 133 Stat. at 28. On February 15, 2019, President Trump signed the CAA into law.[12] That same day, however, he expressed dissatisfaction with the appropriation for border wall construction and announced that his Administration would instead spend up to $8.1 billion for that purpose.[13]

The White House stated that it would draw funding from three sources to supplement the amount appropriated by Congress:

---

[8] *Full Transcripts: Trump's Speech on Immigration and the Democratic Response*, N.Y. Times (Jan. 8, 2019), https://perma.cc/UJ6C-VZ37.

[9] *See* Further Additional Continuing Appropriations Act, 2019, Pub. L. No. 116-5, 133 Stat. 10.

[10] Erica Werner et al., *Border Deal Nears Passage as Lawmakers Prepare for Votes, with Trump Expected to Sign*, Wash. Post (Feb. 14, 2019, 12:25 AM), https://perma.cc/A8HE-ESHS.

[11] Andrew O'Reilly, *Mulvaney Says Border Wall Will Get Built, "With or Without" Funding from Congress*, Fox News (Feb. 10, 2019), https://perma.cc/NGM3-2FML.

[12] *See Statement by the President*, White House (Feb. 15, 2019), https://perma.cc/WNE6-C5ES.

[13] *See Fact Sheet: President Donald J. Trump's Border Security Victory*, White House (Feb. 15, 2019) (Border Victory Fact Sheet), https://perma.cc/77SZ-GA4E.

3

AMICUS BRIEF OF THE
U.S. HOUSE OF REPRESENTATIVES
2:19-CV-1502-BJR

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building, Washington, DC, 20515
(202) 225-9700

- about $601 million from the Treasury Forfeiture Fund, 31 U.S.C. § 9705;
- up to $2.5 billion under the DOD funds transferred for Support for Counterdrug Activities, 10 U.S.C. § 284; and
- up to $3.6 billion reallocated from DOD military construction projects under the President's declaration of a national emergency, 10 U.S.C. § 2808.[14]

The White House stated that these sources "will be used sequentially and as needed."[15]

As a predicate to asserting authority under Section 2808(a) to spend funds on border wall construction, on February 15, 2019, President Trump declared a "national emergency" at the southern border:

> NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 201 and 301 of the National Emergencies Act (50 U.S.C. 1601 *et seq.*), hereby declare that a national emergency exists at the southern border of the United States … . To provide additional authority to the Department of Defense to support the Federal Government's response to the emergency at the southern border, I hereby declare that this emergency requires use of the Armed Forces and, in accordance with section 301 of the National Emergencies Act (50 U.S.C. 1631), that the construction authority provided in Section 2808 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense and, at the discretion of the Secretary of Defense, to the Secretaries of the military departments.[16]

The House is unaware of any other instance in American history where a President has declared a national emergency to obtain funding after having failed to win Congressional approval for an appropriation.[17]

The President's proclamation outlines the asserted basis for the national emergency declaration. It finds that "[t]he southern border is a major entry point for criminals, gang

---

[14] *See id.*

[15] *Id.*

[16] Proclamation No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) (National Emergency Proclamation), https://perma.cc/7SHF-Z2XL.

[17] *See* Charlie Savage, *Presidents Have Declared Dozens of Emergencies, but None Like Trump's*, N.Y. Times (Feb. 15, 2019), https://perma.cc/JG3X-J9YR.

4

AMICUS BRIEF OF THE
U.S. HOUSE OF REPRESENTATIVES
2:19-CV-1502-BJR

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building, Washington, DC, 20515
(202) 225-9700

members, and illicit narcotics."[18] The proclamation concedes that this "problem of large-scale unlawful migration … is long-standing" but states that "the situation has worsened in certain respects in recent years" because there have been "sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending."[19]

Prior to signing the proclamation, President Trump delivered remarks explaining his decision.[20] Among other things, President Trump said that Democrats had appropriated for border security a "crazy" amount of money—"so much money, we don't know what to do with it."[21] Democrats "didn't even fight us on most of the stuff," such as "[p]orts of entry."[22] "The only place [Democrats] don't want to give as much money [is the wall]—[$1.375 billion]," which "[s]ounds like a lot, but it's not so much."[23] Later he remarked, "I went through Congress. I made a deal. I got almost $1.4 billion when I wasn't supposed to get one dollar—not one dollar. 'He's not going to get one dollar.' Well, I got $1.4 billion. But I'm not happy with it."[24]

Reiterating that he was "successful" in getting Democrats to appropriate funding for the wall, President Trump explained why he nevertheless declared a national emergency: "So I did—I was successful, in that sense, but I want to do it faster. I could do the wall over a longer period of time. I didn't need to do this. But I'd rather do it much faster. … And I think that I just want to get it done faster, that's all."[25]

---

[18] *See* National Emergency Proclamation, https://perma.cc/7SHF-Z2XL.

[19] *Id.*

[20] *Remarks by President Trump on the National Security and Humanitarian Crisis on Our Southern Border*, White House (Feb. 15, 2019) (Feb. 15 Rose Garden Remarks), https://perma.cc/5SE7-FS7F.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

5

AMICUS BRIEF OF THE
U.S. HOUSE OF REPRESENTATIVES
2:19-CV-1502-BJR

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building, Washington, DC, 20515
(202) 225-9700

Congress swiftly rebuked President Trump's decision to declare a national emergency at the southern border and spend in excess of what Congress had appropriated on the construction of a border wall. On February 26, 2019, the House adopted House Joint Resolution 46 by a vote of 245 to 182, terminating President Trump's national emergency declaration pursuant to section 202 of the National Emergencies Act, 50 U.S.C. § 1622.[26] On March 14, 2019, the Senate passed the joint resolution by a vote of 59 to 41.[27] The joint resolution was supported by numerous Republicans, including Utah Senator Mitt Romney, who stated that his vote of disapproval was "a vote for the Constitution and for the balance of powers that is at its core."[28] President Trump vetoed the joint resolution on March 15, 2019.[29]

The Administration has since then taken various steps to advance construction of the wall, and most recently it authorized eleven border wall projects in California, Arizona, New Mexico and Texas pursuant to Section 2808.[30] To fund these eleven projects, the Administration announced its intention to reprogram funding that Congress had appropriated for 127 other projects.[31] One of those projects is a pier and maintenance facility in Bangor, Washington, for which Congress appropriated $88.96 million.[32]

The Secretary of Defense stated that eleven border wall projects "are necessary to support the use of the armed forces in connection with the national emergency."[33] He asserted that the

---

[26] 165 Cong. Rec. H2217-18 (daily ed. Feb. 26, 2019).

[27] 165 Cong. Rec. S1882 (daily ed. Mar. 14, 2019).

[28] Marianne Levine, *Senate Deals Blow to Trump in Vote to Terminate Border Emergency*, Politico (Mar. 14, 2019), https://perma.cc/Z2HX-7TZY.

[29] *Veto Message to the House of Representatives for H.J. Res. 46*, White House (March 15, 2019), https://perma.cc/58P4-75AE.

[30] *See* Notice of Filing of Admin. Record for Border Barrier Projects Undertaken Pursuant to 10 U.SC. § 2808 (Administrative Record) at 16-17 (Oct. 11, 2019), ECF No. 9.

[31] *Id*. at 89.

[32] *Id*.

[33] *Id.* at 9.

AMICUS BRIEF OF THE
U.S. HOUSE OF REPRESENTATIVES
2:19-CV-1502-BJR

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building, Washington, DC, 20515
(202) 225-9700

projects "will deter illegal entry, increase the vanishing time of those illegally crossing the border, and channel migrants to ports of entry."[34] In his view, this would "reduce the demand for DoD personnel and assets at the locations where the barriers are constructed and allow the redeployment of DoD personnel and assets to other high-traffic areas on the border without barriers," allowing "DoD to provide support to [the Department of Homeland Security (DHS)] more efficiently and effectively."[35]

## ARGUMENT
### THE ADMINISTRATION'S EXPENDITURE OF FUNDS UNDER SECTION 2808 ON CONSTRUCTION OF A BORDER WALL VIOLATES THE APPROPRIATIONS CLAUSE

### I. Defendants Have Violated the Appropriations Clause

Plaintiff has asserted a constitutional claim under the Appropriations Clause. As the history recited above makes clear, Congress rejected President Trump's request for over $5 billion for a border wall, but the Administration nonetheless decided to build the wall "without Congress."[36] This decision violates the Appropriations Clause, which dictates that the Administration may spend funds—including to build a border wall—only if, and to the extent that, Congress appropriates funds for that purpose. *See, e.g.*, *Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1850) ("It is a well-known constitutional provision, that no money can be taken or drawn from the Treasury except under an appropriation by Congress.").

Having precipitated the longest government shutdown in history because Congress would not appropriate the amount of funds it wanted for a border wall, the Administration now claims to have found "secreted in the interstices of legislation the very grant of power which Congress consciously withheld." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J., concurring). As relevant here, the Administration relies on Section 2808. But this

---

[34] *Id.*

[35] *Id.*

[36] Andrew O'Reilly, *Mulvaney Says Border Wall Will Get Built, 'With or Without' Funding from Congress*, Fox News (Feb. 10, 2019), https://perma.cc/NGM3-2FML.

7

AMICUS BRIEF OF THE
U.S. HOUSE OF REPRESENTATIVES
2:19-CV-1502-BJR

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building, Washington, DC, 20515
(202) 225-9700

statute does not authorize spending in excess of the funds that Congress has appropriated, particularly where, as here, Congress has denied additional expenditures for a particular purpose.

## II. Section 2808 Does Not Allow Defendants to Spend More on a Border Wall Than Congress Appropriated

Defendants are not authorized to spend federal funds on the construction of a border wall under Section 2808. As another court in this Circuit recognized, "[u]nder the circumstances, it is unclear how border barrier construction could reasonably constitute a 'military construction project' such that Defendants' invocation of Section 2808 would be lawful." *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 919 (N.D. Cal. 2019); *see id.* at 921 (expressing "concern[] with [the Administration's] arguments" on Section 2808 but determining at that time that plaintiffs had not shown irreparable harm because the Section 2808 construction project locations had not yet been specified).

Section 2808 provides that

> [i]n the event of a declaration of war or the declaration by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces. Such projects may be undertaken only within the total amount of funds that have been appropriated for military construction, including funds appropriated for family housing, that have not been obligated.

10 U.S.C. § 2808(a). Section 2808(a) thus authorizes the Secretary of Defense to redirect unobligated military construction funds to other projects, subject to three specific limitations: (1) there must be a national emergency "that requires use of the armed forces," (2) the funding must be spent on a "military construction project[]," and (3) the project must be "necessary to support [the] use of the armed forces." *Id.*

**1.** In order to transfer funds under Section 2808, there must be a national emergency that "requires the use of the armed forces"—not simply use of the armed forces' *money*. There is no such national emergency here.

8

AMICUS BRIEF OF THE
U.S. HOUSE OF REPRESENTATIVES
2:19-CV-1502-BJR

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building, Washington, DC, 20515
(202) 225-9700

Border security is a matter for domestic law enforcement—specifically, DHS and Customs and Border Patrol (CBP). *See* 6 U.S.C. § 202. CBP is the "largest federal law enforcement agency in the United States," and its mission is to "safeguard America's borders."[37] Indeed, the Administration recognized this fact when it used $601 million from the Treasury Forfeiture Fund[38] to construct a border wall, because money from this fund can be applied *only* to "law enforcement activities." 31 U.S.C. § 9705(g)(4)(B). Moreover, the military is expressly prohibited from making "direct active use of Federal troops" to execute domestic law under the Posse Comitatus Act, 18 U.S.C. § 1385. *See also United States v. Dreyer*¸ 804 F.3d 1266, 1272 (9th Cir. 2015). The Administration has made no showing that armed forces are "required" to address the described "emergency." Indeed, shortly before the national emergency proclamation, then-Acting Secretary of Defense Patrick Shanahan acknowledged that the situation at the border is "not a military threat,"[39] and another top-level defense official has testified that "[n]one of the capabilities that [the military is] providing [at the southern border] are combat capabilities."[40]

President Trump's proclamation asserts that the situation at the border has "worsened" due to "sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space."[41] But this trend has long been apparent,[42] and the problems it causes, including humanitarian problems, are matters for domestic law enforcement, not the armed forces. And there is no argument that the circumstances at the border require even

---

[37] *See*, *e.g.*, *Snapshot: A Summary of CBP Facts and Figures*, U.S. Customs & Border Protection (Dec. 2018), https://perma.cc/H3JS-PH9C.

[38] *See* Border Victory Fact Sheet, https://perma.cc/77SZ-GA4E.

[39] *Department of Defense Budget Posture: Hearing Before the S. Comm. on Armed Servs.*, 116th Cong. (2019) (statement of Patrick Shanahan, Acting Sec'y, Dep't of Def.) (pre-published transcript available at https://perma.cc/XX2K-J8AX).

[40] Heather Timmons, *The US Border Situation Isn't a National Emergency, Pentagon Officials Tell Congress*, Quartz (Jan. 29, 2019), https://perma.cc/S4V6-VZDG.

[41] National Emergency Proclamation, https://perma.cc/7SHF-Z2XL.

[42] *See*, *e.g.*, *Southwest Border Migration FY2017*, U.S. Customs & Border Protection (Dec. 15, 2017), https://perma.cc/8GW5-FD3K.

9

AMICUS BRIEF OF THE
U.S. HOUSE OF REPRESENTATIVES
2:19-CV-1502-BJR

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building, Washington, DC, 20515
(202) 225-9700

the use of DOD *money* (as distinct from armed forces personnel): the President has stated that the Democrats appropriated for border security "so much money, we don't know what to do with it."[43]

In sum, the purported emergency here—a surge in illegal immigration—does not "require[] the use of the armed forces." 10 U.S.C. § 2808(a). It requires, if anything, enhanced domestic law enforcement. As President Trump admits, Congress has appropriated a "crazy" amount of money for this purpose. Congress has simply chosen to allocate most of that money to border security activities that do not include construction of a border wall. The Administration cannot plausibly claim that the armed forces are nevertheless "required" so that DOD can build a wall that Congress deemed unnecessary.

**2.** In any event, a border wall is not a "military construction project" as defined by statute. Section 2801(a) defines "military construction" as "any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any acquisition of land or construction of a defense access road (as described in section 210 of title 23)." A "military installation," in turn, is "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department." 10 U.S.C. § 2801(c)(4); *see id.* § 2801(b) ("A military construction project includes all military construction work … necessary to produce a complete and usable facility or a complete and usable improvement to an existing facility[.]").

The Administration's border wall projects do not constitute "military construction" because, with the exception of two projects on the Barry M. Goldwater Range, the border wall projects are not being "carried out with respect to a military installation." Simply put, the southern border is not a militarized zone. It is the responsibility of DHS and CBP to ensure border security, not DOD. *See supra* at 9. Indeed, the Administration has previously invoked Section 8005 of the 2019 Department of Defense Appropriations Act as a source of transfer authority to transfer DOD funds for purposes of other border wall projects—but that law *prohibits* transfers for

---

[43] Feb. 15 Rose Garden Remarks, https://perma.cc/5SE7-FS7F.

10

AMICUS BRIEF OF THE  
U.S. HOUSE OF REPRESENTATIVES  
2:19-CV-1502-BJR

OFFICE OF GENERAL COUNSEL  
U.S. HOUSE OF REPRESENTATIVES  
219 Cannon House Office Building, Washington, DC, 20515  
(202) 225-9700

purposes of "military construction."  *See* Pub. L. No. 115-245, § 8005, 132 Stat. 2981, 2999; *see also* Br. of the U.S. House of Representatives as Amicus Curiae in Supp. of Pls' Mot. for a Prelim. Inj. at 2-3, 11, *Sierra Club v. Trump*, No. 4:19-cv-00892 (N.D. Cal. Apr. 15, 2019), ECF No. 47.

When DOD approved the projects under Section 2808, the border land at issue here was not even under its jurisdiction, let alone a "military installation."  In an attempt to circumvent this threshold failing in its Section 2808 justification, the Administration intends to transfer federal lands along the border to DOD or to have DOD acquire or condemn private land along the border and to argue that this newly acquired land should be considered a "military installation."  *See* Administrative Record at 3.  But even if these land acquisitions were valid, they do not transform the planned border wall construction into military construction projects.  As explained, a "military installation" is defined as "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department."  10 U.S.C. § 2801(c)(4).  As another federal court has recognized, the border lands at issue here are plainly not military bases, posts, stations, yards or centers.  *See Sierra Club*, 379 F. Supp. 3d at 920 ("Defendants make no attempt to characterize the U.S.-Mexico border or a border barrier as a 'base, camp, post, station, yard, [or] center.'  *Nor could they*." (emphasis added)).

As that court also correctly noted, "Section 2801 likely precludes treating the southern border as an 'other activity.'"  *Id.*  "The term 'other activity' appears after a list of closely related types of discrete and traditional military locations: 'a base, camp, post, station, yard, [and] center.'"  *Id.* at 921; *see Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) ("[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (quotation marks omitted)).  "Had Congress intended for 'other activity' in Section 2801(c)(4) to be so broad as to transform literally any activity conducted by a Secretary of a military department into a 'military installation,' there would have been no reason to include a list of specific, discrete military locations."  *Sierra Club*, 379 F. Supp. 3d at 921.  As that court

11

1  explained, "[i]t is thus proper to construe 'other activity' as referring to similar discrete and
2  traditional military locations." *Id.*  It remains difficult to "see how the U.S.-Mexico border could
3  fit this bill." *Id.*  The administrative record does not suggest that troops are stationed on the land
4  where the border wall projects will be built or that such land is otherwise in use as a military post,
5  station, yard, or center, or other similar *military* location.  Simply put, "in context and with an eye
6  toward the overall statutory scheme, nothing demonstrates that Congress ever contemplated that
7  'other activity' has such an unbounded reading that it would authorize Defendants to invoke
8  Section 2808 to build a barrier on the southern border." *Id.*

Finally, to accept the Administration's argument that "military construction projects" should include land that DOD is acquiring for the purpose of constructing a border wall and construction of that wall for use by *CBP*—not the military—would be to circumvent the prohibitions of Section 2808 and would not represent a good-faith reading of the statute's requirements.  The House is aware of no prior use of Section 2808 funds for a construction project that will not be used by the military.[44]  Using Section 2808 funds to obtain land for DOD to purportedly create new military installations to build facilities that will be used for non-military purposes is inconsistent with the intent of Section 2808, and in clear defiance of Section 2808's limitation "to construction related to a military installation"—i.e., construction on "types of discrete and traditional military locations." *Sierra Club*, 379 F. Supp. 3d at 920-21.  This Court should not endorse the Administration's obvious attempt to circumvent the purposes of the statute.

**3.**  A border wall is not "necessary to support [the] use of the armed forces."  DHS describes its mission as "gain[ing], maintain[ing], and expand[ing] operational control of the U.S. Border between ports of entry," and views border barriers as a "critical capability[y]" to achieve

---

[44] Previous projects under Section 2808 have included the construction of barracks hangers and improvements to airfield runways.  *See* Michael J. Vassalotti & Brendan W. McGarry, Cong. Research Serv., IN11017, *Military Construction Funding in the Event of a National Emergency* 2 (2019), https://perma.cc/75UP-ANE3 (listing all military construction projects under Section 2808 between 2001 and 2014).

12

AMICUS BRIEF OF THE
U.S. HOUSE OF REPRESENTATIVES
2:19-CV-1502-BJR

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building, Washington, DC, 20515
(202) 225-9700

this mission.[45]  Over the past year and a half, the President has ordered a few thousand troops to assist the DHS and the CBP at the border.  Consistent with the Posse Comitatus Act, however, troops are limited to "support roles that relieve DHS personnel of non-law enforcement duties (e.g., logistics, planning, and intelligence analysis) or that provide monitoring and detection support (i.e., operating mobile surveillance camera units or providing aerial reconnaissance)."[46]

DOD has asserted that a border wall is "necessary" to support the troops because it "will reduce the demand" for the troops at barrier locations,[47] but this assertion falls far short of demonstrating that the border wall is necessary to support the use of the armed forces.  It is, at best, an argument that a border wall will reduce the need for domestic law enforcement at the border.  Put differently, the fact that the border wall will make it easier for DHS and CBP to do their jobs—and potentially reduce or change the way that DOD backup is used—does not mean that the wall is "necessary to support [the] use of the armed forces."  The relationship between the wall and the "armed forces" is too indirect and attenuated to satisfy this standard of necessity.

* * *

The Administration's expenditure of Section 2808 funds defies the mandate of Congress and infringes on the Congressional power of the purse.  This Court should not "stretch th[e] words [of Section 2808's three prerequisites] beyond their normal meaning" to give legal cover to the Administration's transgression.  *Schneider v. Smith*, 390 U.S. 17, 27 (1968).  Section 2808 is one of the scores of statutes that the President may invoke by declaring a national emergency under the National Emergencies Act.[48]  The National Emergencies Act was "not intended to grant additional authority to the President," but instead to make clear that "[t]he President can only exercise those

---

[45] Administrative Record at 42, 54.

[46] *Id.* at 42.

[47] *Id.* at 47.

[48] *See A Guide to Federal Emergency Powers and Their Use*, Brennan Ctr. (2019), https://perma.cc/3HVQ-YQAA.

13

AMICUS BRIEF OF THE
U.S. HOUSE OF REPRESENTATIVES
2:19-CV-1502-BJR

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building, Washington, DC, 20515
(202) 225-9700

powers delegated to him in other statutes."[49] Section 2808 thus limits the circumstances and manner in which the President can exercise this transfer authority. If courts fail to enforce these limits, as a practical matter, the President's emergency authority will be unbounded.

Indeed, accepting the Administration's interpretation of Section 2808 and other purported authorities for the transfer of DOD funds would transform the shutdown of the federal government into mere political theater. The Administration would have known when 2019 DOD appropriations were passed on September 28, 2018, *see* Pub. L. No. 115-245, 132 Stat. 2981, that DOD could transfer billions of dollars in wall funding under the provisions it has now invoked. If, as the Administration claims, it possessed the authority after September 2018 to transfer these funds for border wall construction, it surely would not have precipitated the longest government shutdown in history because Congress refused to appropriate the money it requested for that purpose. The Administration's actions at the end of last year speak far louder than its arguments before this Court now.

This Court should hold that the Administration's expenditure of up to $3.6 billion under Section 2808 for border wall construction violates the Appropriations Clause and is otherwise unauthorized.

**CONCLUSION**

For the foregoing reasons, plaintiff's motion for summary judgment should be granted.

---

[49] S. Rep. No. 94-1168, at 4 (1976); *accord* H. Rep. No. 94-238, at 5-6 (1975).

AMICUS BRIEF OF THE
U.S. HOUSE OF REPRESENTATIVES
2:19-CV-1502-BJR

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building, Washington, DC, 20515
(202) 225-9700

|   |   |
|---|---|
| | Respectfully submitted, |
| CARTER G. PHILLIPS | DOUGLAS N. LETTER (DC Bar No. 253492) |
| VIRGINIA A. SEITZ | *General Counsel* |
| JOSEPH R. GUERRA | |
| CHRISTOPHER A. EISWERTH | */s/ Todd B. Tatelman* |
| | TODD B. TATELMAN (VA Bar No. 66008) |
| SIDLEY AUSTIN LLP | *Deputy General Counsel* |
| 1501 K STREET N.W. | MEGAN BARBERO (MA Bar No. 668854) |
| WASHINGTON, D.C. 20005 | *Associate General Counsel* |
| (202) 736-8000 (telephone) | JOSEPHINE MORSE (DC Bar No. 1531317) |
| (202) 736-8711 (facsimile) | *Associate General Counsel* |
| cphillips@sidley.com | ADAM A. GROGG (DC Bar No. 1552438) |
| | *Assistant General Counsel* |
| | OFFICE OF GENERAL COUNSEL[*] |
| | U.S. HOUSE OF REPRESENTATIVES |
| | 219 Cannon House Office Building |
| | Washington, D.C. 20515 |
| | (202) 225-9700 |
| | douglas.letter@mail.house.gov |
| | *Counsel for Amicus Curiae the United States House of Representatives* |

November 1, 2019

---

[*] Attorneys for the Office of General Counsel for the U.S. House of Representatives and "any counsel specially retained by the Office of General Counsel" are "entitled, for the purpose of performing the counsel's functions, to enter an appearance in any proceeding before any court of the United States … without compliance with any requirements for admission to practice before such court." 2 U.S.C. § 5571(a). The Office of General Counsel wishes to acknowledge the assistance of law clerks Christine Coogle and Lily Hsu, students at The George Washington University Law School, and Nate King, a student at The Catholic University of America, Columbus School of Law, in preparing this brief.

15

AMICUS BRIEF OF THE
U.S. HOUSE OF REPRESENTATIVES
2:19-CV-1502-BJR

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building, Washington, DC, 20515
(202) 225-9700