# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

STATE OF WASHINGTON,

                Plaintiff,

      v.

DONALD J. TRUMP *et al.*,

                Defendants.

Civil Action No. 2:19-cv-01502-BJR

**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

# INTRODUCTION

On February 15, 2019, the President issued a proclamation declaring that a national emergency exists at the southern border. *See* Presidential Proclamation on Declaring a Nat'l Emergency Concerning the S. Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019) (Proclamation). Because the southern border is "a major entry point for criminals, gang members, and illicit narcotics" as well as "large-scale unlawful migration," the President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency." *Id.* Given the "gravity of the current emergency situation," the President also determined that "this emergency requires use of the Armed Forces" and "it is necessary for the Armed Forces to provide additional support to address the crisis." *Id.*

To respond to the national emergency, the President's Proclamation invoked and made available to the Department of Defense (DoD) the statutory authority conferred in 10 U.S.C. § 2808, which authorizes DoD to spend unobligated military construction funds to undertake military construction projects necessary to support the use of the armed forces in response to a national emergency that requires the use of the armed forces. DoD has been building barriers along the southern border since the 1990s, and several thousand military personnel are currently deployed to the southern border to provide a wide range of assistance to the Department of Homeland Security (DHS) in its border security mission. To provide additional support for these military forces, the Secretary of Defense undertook an extensive multi-agency deliberative process that culminated in his decision on September 3, 2019, to undertake 11 border barrier military construction projects in California, Arizona, New Mexico, and Texas pursuant to § 2808 as necessary to support the use of the armed forces in connection with the national emergency.

The State of Washington raises various statutory and constitutional challenges to the Secretary's decision, but none of them has merit. As a threshold matter, the State lacks standing to pursue its claims because the loss of anticipated tax revenue from DoD's decision to fund the barrier

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

1

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

projects, in part, with unobligated funds associated with a future military construction project at Naval Base Kitsap is insufficient to establish an injury-in-fact under Article III. Even if it had standing, the State also lacks a cause of action to pursue its claims under the Administrative Procedure Act (APA) and the Constitution because its alleged economic injuries fall outside the zone of interests protected by the limitations in § 2808, the Consolidated Appropriations Act of 2019 (CAA), Pub. L. No. 116-6, 133 Stat. 13 (2019), and the constitutional provisions it invokes.

With respect to the merits of § 2808, the State challenges the President's decision to declare a national emergency that requires the use of the armed forces, but the State has no cause of action against the President; the decision to declare a national emergency is a nonjusticiable political question; and the State cannot challenge a statutorily-authorized discretionary judgment of the President. Moreover, the Secretary of Defense's decision to undertake the projects was lawful and consistent with the requirements of § 2808. The projects all constitute "military construction" undertaken "with respect to a military installation." *See* 10 U.S.C. § 2801. Congress defined these terms broadly and the border barrier projects fall within those statutory definitions. The Secretary also properly determined that the projects are necessary to support the use of the armed forces in connection with the national emergency at the southern border because the projects will, among other things, enhance the ability of military forces to support DHS more effectively and efficiently. The Secretary's military judgment with respect to the allocation of resources to support the armed forces is committed to his discretion by law or, at most, is subject to review under a highly deferential standard given the long line of authority requiring judicial deference to military judgments. Further, there is no merit to the State's argument that the Secretary acted arbitrarily and capriciously by funding the border barrier projects using money from unobligated military construction projects, as § 2808 requires.

The Court should also reject the State's argument that the use of § 2808 violates other statutory and constitutional provisions. DoD's use of its independent statutory authority pursuant to § 2808 does not violate any provision of the CAA. The State's purported constitutional claims under the

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

2

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

Appropriations Clause and Presentment Clause are nothing more than dressed-up versions of its statutory claims and otherwise fail on the merits.

The State's request for a permanent injunction should be denied because it has not carried its burden to establish standing, let alone an irreparable injury. Additionally, the balance of equities tips sharply in favor of Defendants given the compelling interests in supporting the military forces and protecting the safety and integrity of the Nation's borders, as compared to the State's interest in collecting future tax revenue. Finally, the State's overbroad request for an injunction prohibiting the expenditure of all § 2808 money nationwide is inconsistent with basic equitable principles and is not narrowly tailored to remedy the State's asserted loss of tax revenue associated with the Kitsap project.

For these reasons, as explained below, the Court should deny the State's motion for summary judgment, grant Defendants' cross-motion for summary judgment, and enter final judgment for Defendants on all claims related to the funding and construction of the § 2808 border barrier projects.

## BACKGROUND

### I. DoD's Support for DHS's Efforts to Secure the Southern Border

On January 25, 2017, the President issued an Executive Order stating that it is the policy of the Executive Branch to "secure the southern border of the United States through the immediate construction of a physical wall on the southern border, monitored and supported by adequate personnel so as to prevent illegal immigration, drug and human trafficking, and acts of terrorism." *See* Border Security and Immigration Enforcement Improvements, Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017). On April 4, 2018, the President issued a memorandum to the Secretary of Defense, Secretary of Homeland Security, and the Attorney General titled, "Securing the Southern Border of the United States." Presidential Memorandum, 2018 WL 1633761 (Apr. 4, 2018). The President stated that "[t]he security of the United States is imperiled by a drastic surge of illegal activity on the southern border" and pointed to an "anticipated rapid rise in illegal crossings," as well as "[t]he combination of illegal drugs, dangerous gang activity, and extensive illegal immigration." *Id.* The President determined the situation at the border had "reached a point of crisis" that "once again calls

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

3

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

for the National Guard to help secure our border and protect our homeland." *Id.* To address this crisis, the President directed the Secretary of Defense to support DHS in securing the border, including through the use of the National Guard. *Id.*

The President's directive for the military to assist with DHS's border security efforts builds on a decades-long practice of DoD providing support to civilian law-enforcement activities at the border. Congress has authorized the military to provide a wide range of support to DHS at the southern border. *See, e.g.*, 10 U.S.C. §§ 251–52, 271–84. And since the early 1990s, military personnel have provided extensive assistance to civilian law-enforcement agency activities to secure the border, counter the spread of illegal drugs, and respond to transnational threats. *See* H. Armed Servs. Comm. Hr'g on S. Border Defense Support (Jan. 29, 2019) (Joint Statement of John Rood, Under Secretary of Defense for Policy, and Vice Admiral Michael Gilday, Director of Operations for the Joint Chiefs of Staff) (Exhibit 1). For decades, U.S. military forces have played an active role in barrier construction and reinforcement on the border. *See, e.g.*, H.R. Rep. No. 103-200, at 330-31, 1993 WL 298896 (1993) (commending DoD for its role in constructing the San Diego primary fence); Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities, 1999 WL 258030 (Apr. 27, 1999) (military personnel constructed over 65 miles of barrier fencing); Joint Statement of Rood and Gilday (National Guard built over 100 miles of barriers).

Since the President issued his April 2018 memorandum, military personnel deployed to the southern border have performed a broad range of administrative, logistical, and operational tasks in support of DHS's border security mission. *See* Administrative Record (AR) at 45 (ECF No. 9); H. Comm. Homeland Security Hr'g on DoD's Deployment to the U.S. Mexico Border (June 20, 2019) (Statement of Robert G. Salesses, Deputy Assistant Secretary of Defense) (Exhibit 2); *see id.* (Joint Statement of DHS Officials) (Exhibit 3). These activities include installing vehicle and pedestrian barriers; emplacing concertina wire along the border and at ports of entry; and operating aerial and mobile surveillance equipment to detect activity along the border. *See id.*

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

4

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

## II.  The President's Proclamation Declaring a National Emergency at the Southern Border

On February 15, 2019, the President declared that "a national emergency exists at the southern border of the United States." *See* Proclamation. The President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency." *Id.* The President explained:

> The southern border is a major entry point for criminals, gang members, and illicit narcotics. The problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years. In particular, recent years have seen sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending. If not detained, such aliens are often released into the country and are often difficult to remove from the United States because they fail to appear for hearings, do not comply with orders of removal, or are otherwise difficult to locate.

*Id.* "Because of the gravity of the current emergency situation," the President determined that "this emergency requires use of the Armed Forces" and "it is necessary for the Armed Forces to provide additional support to address the crisis." *Id.*

On March 15, 2019, the President vetoed a joint resolution passed by Congress that would have terminated the national emergency declaration. *See* Veto Message for H.R.J. Res. 46, 2019 WL 1219481 (Mar. 15, 2019). The President relied upon statistics published by U.S. Customs and Border Protection (CBP) as well congressional testimony by the Secretary of Homeland Security to reaffirm that a national emergency exists along the southern border. *See id.* The President highlighted, among other things: (1) a recent increase in the number of apprehensions along the southern border; (2) CBP's seizure of hundreds of thousands of pounds of illegal drugs; and (3) arrests of aliens previously charged with or convicted of crimes. *See id.* The President concluded that the "situation on our border cannot be described as anything other than a national emergency, and our Armed Forces are needed to help confront it." *Id.*

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

5

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

On October 15, 2019, the President vetoed a second joint resolution that sought to terminate the national emergency declaration. *See* S.J. Res. 54 Veto Message, 2019 WL 5206087. The President again reaffirmed that there is a national emergency requiring the use of the armed forces at the southern border. *See id.* The President stated that the "ongoing crisis at the southern border threatens core national security interests" and termination of the national emergency would "impair the Government's capacity to secure the Nation's southern borders against unlawful entry and to curb the trafficking and smuggling that fuels the present humanitarian crisis." *Id.*[1]

### III.   10 U.S.C. § 2808

The President's Proclamation made available to the Secretary of Defense the military construction authority provided by 10 U.S.C. § 2808. *See* Proclamation. 10 U.S.C. § 2808(a) provides:

> In the event of a declaration of war or the declaration by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 *et seq.*) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces. Such projects may be undertaken only within the total amount of funds that have been appropriated for military construction, including funds appropriated for family housing, that have not been obligated.

The term "military construction" as used in § 2808 "includes any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any acquisition of land . . . ." 10 U.S.C. § 2801(a). Congress defined the term "military installation" to mean "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department or, in the case of an activity in a foreign country, under the operational control of the Secretary of a military department or the Secretary of Defense, without regard to the duration of operational control." *Id.* § 2801(c)(4).

Presidents have invoked the military construction authority under § 2808 on two prior

---

[1] Congress failed to override the President's vetoes. *See* Summary, H.R.J. Res. 46, 116th Cong., www.congress.gov/bill/116thcongress/house-joint-resolution/46; Summary S.J. Res. 54, www.congress.gov/bill/116th-congress/senate-joint-resolution/54.

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.          6
Case No. 2:19-cv-01502 (BJR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

occasions. First, President George H.W. Bush authorized the use of § 2808 in 1990 following the Government of Iraq's invasion of Kuwait. *See* Exec. Order No. 12734, 55 Fed. Reg. 48099 (Nov. 14, 1990). Second, President George W. Bush invoked § 2808 in response to the terrorist attacks against the United States on September 11, 2001. *See* Exec. Order No. 13295, 66 Fed. Reg. 58343 (Nov. 16, 2001). The national emergency addressing the September 11 attacks remains in effect today, *see* 84 Fed. Reg. 48545 (Sept. 12, 2019), and DoD has used its § 2808 authority to build a wide variety of military construction projects over the past 18 years, including security fencing and protective barriers at domestic military installations. *See* Cong. Research Serv., Military Construction Funding in the Event of a National Emergency at 1–3 & tbl. 1 (updated Jan. 11, 2019); *see* Memorandum for the Secretary of the Army (Dec. 4, 2001) (Exhibit 4).

## IV. The Secretary of Defense's Authorization to Undertake 11 Border Barrier Military Construction Projects Pursuant to § 2808

On September 3, 2019, pursuant to § 2808, the Secretary of Defense determined that 11 border barrier projects along the international border with Mexico are military construction projects necessary to support the use of the armed forces in connection with the President's declaration of a national emergency. *See* AR at 1–33; *see also id.* at 11 (list and locations of projects); Maps of § 2808 Projects (Exhibit 5)

Based on analysis from the Chairman of the Joint Chiefs of Staff, among others, the Secretary concluded the projects will deter illegal entry, increase the vanishing time of those illegally crossing the border (*i.e.*, the time that passes before a subject who illegally crosses the border can no longer be identified), and channel migrants to ports of entry. *Id.* at 9. Further, the projects will support the use of the armed forces by reducing demand for DoD personnel and assets at the locations where the barriers are constructed and allow redeployment of DoD personnel and assets to other high-traffic areas on the border without barriers. *Id.* Consequently, the barriers serve as force multipliers enhancing military capabilities and allow DoD to support DHS more efficiently and effectively. *Id.*

To fund these projects, the Secretary approved the use of up to $3.6 billion in unobligated

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

7

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

military construction funds. *See id.* at 82–89. The Secretary directed that, initially, only funds associated with projects located outside the United States will be provided to the Department of the Army. *See id.* at 82. Deferred military construction projects outside the United States account for $1.8 billion of the required funds. *See id.* The remaining $1.8 billion associated with deferred projects located in the United States (including U.S. territories) will be made available to the Secretary of the Army when needed for obligation. *See id.* As relevant to this case, one of the deferred military construction projects is a pier and maintenance facility at the Naval Base Kitsap in Bangor, Washington. *See* AR at 89. The project has an estimated cost of $88.75 million and a scheduled contract award date of February 2021. *Id.*

The Secretary identified four different types of land on which the barrier projects would be built and, as necessary, authorized the Secretary of the Army to take steps to acquire and add that land to the Army's real property inventory, either as a new military installation or as part of an existing military installation. *See id.* at 3, 6, 9–10, 30–31. First, two projects will be built on the Barry M. Goldwater Range, an existing military installation in Arizona. *See id.* at 3. The Goldwater Range is used for live fire and weapons exercises by United States military pilots. *See, e.g.,* National Defense Authorization Act for Fiscal Year 2000, Pub. L. 106-65, Title XXX, § 3031, 113 Stat. 512. Second, several projects will be located in whole or in part on Federal land not subject to the Federal Property and Administrative Services Act (Property Act), 40 U.S.C. § 101 *et. seq.*, and that can be transferred under the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 *et seq. See* Declaration of Brigadier General Glenn Goddard ¶ 10 (Exhibit 6). The Secretary authorized and directed the Secretary of the Army to request that the Department of the Interior (DoI) transfer Federal lands subject to the FLPMA required for the projects to the Army. *See* AR at 9–10, 30–31. On September 18, 2019, DoI announced transfers of the public lands for five projects in this category. *See* Public Land Order Nos. 7883–87, 84 Fed. Reg. 50063–65 (Sept. 24, 2019). Third, for Federal land governed by the Property Act, the Secretary of Defense directed that the relevant Federal land holding agency, through the General Services Administration (GSA), transfer administrative

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

8

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

jurisdiction over lands in the project areas to the Army expeditiously and without charge. *See* AR at 9–10, 30–31. Fourth, with respect to any non-Federal land, the United States intends to acquire that land through negotiated purchases or condemnation. *See id.* at 3; Goddard Decl. ¶¶ 9, 10.c. On October 8, 2019, the Secretary of the Army assigned all land necessary for the § 2808 projects to the U.S. Army Garrison Fort Bliss, Texas, making those lands part of the Fort Bliss military installation, upon transfer of administrative jurisdiction to the Army. *See* General Order No. 2019-36, Assignment of Southwest Border Sites (Exhibit 7).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that a party may move for summary judgment on some or all of the claims or defenses presented in a case. Summary judgment is appropriate when, viewing the evidence and drawing all reasonable inferences in favor of the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

### I. The State Lacks Standing.

The State lacks standing to bring this action because DoD's decision to defer the Kitsap pier project does not provide the State with a cognizable injury-in-fact.

To establish standing under Article III of the Constitution, a plaintiff must show: (1) it has suffered an "injury in fact," which is an "actual or imminent" invasion of a legally protected interest that is "concrete and particularized"; (2) the injury must be "fairly traceable" to the challenged conduct of the defendant; and (3) it must be likely that the plaintiff's injury will be redressed by a favorable judicial decision *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

The State bases its standing on two incorrect theories related to the deferral of the Kitsap pier project. *See* State's Mot. at 9–10. First, the State contends that the deferral of the project "by itself" gives the State standing because it is a "loss of direct benefits from the federal government." *See id.* But the State is not a direct recipient of the money that Congress appropriated for the Kitsap project.

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

9

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

The State does not assert that it would bid for the construction contract or otherwise receive funds directly from DoD. Instead, the State's theory is that third party contractors who would receive the money, as well as downstream vendors and individuals in the supply chain who provide the contractors with materials and labor, will now pay fewer taxes to the State. *See* State's Mot. at 10; *see generally* Oline Declaration (ECF No. 18). The indirect nature of the State's asserted injury distinguishes it from the only case the State relies upon to support its direct injury standing theory. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) (holding that California had a "direct financial stake" and therefore standing to challenge the awarding of oil and gas leases where the federal government was required "to turn over a fair share of the revenues . . . to the neighboring coastal State").

Second, the State contends that the loss of tax revenue from the deferral of the Kitsap project provides a basis for standing. *See* State's Mot. at 9–10. But "[l]ost tax revenue is generally not cognizable as an injury-in-fact for purposes of standing." *Arias v. DynCorp,* 752 F.3d 1011, 1015 (D.C. Cir. 2014) (citing *Pennsylvania ex rel. Shapp v. Kleppe,* 533 F.2d 668, 672 (D.C. Cir. 1976)). That is because "virtually all federal policies" will have "unavoidable economic repercussions" on state tax revenues, and accordingly, complaints about such losses typically amount to "the sort of generalized grievance about the conduct of government, so distantly related to the wrong for which relief is sought, as not to be cognizable for purposes of standing." *Kleppe*, 533 F.2d at 672; *see Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) (holding that there was an insufficiently direct link between reduced tax revenue and federal disaster relief decisions to support standing); *Arias*, 752 F.3d at 1015 (holding that loss of tax revenue from anti-drug herbicide-spraying operation resulting in damage to local crops was insufficient to establish standing).

In *Wyoming v. Oklahoma*, the Supreme Court recognized standing to challenge "a direct injury in the form of a loss of specific tax revenues," but distinguished cases where "actions taken by United States Government agencies [have injured their] econom[ies] and thereby caused a decline in general tax revenues." 502 U.S. 437, 448 (1992) (discussing *Kleppe* and *Miller*). In reaching that conclusion, the Supreme Court emphasized that states must establish a direct link between the tax at issue and the

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

10

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

administrative action being challenged to meet the requirements for Article III standing. *Wyoming* concerned a law enacted by Oklahoma that required Oklahoma utility companies to use a certain percentage of Oklahoma coal. *See* 502 U.S. at 443–44. Prior to the law's enactment, Oklahoma utility companies used nearly 100% Wyoming coal, for which Wyoming charged a specific severance tax for extracting coal from the state. *Id.* at 445. After the law's enactment, Oklahoma businesses purchased less Wyoming coal, reducing Wyoming's severance tax revenues accordingly. *Id.* at 446–48. The Supreme Court held that the direct link between Oklahoma's law targeting coal usage and a specific stream of tax revenue based on coal extraction was sufficient to support Wyoming's standing to sue. *Id.* at 447, 451.

The direct connection that the Supreme Court found critical to standing in *Wyoming* is not present in this case, as the State merely asserts that its "general fund revenues" will decline if it cannot levy general sales, use, and occupation taxes on the contractors and other supply chain participants who would receive the funds associated with the Kitsap project. *See* Oline Decl. ¶¶ 7–16; *see also Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) ("a state must show a fairly direct link between the state's status as a recipient of revenues and the legislative or administrative action being challenged") (internal quotations omitted).[2] Because the challenged action in this case is not "directly linked" to State's fisc, *Wyoming*, 502 U.S. at 450, any indirect reduction in tax revenues obtained from third party contractors is insufficient to support standing. *Cf. Lujan,* 504 U.S. at 562 (explaining that standing "is ordinarily substantially more difficult to establish" when an alleged injury turns on the conduct of third parties).

The other cases from this Circuit that the State relies upon—*City of Sausaltio v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004), and *City of Oakland v. Lynch*, 798 F.3d 1159 (9th Cir. 2015)—did not discuss *Wyoming* and, in any event, are distinguishable. In *City of Sausalito*, the plaintiff municipality claimed injury-in-fact on the grounds that plans by the National Park Service to rehabilitate and develop a

---

[2] For these reasons, the Court should not follow the standing analysis in *El Paso Cty. v. Trump*, No. EP-19-CV-66-DB, 2019 WL 5092396 (W.D. Tex. Oct. 11, 2019).

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

11

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

former military base would increase traffic and crowds, decrease the city's aesthetic appeal such that the city's tax revenue derived from those activities would erode, and harm its natural resources. 386 F.3d at 1198–99. In *City of Oakland*, the city successfully alleged injury-in-fact by the potential loss of revenue from a marijuana dispensary operating under a city permit. 798 F.3d at 1164. Unlike the State's claim here, both cases presented the type of direct link between the challenged action and the plaintiffs' status as a collector of specific tax revenues that was held to constitute injury-in-fact in *Wyoming*. 502 U.S. at 448–49.

The State's assertion that it "need only establish 'a sufficient likelihood of economic injury'" is similarly misplaced. State's Mot. at 10 (quoting *Clinton v. City of New York*, 524 U.S. 417, 432 (1998)). The Supreme Court's statement quoted by the State refers to the standing of a private corporation based on competitive economic injury in the marketplace, not the standing of a state government to sue over a federal policy that indirectly results in a diminution of its tax revenue. The problem with the State's standing is not that its economic injury is unlikely, but that it is not the type of economic injury that gives rise to standing.

Additionally, contrary to the State's argument, *see* State's Mot. at 10, the "special solicitude" for states referred to in *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007), does not relax the requirements of Article III simply because the State is the plaintiff. *See Del. Dep't of Nat. Res. & Envtl. Control v. FERC*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009) (*Massachusetts* "does not eliminate the state [plaintiff's] obligation to establish a concrete injury, as Justice Stevens' opinion amply indicates"). The "special solicitude" afforded to the state plaintiff in Massachusetts, was due to the "unique circumstance" of that case because of "Massachusetts's interests in ensuring the protection of the land and air within its domain, and its well-founded desire to preserve its sovereign territory." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 476 (D.C. Cir. 2009). In *Massachusetts*, there was no question that the State was injured—"rising seas ha[d] already begun to swallow Massachusetts' coastal land." *Massachusetts*, 549 U.S. at 522. That type of injury is far stronger than the State's purported indirect economic harm.

Accordingly, the State's asserted tax loss resulting from DoD's decision to defer the award of

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

12

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

military construction funds to third party contractors is not sufficient to confer standing. *See People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 223–28 (C.D. Ill. 1989) (State of Illinois lacked standing to challenge closure of a military base based on the theory that closure would reduce its tax revenue and harm the state's economy).

## II. The State's APA Claims Lack Merit.

### A. The State is Outside the Zone of Interests Protected By § 2808 and the CAA.

Even if the State had standing, the State's APA claims fail because its alleged economic injuries fall outside the zone of interests protected by the limitations in § 2808 and the CAA. The "zone-of-interests" requirement limits the types of plaintiffs who "may invoke [a] cause of action" to enforce a particular statutory provision. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129–30 (2014). That limitation reflects the reality that Congress generally does not intend to provide a cause of action to "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions" they seek to enforce. *Thompson v. North Am. Stainless, LP*, 562 U.S. 170, 178 (2011). "Congress is presumed to legislate against the background of the zone-of-interests limitation," which excludes putative plaintiffs whose interests do not "fall within the zone of interests protected by the law invoked." *Lexmark*, 572 U.S. at 129.

Where, as here, a plaintiff brings a cause of action under the APA, 5 U.S.C. § 551 *et seq.*, to challenge a federal agency's compliance with another statute, the "interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012); *see Lexmark*, 572 U.S. at 129.

Indeed, the absence of a cause of action was among the reasons the Supreme Court stayed an injunction issued by another district court in this Circuit stopping border barrier construction where the plaintiffs presented similar arguments to the State's arguments that DoD was precluded from transferring money to fund border barrier construction. *See Trump v. Sierra Club*, 2019 WL 3369425 (U.S. July 26, 2019) ("Among the reasons is that the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

13

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

compliance with Section 8005.").[3]

Here, the State lacks a cause of action to enforce the limitations in § 2808 and the CAA because its tax revenue interests fall outside the zone of interests of those provisions.  Section 2808 provides that in the event the President declares a national emergency that requires the use of the armed forces, DoD may undertake military construction projects, "without regard to any other provision of law," that are "necessary to support such use of the armed forces."  Nothing in the text of § 2808 suggests that Congress intended to permit enforcement of the statute's limitations by parties who, like the State here, assert that a deferred military construction project would indirectly diminish its tax base. The State is not a direct recipient of military construction funds and its only interest is extracting general tax revenue from the contractors and other residents who receive the funds.  There is no evidence Congress intended for § 2808 to protect local governments from downstream economic consequences to their tax bases arising from the deferral of unobligated military construction projects. Moreover, allowing the State's suit to proceed here would lead to "absurd consequences" by enabling local governments to delay the expenditure of funds for emergency military construction projects by filing lawsuits raising generalized economic grievances. *Thompson*, 562 U.S. at 176.  In enacting § 2808 and authorizing military construction during a time of war or national emergency "without regard to any other provision of law," Congress could not have intended that result.

The States also fall outside the zone of interests protected by the provisions of the CAA they

---

[3] In *Sierra Club*, the plaintiffs did not bring an APA claim and instead asserted an implied equitable cause of action.  The district court concluded that the zone-of-interests test did not apply in an *ultra vires* challenge outside of the APA framework, *see Sierra Club v. Trump*, 379 F. Supp. 3d 883, 910 (N.D. Cal. 2019).  A motions panel of the Ninth Circuit expressed skepticism whether the "zone of interests test applies" to a non-statutory *ultra vires* clam, but concluded that, "[t]o the extent" it does apply, "it requires [the court] to ask whether Plaintiffs fall within the zone of interests of the Appropriations Clause," not the statutory provision plaintiffs asserted had been violated (*i.e.*, § 8005 of the DoD Appropriations Act).  *See Sierra Club v. Trump*, 929 F.3d 670, 700–04 (9th Cir. 2019). *But see id.* at 707–20 (N.R. Smith, J., dissenting).  In granting the extraordinary relief of a stay, the Supreme Court necessarily concluded that the Government had satisfied the standard to obtain a stay of the injunction, including a likelihood of success on the merits related to the absence of a cause of action.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (reciting stay standard).  That decision is "clearly irreconcilable" with, and thus supersedes, the motions panel's contrary holding that the Government had not satisfied the stay standard.  *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).  In any event, because the State has asserted a cause of action under the APA for statutory violations, rather than an implied cause of action, there is no question that the zone of interests applies and the correct framework for that analysis is § 2808 and the CAA.  *See Patchak*, 567 U.S. at 224.

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

14

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

invoke.  *See* State's Mot. at 18–21.  Sections 230 and 231 of the CAA simply appropriate funds to

DHS for construction of border barriers in specified areas in the Rio Grande Valley Sector of Texas.

*See* Pub. L. No. 116-6, §§ 230, 231, 133 Stat. 28.  Section 739 of the CAA limits an agency's authority

to increase funding for a "program, project, or activity as proposed in the President's budget request

for a fiscal year" until such a change is enacted in a subsequent appropriations act or made pursuant

to an agency's reprogramming or transfer authority.  *See id.* § 739, 113 Stat. 197.  These provisions

regulate the relationship between Congress and the Executive Branch regarding federal spending and

in no way protect the revenue streams of local governments who tax the contractors and residents

who receive federal funds.  Moreover, the funding for the § 2808 projects at issue here comes from

unobligated military construction funds appropriated to DoD through a separate act, not the CAA.

*See, e.g.*, Energy and Water, Legislative Branch, and Military Construction and Veterans Affairs

Appropriations Act, 2019, Pub. L. No. 115-244, div. C, tit. I (Sept. 21, 2018).  Nothing in the CAA

suggests that Congress intended to allow lawsuits by state governments who seek to protect their

future tax revenue allegedly affected by the use of funds from a completely separate appropriations

statute.  The State's tax revenue interest is thus not even arguably within the zone of interests of the

appropriations process addressed by the CAA.  *See Lexmark*, 572 U.S. at 131 (zone of interests is

determined by identifying the "interests protected by" the statute at issue); *cf. Hazardous Waste*

*Treatment Council v. Thomas*, 885 F.2d 918, 925 (D.C. Cir. 1989) (stating that a defense contractor would

fall outside zone of interests in challenging an appropriations act because "the annual defense

appropriation is not passed *in order* to benefit defense contractors, benefit them though it may").

### B.  The President's Declaration of a National Emergency Requiring the Use of the Armed Forces is Nonjusticiable.

Section 2808's military construction authority is made available to DoD upon "a declaration

by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C.

1601 *et seq.*) that requires use of the armed forces[.]"  The President's Proclamation complied with

the procedural requirements of the National Emergencies Act (NEA), *see* 50 U.S.C. §§ 1621(a), 1631,

and explained why a national emergency exists at the southern border that requires the use of the

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

15

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

armed forces.  *See* Proclamation; *see also* H.R.J. Res. 46 Veto Message; S.J. Res. 54 Veto Message.  The State's challenge to the President's discretionary decision to declare a national emergency that requires the use of the armed forces is nonjusticiable.  *See* State's Mot. at 18, 25–27.

### 1.    Presidential Action is Not Reviewable Under the APA.

The State's APA claim against the President fails at the outset because the APA "does not allow review of the President's action."  *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Dalton v. Specter*, 511 U.S. 462, 476 (1994) ("The actions of the President cannot be reviewed under the APA because the President is not an 'agency' under that Act.").  Accordingly, the Court cannot review the State's claims that the President did not comply with § 2808 or the NEA when he declared a national emergency requiring the use of the armed forces.  *See* State's Mot. at 18, 25–27.

### 2.    The President's National Emergency Declaration Presents a Nonjusticiable Political Question.

Additionally, courts that have considered the issue have uniformly concluded that the President's national emergency declarations present nonjusticiable political questions.  *See, e.g.*, *United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076, 1081 (9th Cir. 1982) ("[W]e will not address these essentially-political questions."); *United States v. Amirnazmi*, 645 F.3d 564, 581 (3d Cir. 2011) ("[F]ederal courts have historically declined to review the essentially political questions surrounding the declaration or continuance of a national emergency."); *Sardino v. Fed. Reserve Bank of New York*, 361 F.2d 106, 109 (2d Cir. 1966) (concluding that President Truman's national emergency declaration concerning the situation in Korea was not justiciable and "courts will not review a determination so peculiarly within the province of the chief executive"); *Santiago v. Rumsfeld*, 2004 WL 3008724, at *3 (D. Or. Dec. 29, 2004) (holding that plaintiffs challenge to "whether the national emergency declared by the President continues to apply to Afghanistan" has "raised an essentially political issue" and "[c]ourts should refrain from ruling on such issues"), *aff'd* 403 F.3d 702 (9th Cir. 2005) and 407 F.3d 1018 (9th Cir. 2005).  The Court should not depart from this long line of unbroken authority.

"The political question doctrine excludes from judicial review those controversies which

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

16

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 980 (9th Cir. 2007) ("the presence of a political question deprives a court of subject matter jurisdiction"). Both the separation-of-powers doctrine and the policy of judicial self-restraint require that federal courts refrain from intrusion into areas committed by the Constitution to the Legislative and Executive Branches. *See Baker v. Carr*, 369 U.S. 186, 217 (1962). The *Baker* Court set forth the factors that a court is to consider in determining whether a particular claim raises nonjusticiable political questions:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217. The existence of any one of these factors indicates the existence of a political question. *Id.*; *see Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 822 (9th Cir. 2017).

Here, the State challenges the President's determination that the national emergency "require[s] use of the armed forces[.] 10 U.S.C. § 2808(a); *see* State's Mot. at 18. But that decision—like the declaration of a national emergency itself—is a nonjusticiable political question. First, there are no judicially manageable standards to evaluate the President's decision to deploy the armed forces to the southern border to address the national emergency. As the Supreme Court has explained, "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan v. Morgan*, 413 U.S. 1, 10–12 (1973) (holding that a case seeking to impose restrictions on the domestic deployment of National Guard forces raised nonjusticiable political questions). "[C]ourts lack the competence to assess the strategic decision to deploy" the armed forces "or to create standards to determine" whether use of the armed forces "was justified or well-founded." *El-Shifa*

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

17

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

Pharm. Indus. Co. v. United States, 607 F.3d 836, 844 (D.C. Cir. 2010) (en banc); see Ctr. for Biological Diversity v. Mattis, 868 F.3d 803, 823 (9th Cir. 2017) (A political question exists where the court would have to "pass judgment on the wisdom of the Executive's ultimate foreign policy or military decisions."). "To attempt to decide such a matter without the necessary expertise and in the absence of judicially manageable standards would be to entangle the court in matters constitutionally given to the executive branch." Industria Panificadora, S.A. v. United States, 763 F. Supp. 1154, 1160 (D.D.C. 1991) (quoting In re Korean Air Lines Disaster of Sept. 1, 1983, 597 F. Supp. 613, 616 (D.D.C. 1984)), aff'd on other grounds, 957 F.2d 886 (D.C. Cir. 1992).

Second, judicial review of the President's decision to utilize the armed forces would involve precisely the sort of "policy determination of a kind clearly for nonjudicial discretion" that the Supreme Court has indicated is a hallmark of a political question. Baker, 369 U.S. at 217. The President has chosen to confront the challenges traceable to the current crisis at the border by declaring a national emergency, invoking the express powers delegated to him by Congress under § 2808, and utilizing the unique skills of the armed forces to support DHS at the border. Under these circumstances, the Court cannot review the President's decision without second-guessing the President's policy determination to utilize the armed forces to address the crisis at the southern border. The Court could not decide this question "without first fashioning out of whole cloth some standard for when" use of the armed forces "is justified." El-Shifa Pharm. Indus. Co., 607 F.3d at 845. To grant the State's requested relief, the Court would have to conduct a standardless inquiry into how the current humanitarian and security crisis at the border impacts immigration policy, foreign relations, public safety, and national security, and then weigh those policy considerations against the available resources of the Executive Branch and the armed forces. "The judiciary lacks the capacity for such a task." Id.

Third, the Commander-in-Chief Clause of the Constitution textually commits control of the armed forces to the President. See U.S. Const., art. II, § 2, cl. 1; see Johnson v. Eisentrager, 339 U.S. 763, 789 (1950) ("Certainly it is not the function of the Judiciary to entertain private litigation—even by a

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

18

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

citizen—which challenges the legality, the wisdom, or the propriety of the Commander-in-Chief in sending our armed forces abroad or to any particular region."). Accordingly, "it is the President who, as head of the Executive Branch and Commander in Chief . . . decides whether and when to deploy military forces, not this Court." *Mobarez v. Kerry*, 187 F. Supp. 3d 85, 93 (D.D.C. 2016).

### 3. The Court Cannot Second-Guess Statutorily-Authorized Discretionary Judgments of the President.

Even if there were jurisdiction and a cause of action to challenge the President's Proclamation, the State's claims against the President would fail because the State cannot challenge a statutorily-authorized discretionary judgment of the President. In *Dalton v. Spector*, 511 U.S. 462 (1994), the Supreme Court held that when courts are confronted with a claim alleging that the President has "violated the terms of" a statute, "longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President." 511 U.S. at 474.[4] The State presents exactly the sort of challenge that the Court rejected in *Dalton*; its claim is that the President exceeded his statutory authority under § 2808 because border security is a law enforcement mission that did not warrant declaring a national emergency requiring the use of the armed forces. *See* State's Mot. at 18. In other words, the State argues that the President's decision to declare a national emergency that requires the use of the armed forces was improper in these particular factual circumstances. *Cf. Dalton*, 511 U.S. at 474. But that claim "concerns not a want of Presidential power, but a mere excess or abuse of discretion in exerting a power given." *See id.* (quoting *Dakota Central Telephone Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919)).[5] When a statute "commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Id.* at 477.

---

[4] The Supreme Court only "assume[d] for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA." *Dalton*, 511 U.S. at 474.

[5] In *Dakota Central Telephone Co.*, the Supreme Court rejected the same type of claim that the State asserts here, namely that the President "exceeded the authority given him" pursuant to a statute by taking action when "there was nothing in the conditions at the time the power was exercised which justified the calling into play of the authority." 250 U.S. at 184.

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

19

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

Congress did not define the term "national emergency" in the NEA or § 2808, or impose any conditions or restrictions in § 2808 that would limit the President's discretionary authority as Commander-in-Chief to decide whether a national emergency would require the use of the armed forces. Instead, Congress intentionally left these determinations to the President's discretion. *See Spawr Optical Research,* 685 F.2d at 1080 (recognizing that Congress gave the President "flexibility" and a "broad delegation" to declare a national emergency); *see also* Nat'l Emergencies Act: Hr'gs Before the Subcomm. On Admin. Law and Governmental Relations, 94th Cong. 27, 31 (March 6, 1975) (multiple statements that Congress did not attempt to limit the circumstances under which the President could declare a national emergency). In accordance with § 2808, the President chose to confront the crisis at the southern border by declaring a national emergency that requires the use of the armed forces. There is no basis for the Court to second-guess that military judgment because "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [judicial] review." *Dalton,* 511 U.S. at 476.

The State asserts that the President violated the NEA because he declared a national emergency for "pretextual" reasons in order to circumvent congressional appropriations enactments and thus the Proclamation is subject "to review for good faith." *See* State's Mot. at 25. But even setting the various justiciability obstacles aside, the State provides no support for the proposition that courts can graft new limitations on the President's discretionary authority to declare a national emergency without statutory basis. Moreover, the case the State cites to support its position—*Kleindienst v. Mandel*, 408 U.S. 753 (1972)—does not address Presidential action and, in any event, supports Defendants' position. *Id.* at 769 (holding that where the Attorney General gave a "facially legitimate and bona fide" reason for his action, the courts will not "look behind the exercise of that discretion").

The State's reliance on *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), is also misplaced because that case involved a claim that the Secretary of Commerce acted arbitrarily and capriciously under the APA based on a pretextual rationale. As explained above, arbitrary and capricious review under the APA is not available for Presidential action. *See Dalton,* 511 U.S. at 476. The State also points to Congress's efforts to terminate the Proclamation, *see* State's Mot. at 26, but the absence of

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

20

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

a judicial enforcement mechanism in the NEA and fact that Congress has been unable to muster the political support to override the President's vetoes only reinforces the NEA's exclusive remedial scheme that allows Congress, not private litigants, to challenge through political means the President's determination that a particular national emergency exists. *See* 50 U.S.C. § 1622; *see also Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981) ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate.").

### C. The § 2808 Border Barriers Are Military Construction Projects.

Assuming the Court reaches the merits of the State's claim, the Secretary of Defense's actions are plainly lawful. Section 2808(a) authorizes the Secretary of Defense to "undertake military construction projects" and there is no dispute here that the planned border barriers constitute "construction" being undertaken by DoD. Accordingly, the projects fall within the definition of "military construction" so long as they are undertaken "with respect to a military installation." 10 U.S.C. § 2801(a).

The locations of the planned border barrier projects fall within the broad definition of "military installation," which includes "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department[.]" *Id.* § 2801(c)(4). Two of the projects are on the Goldwater Range, an existing military installation along the border in Arizona. *See* AR at 11. The State, however, contends that construction of the projects will not be "with respect to" the Goldwater Range because the barriers have "no functional relation to a live fire range." State's Mot. at 12. But nothing in the text of § 2801 imposes a "functional relationship" test that the State attempts to add here. The statute requires that the projects be "carried out with respect to a military installation," which simply requires that the projects "relate to" a military installation. *See Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 502 (9th Cir. 2005) ("The interpretation of the phrase "relates to" instructs us on how to interpret the phrase "with respect to," as both phrases are similar in scope and meaning."); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 (1983) ("A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

21

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

a connection with or reference to such a plan."). That requirement is plainly satisfied for the Goldwater Range projects because the projects will replace and add barriers along a military installation. Even if the Court were to apply the State's proposed "functional relationship" test, the standard is also easily met here because barriers will assist the armed forces deployed in the Yuma Sector and otherwise impede passage of migrants onto a live-fire range. *See* AR. at 46–47.

With respect to the remaining project areas, DoD has the authority to obtain administrative jurisdiction over the requisite land and add it to an existing military installation in accordance with DoD's regulations governing property acquisition. *See* DoD Instruction 4165.14, *Real Property Inventory and Forecasting*; DoD Instruction 4165.71, *Real Property Acquisition*. DoD may acquire land necessary for § 2808 projects, given that § 2808 expressly authorizes "military construction," including "any acquisition of land." 10 U.S.C. § 2801(a). Section 2808 further authorizes the Secretary of Defense to undertake military construction projects (including land acquisitions) "without regard to any other provision of law." This broad language—a variant of a *non obstante* or "notwithstanding" clause—sweeps aside all statutory and regulatory provisions that might otherwise constrain the authority provided by § 2808. *See Am. Fed'n of Gov't Emps., Local 3295 v. Fed. Labor Relations Auth.*, 46 F.3d 73, 76 (D.C. Cir. 1995). The clause thus provides "a sweeping dispensation from all legal constraints," and "indicate[s] that Congress intended agencies to enjoy 'unfettered discretion.'" *Id.* at 76; *United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007) (en banc) ("The Supreme Court has indicated as a general proposition that statutory 'notwithstanding' clauses broadly sweep aside potentially conflicting laws."). Accordingly, land acquisition authorized by § 2808 need not comply with otherwise-applicable statutory restrictions.

In addition, for land currently controlled by other federal agencies, Congress has authorized land transfers between federal agencies, although such transfers are not subject to statutory constraints because of § 2808's *non obstante* clause. The FLPMA authorizes the Secretary of the Interior to make "withdrawals" of land, 43 U.S.C. § 1714(a), including the "transfer[ of] jurisdiction over an area of Federal land . . . from one department, bureau or agency to another department,

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

22

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

bureau or agency," *id.* § 1702(j).  Further, the Property Act, 40 U.S.C. §§ 101 *et seq.*, authorizes GSA to transfer excess real property between agencies.  *See id.* § 521.  For any non-federal land, the federal government's power of eminent domain has long been used to acquire property for military installations.  *See, e.g., United States v. 32.42 Acres of Land, More or Less, Located in San Diego Cty., Cal.*, 683 F.3d 1030, 1038 (9th Cir. 2012).

As explained above, the Secretary of Defense has directed the Secretary of the Army to acquire administrative jurisdiction of real property from other Federal agencies and acquire the non-Federal real property necessary to undertake the § 2808 projects.  *See supra* at 8–9.  And the Secretary of the Army has determined that the sites designated for the § 2808 border barrier military construction projects will be part of the Fort Bliss military installation upon transfer of administrative jurisdiction of those sites to the Department of the Army.  *See* Exhibit 7.  There is thus no merit to the State's argument that the projects are not "military construction."  All of the projects will be undertaken "with respect to a military installation": either the Goldwater Range or Fort Bliss.  These are clearly existing military installations, *i.e.*, a "base, camp, post, station, yard, center[.]"

In addition, the project locations meet the definition of a military installation because they are an "activity under the jurisdiction of the Secretary of a military department."  10 U.S.C. § 2801(c)(4).  The State disagrees and points to a decision by another district court in a related case challenging border barrier construction.  *See Sierra Club v. Trump*, 379 F. Supp. 3d 883, 920–21 (N.D. Cal. 2019).  That court considered the issue in the context a motion for preliminary injunction before the Secretary of Defense had made his decision to utilize § 2808 and expressed concern that canons of statutory construction "likely preclude[] treating the southern border as an 'other activity.'"  *Id.*  The court observed that the term "other activity" in § 2801 should be construed as referring to "discrete and traditional military locations" similar to "a base, camp, post, station, yard, [and] center."  *Id.* at 921.  But Defendants are *not* arguing that the entire southern U.S. border falls within the scope of an "other activity" constituting a military installation.  The Secretary of has selected 11 discrete, specific

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

23

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

project locations on which to construct border barrier projects that fall within the broad statutory definition of a "military installation." 10 U.S.C. § 2801(c)(4).

The "'other activity' clause of § 2808 is not an empty term," and "Congress undoubtedly contemplated that military installations would encompass more than just 'a base, camp, post, station, yard, [or] center.'" *Sierra Club*, 379 F. Supp. 3d at 921. Congress's choice to include an unqualified, all-encompassing term like "or other activity" indicates its intent to make the term "military installation" inclusive of activities under the jurisdiction of the Secretary of a military department *in addition to* those facilities listed in the statute. 10 U.S.C. § 2801(c)(4). Indeed, the Supreme Court has noted, with specific reference to the statute defining the terms in § 2808, that federal law treats the term "military installation" as "synonymous with the exercise of *military jurisdiction*," *United States v. Apel*, 571 U.S. 359, 368 (2014)—an exercise of jurisdiction that is present for all of the projects. If Congress had wished to limit the definition of "military installation" for purposes of § 2808, it could have done so, as it has in other statutes that define the term more narrowly in different contexts. *See* 10 U.S.C. § 2687(g)(1) (defining, for the purpose of base closures and realignments, "military installation" to include "other activity under the jurisdiction of the Department of Defense" but clarifying that "[s]uch term does not include any facility used primarily for civil works" or similar activities); Pub. L. No. 114-287, § 3, 130 Stat. 1463 (2016) (defining military installation as "any fort, camp, post, naval training station, airfield proving ground, military supply depot, military school, or any similar facility of the Department of Defense.").

Contrary to the State's argument, *see* State's Mot. at 14–15, it does not defy common sense for Congress to define military construction broadly, thereby providing DoD with appropriate flexibility to engage in emergency military construction. In passing § 2808, Congress did not limit the type of projects that could be built, recognizing "it is impossible to provide in advance for all conceivable emergency situations," H.R. Rep. No. 97-44, at 72 (1981). Further, the "only restriction" Congress placed on the scale of any such projects is that "the total cost of all projects undertaken must be within the unobligated amount of funds previously appropriated for military construction

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

24

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

and military family housing." *See* H.R. Rep. 97-612 at 20. The Court should accordingly reject the State's attempt to limit DoD's § 2808 authority by reference to inapposite canons of construction that that run contrary to the plain text of the statue and Congress's intent.

The State also incorrectly argues that DoD's reliance on § 8005 of the DoD Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat. 298, and 10 U.S.C. § 284 to provide counter-narcotics support for border barrier construction to DHS is "an implicit acknowledgment that border wall projects here are not 'military construction.'" State's Mot. at 13.[6] Defendants agree that the border barrier construction projects that DoD is undertaking pursuant to its § 284 counter-narcotics support authority are not "military construction" as defined by § 2801(c)(4) because, as explained in DHS's request for support to DoD, the § 284 projects will be constructed on federal property, and none of the land is part of a military installation, nor is the construction being carried out with respect to a military installation. *See* Declaration of Kenneth Rapuano ¶ 3 (Exhibit 8). By contrast, the projects funded pursuant to § 2808 are all being undertaken with respect to a military installation. That distinction as to the status of the land where the projects are built is significant, and undermines the State's claim that Defendants are arguing inconsistent positions. Section 2808 and § 284 are entirely separate statutes and there is nothing inconsistent about DoD utilizing each of those authorities to undertake different border barrier projects that meet the requirements of each respective statute.[7]

### D. The Border Barrier Projects are Necessary to Support the Use of the Armed Forces.

Section 2808 also requires that the military construction projects must be "necessary to support such use of the armed forces." 10 U.S.C. § 2808(a). That requirement is satisfied here and the State's contrary arguments lack merit. *See* State's Mot. at 15–18.

---

[6] The border barrier projects undertaken pursuant to § 8005 and § 284 are subject to ongoing litigation in the *Sierra Club* case and separate from the § 2808 projects at issue in this case.

[7] The State is also incorrect that Congress has never appropriated funds to DoD for border barrier construction. DoD has constructed border barriers pursuant to its counter-narcotics appropriation for decades. *See, e.g.*, H.R. Rep. No. 110-652, 420 (2008) (recommending a $5 million increase to DoD's funding to continue construction of a southern border fence, which was described as an "invaluable counter-narcotics resource"). Contrary to the State's argument, *see* State's Mot. at 13, past practice supports DoD's involvement in border barrier construction. *See supra* at 4.

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

25

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

As a threshold matter, the Secretary's decision to undertake military construction under § 2808 is not subject to judicial review under the APA because it is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). A decision is generally "'committed to agency discretion by law' when 'a court would have no meaningful standard against which to judge the agency's exercise of discretion." *City and County of San Francisco v. Dep't of Transp.*, 796 F.3d 993, 1001 (9th Cir. 2015) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). "[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" *Heckler*, 470 U.S. at 830. Here, there is no meaningful standard by which the Court could review the Secretary of Defense's decision that the border barrier projects "are necessary to support such use of the armed forces." 10 U.S.C. § 2808. That is a military judgment committed to the Secretary, and the statute does not specify any criteria the Secretary must consider in making his determination. Nor does it include any specific prohibitions or judicially manageable standards limiting the Secretary's determination of what would constitute a project "necessary" to support the use of the armed forces. *See NFFE v. United States*, 905 F.2d 400, 405–06 (D.C. Cir. 1990) (concluding that decisions about closure of military bases were committed to agency discretion by law because "the federal judiciary is ill-equipped to conduct reviews of the nation's military policy").

Even if the Secretary's judgment were reviewable, it would be entitled to substantial deference from this Court. *See, e.g., Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (military officials are owed "great deference" by courts faced with requests to enjoin military action); *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) (Courts must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest."); *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981) (Courts must give "a healthy deference to legislative and executive judgments in the area of military affairs."). Indeed, the Supreme Court has traditionally been reluctant to intervene in the conduct of military affairs. *See, e.g., Winter*, 555 U.S. at 24–27; *North Dakota v. United States*, 495 U.S. 423, 443 (1990); *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988); *Chappell v. Wallace*, 462 U.S. 296, 300 (1983); *Gilligan*, 413 U.S. at 10; *Orloff v. Willoughby*, 345 U.S. 83, 93–94

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.                26
Case No. 2:19-cv-01502 (BJR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

(1953); *see also Sebra v. Neville*, 801 F.2d 1135, 1142 (9th Cir. 1986) ("Courts are properly wary of intruding upon that sphere of military decision-making" regarding "deployment of troops and overall strategies of preparedness"). This reluctance rests on separation-of-powers concerns as well as the principle that judges "are not given the task of running the Army," *Orloff,* 345 U.S. at 93, and are "ill-equipped" to determine the impact of judicial intrusion on military decision making, *Chappell*, 462 U.S. at 305. For these reasons, the Supreme Court has instructed courts to defer to "[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force." *Gilligan*, 413 U.S. at 10; *see Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019) (granting writ of mandamus concerning discovery where the court did not apply "the appropriate deference due to a proffered military decision").

Applying this highly deferential standard of review, the administrative record supports the Secretary's military judgment that the projects are necessary to support the use of the armed forces in connection with the national emergency at the southern border. *See* AR at 1–11; 42–75; 97–137. In reaching this decision, the Secretary undertook a thorough and deliberate process of study and review that are the hallmark of judicial deference to military decisions. *See, e.g., Goldman*, 475 U.S. at 508–09; *Rostker*, 453 U.S. at 71–72; *Karnoski*, 926 F.3d at 1202. The Secretary requested and received information from DHS concerning which border barrier projects DHS considers to be most effective in improving the effectiveness and efficiency of DoD personnel supporting CBP at the southern border. *See* AR 50–57, 91. DHS explained that the proposed border barrier construction would fundamentally change the dynamic at the border, would give a distinct and enduring advantage to the Border Patrol as a force multiplier, and would provide agents with capabilities to respond more quickly to illicit activities. *Id.* at 56–57. As such, the projects would improve the effectiveness and efficiency of DoD personnel by allowing them to shift away from providing support to frequent, low risk border incursions and instead concentrate on monitoring, tracking, and responding to a smaller, more focused set of higher risk activities at the border. *Id.* at 57. By serving as a force multiplier for DHS, the projects will reduce reliance by DHS on DoD for force protection, surveillance support,

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

27

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

engineering support, and air support, and thus allow DoD to focus its efforts on a smaller, more focused area. *Id.*

In addition, the Secretary received two separate reports from the Chairman of the Joint Chiefs of Staff providing his views on whether and how border barrier projects would support the use of the armed forces deployed to the border to support DHS. The Chairman provided a preliminary assessment in February 2019. *See* AR at 119–24. That assessment concluded, among other things, that constructing physical barriers in areas where military personnel are deployed could allow those forces to be re-prioritized to other missions in support of DHS, thereby enabling a more efficient use of DoD personnel. *See id.* at 122–24. After receiving the DHS recommendation, the Secretary requested that the Chairman provide an updated and expanded report assessing a variety of factors analyzing how border barriers could support the use of the armed forces. *See id.* at 97–98.

The Chairman's final report, based on consultations with multiple DoD and DHS components, identified four key factors upon which to assess whether the projects were necessary to support the use of the armed forces at the southern border: 1) prioritization by DHS of the projects; 2) current migrant flows measured by apprehensions per month; 3) current troop dispositions and support missions by CBP sector; and 4) the type of land upon which the proposed projects were to be undertaken. *See id.* at 61–62. The Chairman then conducted a detailed analysis of these factors for each border patrol sector where proposed construction would take place. *See id.* 63–70. The Chairman analyzed, among other things, the type of proposed border barrier construction; the location and mileage of each project; the number of DoD personnel deployed to each sector and the support activities they provide to DHS; and the impact the barriers are expected to have on denying illegal entry, channeling migrants to ports of entry, and increasing vanishing times along the southern border. *See id.* For example, the Chairman concluded that barriers will reduce the areas where migrants can cross easily, thereby reducing the need for DoD personnel to operate mobile surveillance cameras as well as conduct monitoring and detection operations between ports of entry. *See id.* at 68–70. In the end, the Chairman developed a prioritized list of border barrier projects and

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

28

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

concluded that the projects are necessary to support the use of the armed forces because they support those forces by enabling more efficient use of DoD personnel, and may ultimately reduce the demand for military support over time. *Id.* at 64. Contrary to the State's argument, *see* State's Mot. at 15–18, the record explains how the projects are necessary to support military personnel, separate and apart from any benefit the projects also provide to DHS.

Relying on the Chairman's analysis and advice, as well as input from the U.S. Army Corps of Engineers, DHS, and DoI, the Secretary of Defense determined that the border barrier projects discussed above are necessary to support the use of the armed forces in connection with the national emergency. *See* AR at 1–11; 42–48 (Secretary's determination and summary of analysis regarding necessity of border barriers). The Secretary concluded that the border barrier projects will deter illegal entry, increase the vanishing time of those illegally crossing the border, and channel migrants to ports of entry. *See* AR at 9. Thus, he determined, the projects will reduce the demand for DoD personnel and assets at the locations where the barriers are constructed and allow the redeployment of DoD personnel and assets to other high-traffic areas on the border without barriers. *See id.* Given the extensive record supporting the Secretary's decision, the Court should defer to his military judgment that the barriers are necessary to support the use of military forces at the border. *See, e.g., Gilligan*, 413 U.S. at 10.

### E. DoD's Use of § 2808 Does Not Violate the CAA.

The State has also failed to establish that DoD's use of § 2808 violates the CAA. *See* State's Mot. at 18–21. Although one component of the CAA—the Department of Homeland Security Appropriations Act, 2019—places restrictions on border barrier construction funded with DHS appropriations, the CAA does not expressly or implicitly limit Defendants' ability to rely upon other statutory authorities and appropriations to fund the additional border barrier construction at issue here. And the use of such statutory authorities does not violate any other provision of the CAA.

Contrary to the State's contentions, Congress's appropriation of funds to DHS for border barrier construction in the CAA does not limit DoD's ability to utilize other available congressionally-

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

29

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

authorized statutory authorities and appropriations for such construction. The State argues that Congress's specific appropriation to DHS to fund, with restrictions, certain border barrier construction in Texas is tantamount to a prohibition of expenditures on any other statutorily authorized border barrier construction funded by other appropriations. *See id.* at 19–20. Not so. "An agency's discretion to spend appropriated funds is cabined only by the text of the appropriation." *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 200 (2012) (quotation omitted). The State has identified no restriction in the CAA on the funding of border barrier construction pursuant to other statutory authorities, nor does its plain text include one. *See generally* Pub. L. No. 116-6 (2019). The CAA's funding provisions do not otherwise alter the meaning or availability of permanent statutes already in effect. Nor did Congress modify § 2808 in the CAA. *See id.* The absence of such provisions precludes any inference that Congress intended to, or actually did, disable the use of other available authorities. *See Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978) ("doctrine disfavoring repeals by implication applies with full vigor when the subsequent legislation is an appropriations measure"); *see also Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1558 (D.C. Cir. 1984) ("[W]hen appropriations measures arguably conflict with the underlying authorizing legislation, their effect must be construed narrowly.").

In the absence of contrary language, the grant of a specific appropriation cannot be read to restrict the use of separately appropriated funds for similar purposes pursuant to other statutory authority. Had Congress wished to restrict all other border barrier construction—including construction authorized by § 2808—it could have plainly so stated, as it did elsewhere with respect to other funds in the CAA. *See, e.g.*, Pub. L. No. 116-6, Div. A, §§ 206, 231. The President made clear prior to the CAA's passage his intention to use alternative statutory sources to fund barrier construction, *see* Am. Compl. ¶¶ 75–79, but Congress nonetheless included no rider forbidding it. Because the CAA's text includes no such restrictions, neither its limits on border barrier construction funded by specific DHS appropriations, nor the history of negotiations regarding border barrier construction funding constrains DoD's ability to expend funds pursuant to § 2808. *See Salazar*, 567 U.S. at 200.

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

30

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

The State nonetheless argues that DoD cannot use a general appropriation for an expenditure where Congress has provided a more specific appropriation for the same expenditure. *See* State's Mot. at 17. But the case the State cites, *Nevada v. Department of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005), stands for a much narrower, and inapposite, principle that when a single federal agency is determining which of two appropriations to that agency should be used for a particular object or purpose, Congress presumptively intends the agency to use its specific appropriation rather than its general appropriation. Here, DoD is using its own appropriated funds for the § 2808 projects and an appropriation of funds to one agency (here, to DHS in the CAA) cannot limit a second agency (DoD) from using its own separate appropriations. Indeed, the GAO—the independent, nonpartisan arm of Congress charged with auditing Executive spending— recently concluded that DoD did not violate the general-specific appropriation principle in using §§ 8005 and 284 for border barrier construction even though Congress had appropriated funds to DHS for such construction in the CAA. *See* GAO Opinion B-330862 at 13–15 (Sept. 5, 2019) (Exhibit 9) (citing prior GAO opinions). The same reasoning applies equally to DoD's use of § 2808 and provides further support to deny the State's CAA claim.

In the absence of language in the CAA specifically restricting the use of § 2808, the State claims that DoD's actions are nonetheless prohibited by § 739 of the CAA. *See* State's Mot. at 20–21. That provision states:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

Pub. L. No. 116-6, div. D, § 739. The State's allegations rest upon a faulty premise: that barrier construction undertaken pursuant to separate funding and statutory authority under § 2808 is somehow adding funds to DHS's appropriation in the CAA. It is not. Any funds utilized for border barrier construction pursuant to § 2808 will be used for the purpose for which they were

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.                    31
Case No. 2:19-cv-01502 (BJR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

appropriated—military construction activities—and consistent with § 2808's requirements, not to increase funding of DHS's appropriation. There is no violation of § 739 because DoD is not adding additional money to a "program, project, or activity" within one of DHS's budget accounts, as that term of art is understood in the appropriations context. *See* Government Accountability Office (GAO), *A Glossary of Terms Used in the Federal Budget Process* 80 (Sept. 2005) (defining "program, project, or activity" as an "[e]lement within a budget account"); *see* 31 U.S.C. § 1112 (GAO is statutorily required to publish and maintain standard terms related to the federal budget process). Contrary to the State's argument, the term "program, project, or activity" as used in § 739 refers to a particular item funded in an agency's budget account as set forth in an appropriations act, not the "border wall" generally. *See* 2 U.S.C. § 906(k)(2) (defining "programs, projects, and activities" for purposes of budget sequestration by reference to "a budget account . . . as delineated in the appropriation Act or accompanying report for the relevant fiscal year covering that account"); *United States v. Burgess*, 1987 WL 39092, at *17 n.16 (N.D. Ill. Dec. 1, 1987) (defining the term by reference to the "most specific level of budget items" listed in an appropriations act and committee reports). The fact that Congress has separately appropriated funds to DoD for § 2808 military construction does not transform DoD's use of its § 2808 authority into an excess infusion of money to an entirely separate DHS appropriation. The use of funds at issue here complies with § 739, and the State has not established a violation of the CAA.[8]

### F. DoD's Use of § 2808 Authority Was Not Arbitrary and Capricious.

The Secretary of Defense's decision to undertake military construction pursuant to § 2808 amply meets the APA's deferential arbitrary and capricious standard. The State's claim that DoD acted arbitrarily and capriciously by "fail[ing] to consider an important aspect" of its § 2808 decision—specifically, the "cost of cancelling the [deferred] projects" in order to undertake the § 2808 projects—is without merit. State's Mot. at 22.

---

[8] For these reasons, the analysis of the CAA in *El Paso Cty.*, 2019 WL 5092396 at *12–15, should not be followed.

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

32

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

Section 2808 expressly authorizes the Secretary to fund construction authorized under that section with "funds that have been appropriated for military construction . . . that have not been obligated." *See* 10 U.S.C. § 2808 (a). The statute does not identify *any* factors that the Secretary must consider in determining which military construction projects should be deferred in order to fund § 2808 projects. *See* H.R. Rep. 97-612 at 20 (June 17, 1982) ("The *only restriction* in [§ 2808(a)] is that the total cost of all projects undertaken must be within the unobligated amount of funds previously appropriated for military construction and military family housing.") (emphasis added). Rather, it leaves such judgments to the Secretary's broad discretion. *See NFFE*, 905 F.2d at 405–06.

Here, contrary to the State's claim, the record reflects that DoD exercised that discretion with the stated objective of *minimizing* the effects of deferring existing military construction. The Secretary directed the DoD Comptroller, through close consultation with DoD Components, to identify for deferral only "military construction projects that are not scheduled for award until fiscal year 2020 or later[,]" AR at 13, "the deferral of which would have a minimal effect on Component readiness[,]" *id.* at 5, and would be consistent with the National Defense Strategy, *id.* at 94. And per the Secretary's instructions, the Comptroller prioritized deferrals "such that, initially, only [$1.8 billion of] funds associated with deferred military construction projects outside of the United States will be made available[.]" *Id.* at 13. The remaining funds associated with deferred domestic projects—like the Kitsap project at issue in this case—will be made available as necessary once overseas funds are exhausted. *Id.* at 14. As the Secretary explained, one purpose of "prioritizing funds in this manner is to provide [DoD] time to work with [Congress] to determine opportunities to restore funds for these important military construction projects[.]" *Id.*; *see* S. 1790, 116th Cong. § 2906 (bill to replenish deferred funds). Thus, the Secretary cannot fairly be said to have inadequately weighed the potential impacts of deferring existing military construction projects or to have insufficiently explained the rationale for selecting which projects to defer, particularly given the "healthy deference" due military judgments. *Rostker*, 453 U.S. at 66; *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Inc. Co.*, 463 U.S. 29, 43 (1983) (agency must "examine the relevant data and articulate a satisfactory

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

33

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

1  explanation for its action"); *Crickon v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009) (APA review is "highly

2  deferential").

3       Relying on *Mingo Logan Coal Co. v. Envtl. Prot. Agency*, 829 F.3d 710, 733 (D.C. Cir. 2016), the

4  State argues that DoD must "weigh the cost of cancelling the projects against the expected benefits

5  from 'emergency' projects." State's Mot. at 22. But the State fails to note that the language it quotes

6  in *Mingo Logan Coal Co.* is from the dissent. *See* 579 F.3d at 733 (Kavanaugh, J., dissenting). The

7  majority held that it "need not and [did] not decide precisely what" the EPA "may and must consider"

8  in making the decision challenged in that case. *Id.* at 730. And, here, it is undisputed that *nothing* in

9  the plain text of § 2808 requires DoD to engage in a cost-benefit analysis of the deferred projects.

10  *See Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 510–11 (1981) ("When Congress has intended

11  that an agency engage in cost-benefit analysis, it has clearly indicated such intent on the face of the

12  statute."); *Cent. Arizona Water Conservation Dist. v. EPA*, 990 F.2d 1531, 1542 n.10 (9th Cir. 1993).

13       Even where a statute sets forth specific factors for an agency to consider, if Congress "did

14  not assign the specific weight the [agency] should accord each of these factors, the [agency] is free to

15  exercise [its] discretion in this area." *Cent. Arizona Water Conservation Dist.*, 990 F.2d at 1542 (quoting

16  *New York v. Reilly*, 969 F.2d 1147, 1150 (D.C. Cir. 1992)); *Brady v. FERC*, 416 F.3d 1, 6 (D.C. Cir.

17  2005); *see also Sec'y of Agric. v. Cent. Roig Ref. Co.*, 338 U.S. 604, 611 (1950) (where statutorily mandated

18  "consideration[s]" are not "mechanical or self-defining standards," they indicate Congress's

19  recognition that they involve "wide areas of judgment and therefore of discretion"). Here, no statute

20  dictates the factors for DoD to consider in determining which yet-to-be awarded military

21  construction projects to defer in order to fund § 2808 construction. On the contrary, the Secretary's

22  use of his § 2808 authority is committed to his discretion precisely because (among other things)

23  matters of military policy—including assessments of "military value"—are "better left to those more

24  expert in issues of defense." *NFFE*, 905 F.2d at 406; *see Dist. No. 1, Pac. Coast Dist., Marine Eng'rs'*

25  *Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 41–42 (D.C. Cir. 2000).

26

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.          34
Case No. 2:19-cv-01502 (BJR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

1    The State's claim that "the Secretary ignored 'considerable evidence in conflict'" with his

2    decision likewise fails. State's Mot. at 22. DoD's decision to defer certain projects in order to fund

3    § 2808 construction was not grounded on the assertion that deferral of the projects would have no

4    impact on a component's mission. Nor is a "conflict" presented by the fact that DoD previously

5    requested appropriations to fund now-deferred projects in order to support a component's readiness.

6    As the Secretary's decision makes plainly clear, *minimizing* the effects of his § 2808 decision was a

7    central consideration. *See* AR at 5, 13, 14. And determining which projects best minimized the impact

8    to the military's operational readiness is precisely the type of "military value" assessment that should

9    be left to DoD's expertise. *NFFE*, 905 F.2d at 405–06.

10       Accordingly, Congress has not instructed DoD to give the considerations urged by the State

11   any particular weight—or, indeed, any weight at all. That any specific factors related to Naval Base

12   Kitsap did not receive conclusive weight in the final calculus is therefore no reason to disturb DoD's

13   decision, particularly in light of the narrow and deferential standard of APA review. *See, e.g.*, *Reilly*,

14   969 F.2d at 1150. The State has shown no "clear error" in DoD's exercise of its discretionary

15   judgment under § 2808 and thus its APA claim fails. *See State Farm*, 463 U.S. at 43.

16       ## II.    The State's Constitutional Claims Lack Merit.

17       The State also asserts that DoD's use of § 2808 violates the Appropriations and Presentment

18   Clauses of the Constitution. *See* State's Mot. at 23–24. At the outset, the State lacks a cause of action

19   and cannot satisfy the zone-of-interests requirement for these constitutional claims. Just as its alleged

20   tax revenue interests are unrelated to the limitation in § 2808 and the CAA, those purported injuries

21   also do not fall within the asserted constitutional limitations on Congress's power to authorize

22   emergency military construction.[9]

23

24   ───────────────
     [9] The State appears to assert its constitutional claims only through the APA's cause of action, *see* State's Mot. at 23, but
     to the extent the State is separately asserting an implied equitable action under the Constitution, this is not "a proper
25   case" for the "judge made remedy" of an implied cause of action under the Appropriations and Presentment Clauses.
     *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *Grupo Mexicano De Desarrollo SA v. All. Bond Fund,*
26   *Inc.*, 527 U.S. 308, 319 (1999). The State identifies no history or tradition of courts of equity inferring an equitable cause
     of action directly under those clauses in analogous circumstances.

In any event, the State merely recasts its statutory claims in constitutional terms, and "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton*, 511 U.S. at 473. The Supreme Court unanimously rejected the State's argument in *Dalton*, explaining that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." 511 U.S. at 472. The Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution is implicated if executive officers rely on it as an independent source of authority to act—which is not the case here— or if the officers rely on a statute that itself violates the Constitution, also not the case here. *Id.* at 473 & n.5. But claims alleging that an official has "exceeded his statutory authority are not 'constitutional' claims." *Id.* at 473. *Dalton*'s reasoning applies here and refutes the State's argument that they have a constitutional claim or cause of action.

The State asserts no constitutional violation separate from the alleged statutory violations. Rather, the State argues that Defendants actions are "contrary to the CAA, not authorized by 10 U.S.C. § 2808, and thus contrary to Article I, Section 7 and 9 of the Constitution." *See* State's Mot. at 24. These claims concern "simply" whether the Secretary of Defense has "exceeded his statutory authority" in authorizing the border barrier projects at issue; "no constitutional question whatever is raised," "only issues of statutory interpretation." *Dalton*, 511 U.S. at 473-74 & n.6. If the State's claims established constitutional issues, then every allegation that the President or his agents exceeded their statutory authority in some way would also constitute a constitutional claim. The Supreme Court has foreclosed that path. *Dalton*, 511 U.S. at 472.

On the merits, the Appropriations Clause simply requires that money drawn from the Treasury must be "in Consequence of Appropriations made by Law." U.S. Const., art. I, § 9, cl. 7. Accordingly, action undertaken pursuant to a federal statute like § 2808 that authorizes an expenditure "by Law" cannot violate the Appropriations Clause. *See Harrington v. Schlesinger*, 528 F.2d 455, 457–58 (4th Cir. 1975) (statutory funding disputes turn solely on "the interpretation and application of congressional

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

36

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

statutes under which the challenged expenditures either were or were not authorized," not on a "controversy about the reach or application of" the Appropriations Clause).

There is also no merit to the State's Presentment Clause claim, which asserts that DoD's use of § 2808 violated the purported limitations in the CAA. *See* State's Mot. at 24. Section 2808 does not empower any executive official to amend or repeal any law, actually or effectively. The CAA remains in effect, and the Presentment Clause does not prevent DoD from acting pursuant to other duly enacted statutes and appropriations to fund border barrier construction.

### III. The State Has Not Met The Requirements For a Permanent Injunction.

The Court should deny the State's overbroad request for a permanent injunction that would stop all § 2808 projects nationwide. *See* State's Mot. at 1; Proposed Order (ECF No. 16-1). "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC.*, 547 U.S. 388, 391 (2006). Even if State were to prevail on the merits, permanent "injunctive relief is not automatic, and there is no rule requiring automatic issuance of a blanket injunction when a violation is found." *See N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007). A permanent "injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter,* 555 U.S. at 32.

### A. The State Has Not Established an Irreparable Injury.

As explained above, the State lacks standing to challenge the § 2808 projects thus, *a fortiori*, it cannot satisfy the higher irreparable injury standard required for a permanent injunction. *See supra* at 9–13; *see Center for Food Safety v. Vilsack*, 636 F.3d 1166, 1171–73 & n.6 (9th Cir. 2011). The State is affected by the § 2808 decision only insofar as the decision to defer the award of contracts associated with the Kitsap pier project will deprive the State of the ability to collect tax revenue from contractors,

subcontractors, and individuals in the supply chain who might receive those funds. But the indirect effects of anticipated lost tax revenues are "generally not cognizable as an injury-in-fact for purposes of standing," *Arias*, 752 F.3d at 1015, and therefore insufficient to establish an irreparable injury.

## B. The Balance of Equities and Public Interest Weigh Against Injunctive Relief.

The balance of equities and public interest also weigh decidedly in Defendants' favor. *See Nken,* 556 U.S. at 435 (holding that these factors merge when the federal government is a party). The President has declared a national emergency because of the large numbers of aliens attempting to cross the border and the huge quantities of illegal drugs that continue to be smuggled across the border each year. *See* Proclamation; Veto Messages; *see also* Declaration of Millard LeMaster (Exhibit 10) (drug and border crossing statistics in fiscal year 2019). As the Supreme Court has recognized, the Government has "compelling interests in safety and in the integrity of our borders." *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 672 (1989). The President has also determined that the unique skills and resources of the armed forces are required to confront this crisis. *See* Proclamation; Veto Messages. Further, the Secretary of Defense has concluded, based on detailed analysis and advice from the Chairman of the Joint Chiefs of Staff, that the § 2808 border barrier projects are necessary to support the use of the armed forces in the context of their support to DHS at the southern border. Defendants and the public thus have a compelling interest in ensuring that military forces are properly supported and have the necessary resources to ensure mission success. *See Goldman*, 475 U.S. at 507 (courts must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest."); *Winter*, 555 U.S. at 25 (military training and readiness are of the "utmost importance").

These interests "plainly outweigh[]" the State's asserted in interest in collecting future tax revenue from government contractors. *Winter*, 555 U.S. at 26. The State does not contend otherwise and makes no effort to explain how the inability to collect approximately $2.6 million in future general tax revenue beginning in February 2021, when the contract for the Kitsap project is scheduled to be

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

38

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

awarded, would irreparably harm any State program. *See generally* Oline Decl. (ECF No. 18). Given the lopsided balance of equities and the fact that the State's interests are even less substantial than those of the plaintiffs in *Winter*, it would be an abuse of discretion to award the "extraordinary remedy" of a permanent injunction when the State has not made a "clear showing" that it is entitled to such relief. *Id.* at 22.

### C. The Court Should Reject the State's Overbroad Injunction.

There is no basis for the Court to grant the State's request for a sweeping nationwide injunction that would stop all construction and funding under § 2808. *See* State's Mot. at 29–30. It is a basic principle of Article III that "a plaintiff's remedy must be limited to the inadequacy that produced his injury in fact." *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (quotation omitted). As the Ninth Circuit recently emphasized, "[a]n injunction must be narrowly tailored to remedy the specific harm shown." *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (internal quotations omitted); *see Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). It "should be no more burdensome to the defendant than necessary to provide complete relief." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Applying these traditional principles of equity, if the Court deems an injunction necessary, the State should at most receive an injunction prohibiting DoD from using the $88.75 million associated with the Kitsap pier project on § 2808 activities. That relief that would fully remedy the State's asserted harm to its tax revenue and return the State to the same position it was in prior to the Secretary of Defense's decision to defer the Kitsap project. *See* State's Mot. at 11 (conceding that an injunction that would "restore the status quo" and "allow[] the Bangor Project to remain on track" would redress the State's asserted injury). No broader injunction is necessary to provide the State with complete relief. *See E. Bay Sanctuary Covenant*, 934 F.3d at 1029 ("The district court clearly erred by failing to consider whether nationwide relief is necessary to remedy Plaintiffs' alleged harms.").

Accordingly, the Court should reject States' request for an overbroad injunction prohibiting any further use of the entire $3.6 billion that DoD has authorized for § 2808 border barrier projects

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

39

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

nationwide. First, the State provides no support for its contention that "there is no practical way to disaggregate" the money for the Kitsap project from the other § 2808 funds. State's Mot. at 30. Money is, of course, fungible and there is no practical obstacle that would prevent a tailored injunction targeted solely to the $88.75 million at issue in this case. Second, given the other cases pending in the Ninth Circuit as well as the Fifth and D.C. Circuits raising similar claims challenging DoD's use of § 2808, an overbroad injunction stopping all § 2808 activity would have "detrimental consequences to the development of law and deprive appellate courts of a wider range of perspectives." *California v. Azar*, 911 F.3d 558, 583 (9th Cir. 2018); *see E. Bay Sanctuary Covenant*, 934 F.3d at 1029–30 (limiting geographic scope of an injunction and emphasizing the importance of allowing similar litigation in other courts to proceed).[10] The State attempts to distinguish *East Bay Sanctuary Covenant* on the ground that it was decided in a preliminary posture, *see* State's Mot. at 30, but there is no merit to that argument because the Supreme Court has emphasized that the same equitable factors are analyzed "for any injunctive relief, preliminary or permanent." *Winter*, 555 U.S. at 32. Third, even if the State were correct that this case raised a constitutional issue, *see* State's Mot. at 30, that is no basis to depart from long-standing equitable principles when deciding the scope of an appropriate remedy. In all events, injunctive relief must be "properly tailored to the alleged harm" and that principle requires that the State receive, at most, an injunction prohibiting DoD from expending only the funds associated with the Kitsap project. *E. Bay Sanctuary Covenant*, 934 F.3d at 1030.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for summary judgment, deny the State's motion for summary judgment, and enter final judgment for Defendants on all claims related to the § 2808 projects. A proposed order is attached.

---

[10] These cases include an action brought by a collection of 20 States seeking to enjoin construction of barriers in two plaintiff states (California and New Mexico) as well as the the deferral of military construction projects in non-border states. *See California v. Trump,* No. 19-CV-872 (N.D. Cal.). The Court should not preempt ongoing litigation in other courts by granting overbroad relief. *See Center for Biological Diversity v. Trump,* No. 19-CV-2085 (D.D.C.); *Rio Grade Valley International Study Center v. Trump,* No. 19-CV-720 (D.D.C.); *U.S. House of Representatives v. Mnuchin,* No. 19-CV-969 (D.D.C.); *El Paso County v. Trump,* No. 19-CV-66 (W.D. Tex.); *Sierra Club v. Trump,* No. 19-CV-892 (N.D. Cal.).

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.                    40
Case No. 2:19-cv-01502 (BJR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

DATED: November 15, 2019                Respectfully submitted,

                                        JOSEPH H. HUNT
                                        Assistant Attorney General

                                        JAMES M. BURNHAM
                                        Deputy Assistant Attorney General

                                        ALEXANDER K. HAAS
                                        Director, Federal Programs Branch

                                        ANTHONY J. COPPOLINO
                                        Deputy Director, Federal Programs Branch

                                        /s/ Andrew I. Warden
                                        ANDREW I. WARDEN
                                        Senior Trial Counsel (IN Bar No. 23840-49)

                                        KATHRYN C. DAVIS
                                        RACHAEL L. WESTMORELAND
                                        MICHAEL J. GERARDI
                                        LESLIE COOPER VIGEN
                                        Trial Attorneys
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street, NW
                                        Washington, D.C. 20005
                                        Tel.:   (202) 616-5084
                                        Fax:    (202) 616-8470

                                        *Attorneys for Defendants*

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2019, I electronically filed the foregoing Cross-Motion For Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: November 15, 2019

/s/ Andrew I. Warden
ANDREW I. WARDEN

DEFS.' MOT. FOR SUMM. JUDG. AND
OPP'N TO PLS.' MOT. FOR SUMM. JUDG.
Case No. 2:19-cv-01502 (BJR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Tel: (202) 616-5084