1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

STATE OF WASHINGTON ,                  )
                                                                )
10                   *Plaintiff*,                            )            CASE NO.       2:19-cv-01502-BJR
                                                                )
11          v.                                                  )
                                                                )            ORDER ON CROSS MOTIONS
12                                                              )            FOR SUMMARY JUDGMENT
                                                                )
13   DONALD J. TRUMP, *et al.*,                )
                                                                )
14                   *Defendants*,                       )
                                                                )
15   _____)

16

17                                        **I.         INTRODUCTION**

18          This matter comes before the Court on the parties' cross motions for summary judgment.

19   The State of Washington ("Washington," "the State," or "Plaintiff") brings this lawsuit—and the

20   instant motion for summary judgment—to enjoin Defendants[1] from diverting $88.96 million in

21   funding from a construction project located at the Naval Submarine Base Bangor ("the Bangor

22

23   ─────────────────────

[1] The Defendants in this lawsuit are: Donald J. Trump, in his official capacity as President of the United States,
24   Steven T. Mnuchin, in his official capacity as United States Secretary of the Treasury, Mark T. Esper, in his official
capacity as the United States Secretary of Defense, Ryan D. McCarthy, in his official capacity as Acting United
States Secretary of the Army, Richard V. Spencer, in his official capacity as United States Secretary of the Navy,
Matthew Donovan, in his official capacity as Acting United States Secretary of the Air Force, David Bernhardt, in
his official capacity as Acting United States Secretary of Interior, the United States of America, the United States
Department of the Treasury, the Department of Defense, and the Department of Homeland Security (collectively
"Defendants").

1

Project") on the Kitsap Peninsula in Washington, to construction of a wall along the United States-Mexico border. Defendants cross move for summary judgment and seek dismissal of the State's claims, arguing among other things that the State lacks Article III standing to pursue the claims, and that their actions are authorized by statute.

The circumstances in which this conflict arises are well-known. President Trump has long advocated for a border wall between the United States and Mexico; Congress has refused to appropriate the funds he requested to build the wall. This impasse led to the nation's longest government shutdown, beginning in December 2018 and ending 35 days later on January 25, 2019 when Congress passed, and the President signed, a stopgap spending measure to reopen the government for three weeks while a bipartisan committee negotiated an agreement on border security. On February 14, 2019, Congress passed the Consolidated Appropriations Act of 2019 ("CAA") in which it appropriated $1.375 billion to the Department of Homeland Security for border security. This amount was far less than the $5.7 billion President Trump had requested.

The President signed the CAA into law, but concurrently issued a proclamation under the National Emergencies Act, 50 U.S.C. §§ 1601-1651, in which he declared that a national emergency existed at the southern border of the United States. Pursuant to this proclamation, the President invoked 10 U.S.C. § 2808, a military construction funding provision that according to the Trump Administration allows the Department of Defense to "reprogram" funds appropriated by Congress for military construction projects away from those projects and instead use the monies to build the border wall. Thereafter, the Department of Defense identified which military construction projects it intends to defer in order to fund the border wall. The Bangor Project is among the deferred projects.

2

Washington's arguments are based on both statutory and constitutional grounds. First, because the Trump Administration is implementing its plan through its federal executive departments—namely, the Department of Defense and the Department of Homeland Security—Washington challenges the Defendants' actions through the familiar legal framework of the Administrative Procedures Act ("APA"), which grants federal courts oversight over the actions of these departments. The State contends that the decision to reprogram the Bangor Project funds must be set aside pursuant to the APA on three independent grounds: first, 10 U.S.C. § 2808 does not authorize Defendants' actions, and therefore the decision is "in excess of statutory … authority;" second, the actions are barred by the CAA and therefore "not in accordance with the law;" and  third, the decision is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A),(C)). The State also argues that Defendants' actions run afoul of the separation of powers enshrined in the Constitution, and in particular that Defendants' actions violate, *inter alia,* the Appropriations Clause and the Presentment Clause.[2] Washington asks this Court to permanently enjoin Defendants' efforts to reprogram the military construction funds.

Having reviewed the cross motions for summary judgment, the responsive pleadings, amici curiae briefs[3], the record of this case, and the relevant legal authorities, and having heard oral argument,[4] the Court will grant in part Washington's motion and deny Defendants' motion. The reasoning for the Court's decision follows.

---

[2] Because the Court resolves the controversy before it on statutory grounds, as discussed below, it does not reach Plaintiff's constitutional claims. *See infra*, § IV.C.

[3] The following amici curiae filed briefs, all in support of the State of Washington: (1) sixty former officials in the U.S. government who have worked on national security and homeland security issues (dkt. no. 20); (2) the Northwest Immigrant Rights Project and National Immigration Law Center (dkt. no. 26); (3) the Brennan Center for Justice at NYU School of Law (dkt. no. 33); (4) the United States House of Representatives (dkt. no. 36); and (5) a bipartisan group of more than 100 former Members of the House of Representatives (dkt. no. 37).

[4] The Court held a hearing on the cross motions for summary judgment on January 23, 2020.

## II.   FACTUAL BACKGROUND

### A.   The President's Negotiations with Congress

As stated above, the President campaigned on the promise to build "The Wall" between the United States and Mexico. Five days after taking the oath of office, President Trump issued an Executive Order stating that it is the policy of the Executive Branch to "secure the southern border of the United States through the immediate construction of a physical wall on the southern border, monitored and supported by adequate personnel so as to prevent illegal immigration, drug and human trafficking, and acts of terrorism."[5]

Upon taking office, President Trump sought $2.6 billion in appropriations from Congress for barrier construction along the southern border.[6,7] Congress declined to appropriate the amount requested, instead allocating $1.571 billion for border security.[8] Members of Congress introduced several bills throughout 2018 that would have appropriated additional billions for border barrier construction along the southern border, but ultimately Congress declined to pass any of these bills. *See Sierra Club v. Trump*, 929 F.3d 670, 677 (9th Cir. 2019) (listing bills). In fact, between 2017 and 2018, Congress considered and rejected at least ten additional bills to fund the border wall. *Id*.

Unhappy with Congress's repeated refusal to appropriate the funds he requested for the border wall, in December 2018, President Trump declared that he would not sign any government funding bill that did not allocate substantial funding for a physical barrier along the

---

[5] Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017).

[6] *See, e.g.*, *Budget of the U.S. Government: A New Foundation for American Greatness: Fiscal Year 2018*, Office of Mgmt. & Budget 18 (2017), https://www.whitehouse.gov/wp-content/uploads/2017/11/budget.pdf (requesting "$2.6 billion in high-priority tactical infrastructure and border security technology, including funding to plan, design, and construct a physical wall along the southern border").

[7] Office of Mgmt. & Budget, Exec. Office of the President, *Budget of the United States Government, Fiscal Year 2018* at 18 (2017).

[8] Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. F, tit 11, § 230(a) (2018).

4

United States' southern border.[9] He also repeatedly stated that he was willing to declare a national emergency in order to obtain funding for the wall if Congress refused to allocate the funds.[10]

Congress did not pass a funding bill with the President's requested border barrier appropriations, and as a result, the United States entered the longest partial federal government shutdown in its history. During the shutdown, the President "request[ed] $5.7 billion for construction of a steel barrier" of approximately "234 miles of [a] new physical barrier" along "the Southwest border" of the United States.[11] As stated above, the government shutdown ended without an agreement on the amount to be provided for border barrier funding.[12] Instead, Congress passed and the President signed a stopgap spending measure to reopen the federal government for three weeks, *Sierra Club*, 929 F.3d at 678 (citing H.R.J. Res. 28, 116th Cong. (2019)), and a bipartisan committee of House and Senate lawmakers was created to "put together a Homeland Security package" within the "next 21 days" for the President to "sign into law."[13]

### B.    The Consolidated Appropriations Act of 2019

On February 14, 2019, Congress passed the Consolidated Appropriations Act of 2019 ("CAA"). Pub. L. No. 116-6, div. A, 133 Stat. 13 (2019). The CAA consolidated into one bill

---

[9] Erica Werner et al., *Trump Says He Won't Sign Senate Deal to Avert Shutdown, Demands Funds for Border Security*, Wash. Post (Dec. 21, 2018), https://wapo.st/2EIpkHu?tid==ss_tw&utm_term=.6e7c259f6857).

[10] *Remarks by President Trump During Roundtable Discussion with State, Local, and Community Leaders on Border Security and Safe Communities* (Jan. 12, 2019) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-congressional-leadership-border-security/; *see also*, *Remarks by President Trump in Meeting with Senate Minority Leader Chuck Schumer and House Speaker-Designate Nancy Pelosi*, The White House (Dec. 11, 2018, 11:40 A.M.), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-senate-minority-leader-chuck-schumer-house-speaker-designate-nancy-pelosi/.

[11] Letter from Russell T. Vought, Acting Dir. Of the Office of Mgmt. and Budget, to Richard Shelby, Chairman of the Senate Comm. on Appropriations (Jan. 6, 2019).

[12] *Remarks Delivered by President Trump on the Government Shutdown* (Jan. 25, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-government-shutdown/.

[13] Remarks by President Trump on the Government Shutdown (Jan. 25, 2019) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-government-shutdown/.

appropriations acts related to different federal agencies, including the Department of Homeland Security Appropriations Act for Fiscal Year 2019. *See id.*, div. A. The CAA made available $1.375 billion—less than one quarter of the $5.7 billion sought by the President—for border barrier security. Further, the CAA placed several limitations on how the funds could be spent.[14]

Most importantly, being well-aware of President Trump's repeated threats to declare a national emergency if Congress did not provide him with the full $5.7 billion he requested to build the border wall, Congress included § 739 in the CAA. Section 739 provides:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriations Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

*Id.* at § 739. President Trump signed the CAA into law the following day.

### C.   The President Issues Proclamation No. 9844

The same day that the President signed the CAA into law, he issued Proclamation No. 9844 under the National Emergencies Act, declaring that "a national emergency exists at the southern border of the United States":

> The current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency. The southern border is a major entry point for criminals, gang members, and illicit narcotics. The problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years. In particular, recent years have seen sharp increases in the number of family units entering and seeking entry to the United States and an

---

[14] First, the funds can only be used to construct "pedestrian fencing, including levee pedestrian fencing." *Id.* at § 230(a)(1). Second, the fencing must be of a design that was "deployed as of the date of the Consolidated Appropriations Act, 2017 (Public Law 115-31), such as currently deployed steel bollard designs, that prioritize agent safety." *Id.* at § 230(b). Third, the CAA provides that "[n]one of the funds made available by this Act or prior Acts are available for the construction of pedestrian fencing" within various specified wildlife refuges and parks. *Id.* at § 231.

inability to provide detention space for many of these aliens while their removal proceedings are pending. If not detained, such aliens are often released into the country and are often difficult to remove from the United States because they fail to appear for hearings, do not comply with orders of removal, or are otherwise difficult to locate. In response to the directive in my April 4, 2018, memorandum and subsequent requests for support by the Secretary of Homeland Security, the Department of Defense has provided support and resources to the Department of Homeland Security at the southern border. Because of the gravity of the current emergency situation, it is necessary for the Armed Forces to provide additional support to address the crisis.

Proclamation No. 9844, 84 Fed. Reg. 4,949. As he repeatedly stated he would do, along with the Proclamation, President Trump invoked 10 U.S.C. § 2808, which provides that the Secretary of Defense may authorize military construction projects if three criteria are met: (1) the President has declared a national emergency that (2) requires use of the armed forces and (3) the authorized projects will support the armed forces. *See* 10 U.S.C. § 2808(a). Specifically, the White House declared that, among other funding sources, "[u]p to $3.6 billion" will be "reallocated from Department of Defense military construction projects" previously appropriated by Congress and instead used for barrier construction along the southern border pursuant to § 2808 and "the President's declaration of a national emergency."[15]

Congress sought to terminate the national emergency on two occasions, but each time the President vetoed the joint resolution and Congress failed to override the President's veto. *See* 165 Cong. Rec. H2799, H2814-15 (2019); S.J. Res. 54, 116 Cong. (2019).

**D.  Defendants Divert Military Construction Funding from a Project Located in Washington State**

On September 3, 2019, the Secretary of Defense gave notice to Congress that, pursuant to the Proclamation, he had "authorized and directed the Acting Secretary of the Army to

---

[15] *President Donald J. Trump's Border Security Victory*, The White House (Feb. 15, 2019), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-security-victory/

undertake" the building of eleven border barrier projects in California, Arizona, New Mexico, and Texas. *See California v. Trump*, 407 F. Supp. 3d 869, 880 (N.D. Cal. 2019). Collectively, the eleven projects total $3.6 billion and include 175 miles of border barrier construction. *Id*. The eleven projects include two on the Barry M. Goldwater Range in Arizona, seven on federal public domain land that is under the jurisdiction of the Department of Interior, and two on non-public land that would need to be acquired through either purchase or condemnation before construction could begin. *Id*. at 880-81.

Two days later, on September 5, 2019, the Department of Defense announced that it would obtain the $3.6 billion necessary to build the eleven border barrier projects by diverting funds from 127 military construction projects pursuant to 10 U.S.C. § 2808. *Id*. at 881. Included in the list of 127 military construction projects is the Bangor Project, for which Congress had appropriated $88.96 million. Bangor is home to the United States Pacific Fleet of Trident Ballistic Missile Submarines, nuclear powered submarines that carry nuclear warheads. Dkt. No. 1, at 30. Congress authorized funding for the Bangor Project as part of the John S. McCain National Defense Authorization Act to address what the Navy described as deficiencies at the strategically important Base. Pub. Law No. 115-232, Sec. 2201 (Aug. 13, 2018). The Project includes constructing a pier for two 250-foot blocking vessels, a boat shop capable of supporting 30 vessels, a fueling station, and a fuel storage tank.

### E.    Procedural History

On September 19, 2019, the State filed this lawsuit to enjoin Defendants from diverting the military funds Congress appropriated for the Bangor Project to the eleven boarder barrier projects. Dkt. No. 1. Washington filed an amended complaint on October 25, 2019, as well as the instant motion for summary judgment. Dkt. Nos. 15 and 16. Defendants filed a cross motion for

8

summary judgment on November 15, 2019 and further agreed not to obligate the $88.96 million

appropriated for the Project until February 1, 2020. Dkt. Nos. 10 and 43. The Court held oral

argument on the motions on January 23, 2019. Thereafter, Defendants agreed to delay obligating

the $88.96 million until March 1, 2020. *Id*. The motions are now ripe and ready for resolution.[16]

## III.   STANDARD OF REVIEW

"[S]ummary judgment is appropriate when 'there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law.'" *Albino v. Baca*, 747 F.3d 1162,

1168 (9th Cir. 2014)(quoting Fed. R. Civ. P. 56(a)). Where, as here, the material facts are not

---

[16]   There are three cases that are related to the instant case: *State of California v. Trump*, No. 19-cv-00872-HSG and *Sierra Club v. Trump*, No. 19-cv-00892-HSG, both filed in the Northern District of California and both before the Honorable Haywood S. Gilliam, Jr., and *El Paso County v. Trump*, No. EP-19-cv-66-DB before the Honorable David Briones in the Western District of Texas. Each case is filed against essentially the same defendants as those in the instant case and each case challenges the Trump Administration's diversion of military construction funding to the eleven border barrier projects along the southern border of the United States. The cases raise substantially similar but not identical issues and arguments. Differences include the type of plaintiff and injuries alleged, as well as the source of funding and the statutes the defendants rely on to divert the funding.

On May 24, 2019, Judge Gilliam issued a permanent injunction against Defendants in *Sierra Club*, barring them from using § 8005 of the Department of Defense Appropriations Act of 2019 to reprogram approximately $2.5 billion from the Department of Defense to the Department of Homeland Security for purposes of building the border barrier projects. *Sierra Club v. Trump*, 379 F. Supp. 3d 883 (N.D. Cal. May 24, 2019). Defendants filed an emergency motion requesting a stay of the permanent injunction, which the Ninth Circuit denied on July 3, 2019. *Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019). On July 26, 2019, the Supreme Court stayed the permanent injunction pending resolution of the Trump Administration's appeal before the Ninth Circuit and any subsequent *writ of certiorari*. *Trump v. Sierra Club*, 140 S. Ct. 1 (2019). In the one-paragraph decision, the Supreme Court stated that "the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." *Id*.

On December 11, 2029, Judge Gilliam issued a permanent injunction barring Defendants from reprogramming military construction spending pursuant to 10 U.S.C. § 2808 for nine of the eleven proposed border barrier projects. *California v. Trump*, 407 F. Supp. 3d 869 (N.D. Cal. December 11, 2019). However, Judge Gilliam stayed the permanent injunction in light of the Supreme Court's decision in *Sierra Club*. An appeal of Judge Gilliam's December 11, 2019 decision is currently pending before the Ninth Circuit.

Meanwhile, two months earlier, on October 11, 2019, Judge Briones in the Western District of Texas issued a decision in which he determined that the Trump Administration's proposed plan for funding the eleven border barrier projects through § 2808 violated the 2019 Consolidated Appropriations Act, generally, and § 739 of the Act, specifically. *El Paso County v. Trump*, 2019 WL 5092396 (W.D. Tex. Oct. 11, 2019). On December 10, 2019, Judge Briones issued a nationwide permanent injunction barring the Trump Administration from using § 2808 funds beyond the funds allocated in the 2019 Consolidated Appropriations Act for the border barrier projects. *El Paso County v. Trump*, 407 F. Supp. 3d 655 (W.D. Tex. Dec. 10, 2019). On January 8, 2020, a panel of the Fifth Circuit granted the Trump Administration's request to stay the injunction pending resolution of the appeal and denied the plaintiffs' request to expedite the appeal. *El Paso County v. Trump*, No. 19-51144 (5th Cir. Jan. 8, 2020).

genuinely in dispute and the questions before the Court are purely legal, the Court can resolve Administrative Procedures Act challenges on summary judgment. *King County v. Azar*, 320 F. Supp. 3d 1167, 1171 (W.D. Wash. 2018), *appeal dismissed*, 2018 WL 5310765 (9th Cir. 2010). Similarly, questions of statutory and Constitutional interpretation are questions of law, which may properly be resolved at summary judgment. *See Union Stations Associates, LLC v. Puget Sound Energy, Inc*., 238 F. Supp. 2d 1226, 1229 (W.D. Wash. 2002).

## IV.   DISCUSSION

### A.   Washington Has Article III Standing to Bring Its Claims

As stated above, Washington claims that Defendants' diversion of $88.96 million from the Bangor Project to the border barrier projects pursuant to 10 U.S.C. § 2808 violates the APA, as well as the Appropriation and Presentment Clauses of the Constitution. However, before turning to the merits of Washington's claims, the Court must first address Defendants' threshold assertion that Washington lacks Article III standing to pursue its claims.

A plaintiff seeking relief in federal court bears the burden of establishing "the irreducible constitutional minimum" of Article III standing. *Spokeo, Inc. v. Rovins*, ___ U.S. ___, 136 S.Ct. 1540, 1547 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Article III of the Constitution limits federal courts' jurisdiction to "cases" and "controversies" and "[o]ne element of the case-or-controversy requirement" is that a plaintiff must establish that it has "standing to sue." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). "The law of Article III standing, which was built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers

of the political branches." *Clapper*, 568 U.S. at 408 (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 492-493 (2009)).

To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendants; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw, Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000). At summary judgment, a plaintiff "must 'set forth' by affidavit or other evidence 'specific facts'" to establish standing. *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)). When evaluating a plaintiff's standing, courts must "take as true" the factual evidence that plaintiff submits. *Id*.

Here, Washington alleges that it will suffer two distinct injuries if Defendants divert the funds that Congress appropriated for the Bangor Project: (1) the loss of tax revenues Washington would have received as a result of the Bangor Project, and (2) the loss of the Bangor Project itself, including the possible harms arising from that loss. Defendants do not challenge the causation and redressability aspects of Article III standing. Instead, they contend that Washington lacks standing because its alleged harms—the loss of tax revenues and the Project itself—do not constitute cognizable injuries-in-fact. According to Defendants, the alleged loss of tax revenue is not a cognizable injury-in-fact because Washington has failed to establish a direct link between the tax at issue and the administrative action being challenged, as is required by *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). Instead, Defendants argue, Washington claims only that its "general fund revenues" will decline. Defendants further argue that the loss of the Bangor Project itself does not constitute a cognizable injury-in-fact because Washington is not a

direct recipient of the money that Congress appropriated for the Project, rather the money will go to third-party contractors, vendors, other individuals in the supply chain.

This Court rejects Defendants' contentions and concludes that Washington has Article III standing to pursue its claims. First, the projected tax revenue loss is sufficient to establish standing for Article III purposes. Washington is not arguing a merely theoretical reduction in general revenue. It has established that the construction activity at the Bangor Project itself would be subject to both sales and use tax, and that such taxes are "the single largest source of State tax revenue." Declaration of Kathy L. Oline in Support of Motion for Summary Judgment ("Oline Dec."), Dkt. No. 18 at ¶ 8. In addition, the Project would engender business and occupation tax. *Id*. at ¶ 10. Washington projects that its total tax loss from the loss of the Bangor Project will be approximately $2.6 million, with an additional loss of approximately $880,000 in local taxes. *Id*. at ¶¶ 19, 22. Thus, Washington has shown that it will suffer the loss of significant tax revenue as a direct result of Defendants diverting funding from the Bangor Project, and such loss is sufficient to establish Article III standing.

This conclusion is in accord with the Ninth Circuit's recent decision in *City of Oakland v. Lynch*, 798 F.3d 1159 (9th Cir. 2015). In *City of Oakland*, the city sued to enjoin the federal government from seeking civil forfeiture of a local medical marijuana dispensary that was acting in accordance with local and state laws, but in violation of the federal Controlled Substances Act. 798 F.3d at 1162. Oakland projected that it would lose significant sales tax revenues if the dispensary was closed; the government argued that the expected loss of tax revenue was too speculative to establish injury for Article III standing purposes. The Ninth Circuit rejected the government's argument, concluding instead that Oakland's anticipated loss of tax revenue conferred Article III standing. *Id*. at 1164 (noting that if the dispensary closed "it will no longer

provide Oakland with tax revenue, either directly through income taxes or indirectly through customer sales taxes. And [Ninth Circuit] precedent makes clear that the deprivation of revenue constitutes injury under Article III); *see also*, *City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004) (holding that an expected loss of tax revenue constituted a sufficient injury for purposes of Article III standing).

Nor does *Wyoming v. Oklahoma*, cited by Defendants, dictate a different conclusion. *Wyoming* concerned a law enacted by Oklahoma that required Oklahoma utility companies to use a certain percentage of coal that was mined in Oklahoma. 502 U.S. at 443-44. Prior to the law's enactment, nearly 100% of coal used by Oklahoma utility companies was mined in Wyoming. Wyoming charged a severance tax on the coal sold to the Oklahoma companies. *Id*. at 445. After the law went into effect, Oklahoma utilities began purchasing Oklahoma coal, thereby reducing the amount of severance tax Wyoming collected. *Id*. at 447. Wyoming sued, alleging that Oklahoma's law violated the Commerce Clause. The Supreme Court concluded that Wyoming stated an injury for Article III standing purposes because "Wyoming's loss of severance tax revenues 'fairly can be traced' to the Act." *Id*. (quoting Report of Special Master 11). Similarly, Washington has demonstrated that it will suffer significant state and local tax revenues if the Bangor Project is not restored. The link between the revenue loss and the administrative action could hardly be more direct: the construction activities related to the Bangor Project will be subject to sales or use tax, and the loss of the Project would mean the loss of those taxes. Indeed, Washington's projected gross sales receipt tax for the project was included in the Navy's proposal to Congress. Thus, this Court concludes that Washington's expected loss of tax revenue is sufficient to confer standing. *See also El Paso County v. Trump*, 2019 WL 5092396, *7 (W.D. Tex. Oct. 11, 2019) (El Paso County's potential loss in $4 million

13

in tourism tax revenue due to "the perception that [El Paso] is chaotic and dangerous and that tourists' access to historical and scenic destinations will be impeded by construction" constitutes an injury-in-fact for Article III purposes).

Moreover, the loss of the Bangor Project is an independently sufficient injury for purposes of Article III. One must look no further than to the Defendants' own representations to see the importance of the Bangor Project to Washington. As stated above, Bangor Base is the homeport for the U.S. Pacific Fleet of Trident Ballistic Missile submarines. In justifying the need for the Banger Project to Congress, the Navy claimed that the Project is necessary to address "deficiencies" at Bangor Base. Pub. L. No. 115-232, § 2201 (2018). Specifically, the Navy testified that the "[m]ission requirements" for the U.S. Pacific Fleet "have outpaced the ability" of Bangor Base "to provide adequate facilities to support the secure transit of the ballistic submarines between Bangor Base and surface/dive points in the Strait of Juan de Fuca." Declaration of Andrew Hughes ("Hughes Dec."), Dkt. No. 17, Ex. A at 7 (stating that without the Bangor Project "[f]ull operational capability of the [Transit Protection System] mission cannot be executed."). It is difficult for this Court to imagine much, if anything, that could be more important to the State of Washington than that the nuclear-powered submarines carrying nuclear warheads are secure when traveling through its waters. The potentially disastrous results of unsecure nuclear weapons within the State's boundaries are so obvious that they do not need to be elaborated on here. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982) (states may sue to assert their "quasi-sovereign interest in the health and well-being— both physical and economic—of [their] residents in general"). The Court concludes that the loss of the Bangor Project is itself a sufficient injury to confer Article III standing. *See El Paso County*, 2019 WL 5092396, *8 (W.D. Tex. October 11, 2019) (loss of construction project at

Fort Bliss represents a missed opportunity to "obtain a benefit," which suffices to show injury in fact for standing purposes).

**B.      Washington's Claims Under the Administrative Procedures Act**

Having found that the State has standing to bring this action, the Court next turns to the merits of Washington's APA claims. Under the APA, a court "shall … hold unlawful and set aside agency action" that is "arbitrary [and] capricious," "not in accordance with the law" or that is "in excess of statutory … authority … or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). As stated above, Washington asserts that Defendants' diversion of $88.96 million from the Bangor Project to fund border wall construction, purportedly pursuant to 10 U.S.C. § 2808, violates the APA for three distinct reasons: (1) it is "not in accordance with law" because Defendants' actions are barred by the CAA, (2) it is "in excess of statutory … authority, or limitations, or short of statutory right" because § 2808 does not, as Defendants claim, authorize their actions, and (3) the administrative record demonstrates that Defendants acted "arbitrar[ily] and capricious[ly]" by defunding the Bangor Project. Dkt. No. 15, Count V. Washington argues that because Defendants' actions violate the APA, it is "entitled to a declaration that any action taken pursuant to the Proclamation is invalid, and an injunction prohibiting Defendants from implementing the Proclamation or otherwise reprogramming funds under [10 U.S.C.] § 2808." *Id.* at ¶ 208. The Court will address the State's arguments in turn. [17]

---

[17] Because the Court holds that Defendants' actions run afoul of the APA on other grounds, the Court need not and does not reach Washington's argument that the "Defendants' cancellation of hundreds of military construction projects" is arbitrary and capricious." Dkt. No. 44 at 20.

### 1. Defendants' Actions Are "Not in Accordance With Law" Because They Violate the Consolidated Appropriations Act

The State argues that Defendants' attempt to reprogram funds pursuant to § 2808 is a violation of the APA, because it is "not in accordance with" the Consolidated Appropriations Act of 2019 ("the CAA"). Pub. L. No. 116-6, div. A, 133 Stat. 13 (2019). Passed in the wake of the partial government shutdown over the President's demand for border wall funding, the CAA constrains the Trump Administration's use of appropriations for border wall construction in several ways. First, Congress rejected the President's demand for $5.7 billion to build 175 miles of a border wall and instead appropriated only $1.37 billion to build 55 miles of pedestrian fencing in Texas's Rio Grande Valley. CAA § 230. Second, Congress differentiated this fencing from the border wall, limiting the designs to ones already deployed, which did not use solid material like concrete. *Id*. at § 230(b). And third, Congress included § 739 in the CAA. Section 739 prohibits the Administration from "increas[ing] … funding for a[ny] program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriations Act, or unless such change is made pursuant to the programming or transfer provision of this or any other appropriations Act." CAA § 739. In other words, § 739 explicitly prohibits the Trump Administration from circumventing Congress, and instead requires that any increased funding for the border wall come through an appropriations act.

Washington argues that Defendants' attempt to use § 2808 to divert an additional $3.6 billion in military construction spending to the eleven border barrier projects is in direct contravention to the foregoing limitations Congress placed in the CAA. Defendants counter that Washington reads the limitations in § 739 too expansively and that if Congress "wished to restrict all other border barrier construction—including construction authorized by § 2808—it

16

could have plainly so stated, as it did elsewhere with respect to other funds in the CAA. The President made clear prior to the CAA's passage his intention to use alternate statutory sources to fund barrier construction, but Congress nonetheless included no rider forbidding it." Dkt. No. 43 at 30 (internal citations omitted). Defendants also argue that § 739 only limits any attempt to increase the funding appropriated by Congress to the Department of Homeland Security through the CAA. Because any funds utilized for border barrier construction pursuant to § 2808 will be used as part of the Department of Defense military construction activities, the funds will not add "additional money to a 'program, project, or activity' within one of [the Department of Homeland Security] accounts." *Id.* at 31-32.

The Court holds that Defendants' attempt to procure additional funds for the border barrier projects outside the appropriations framework violates § 739 of the CAA. As stated above, § 739 specifically requires that any funds "made available in …any other appropriation act" that is "used to increase" funding for a "program, project or activity as proposed in the President's budget request for a fiscal year" must be "enacted" or "made pursuant" to "an appropriation Act." CAA § 739. It is beyond dispute that the border wall is a "program, project, or activity" that was proposed in President Trump's budget request for the fiscal year 2019. *See* Letter from Russell T. Vought, Acting Dir. of the Office of Mgmt. & Budget, to Richard Shelby, Chairman of the Senate Comm. on Appropriations (Jan. 6, 2019) (requesting $5.7 billion for construction of a steel barrier along 234 miles of the southern border). It is also beyond dispute that the military construction funds Defendants seek to reprogram to the border wall pursuant to § 2808 were made available through appropriations by Congress to the Military Construction Appropriations Act. Pub. L. No. 97-106, 95 Stat. 1503. Indeed, the Trump Administration has

17

conceded that the funds were appropriated by Congress.[18] Therefore, according to the explicit terms of § 739, any attempt to apply those funds to the border wall, must be "enacted" or "made pursuant" to an "appropriations act." Under federal law, an "appropriations Act" is an Act whose title begins: "An Act making appropriations." 2 U.S.C. § 622(5); 1 U.S.C. § 105. Section 2808 does not begin with this language; rather, it is a provision of the Military Construction Codification Act, Pub. L. No. 97-124, 96 Stat. 153 (1982), which neither says anything about appropriations in its title, nor makes any appropriations in its body. *El Paso County*, 2019 WL 5092396 at *15. Thus, Defendants' attempt to divert funding to the eleven border barrier projects through § 2808 is in direct conflict with § 739 of the CAA, and must be set aside under the APA. 5 U.S.C.A. § 706(2)(A) (courts should "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law").

In reaching this conclusion, the Court rejects Defendants' argument that the State lacks a cause of action to enforce the CAA because the State's alleged injuries fall outside the "zone of interests" protected by that statute. The "zone-of-interests" requirement is a standing-like limitation on claims that can be brought under the APA. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). Under this doctrine, "a person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: [t]he interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970)). However, the requirement "is not meant to be especially demanding," *Clarke v. Securities Industries Assn.*, 479 U.S. 388, 399 (1987), and the zone-of-

---

[18] Fact Sheet, http://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-security-victory.

interest requirement "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purpose implicit in the statute that it cannot be reasonably assumed that' Congress authorized that plaintiff to sue." *Lexmark*, 572 U.S. at 130 (quoting *Patchak*, 567 U.S. at 225). According to Defendants, the limitations in the CAA are meant to "regulate the relationship between Congress and the Executive Branch regarding federal spending and in no way protect the revenue streams of local governments to tax contractors and residents who receive federal funds." Dkt. No. 43 at 15. Defendants argue that "[n]othing in the CAA suggests that Congress intended to allow lawsuits by state governments who seek to protect their future tax revenue allegedly affected by the use of funds from a completely separate appropriations statute." *Id*.

This Court is not persuaded by Defendants' argument. As stated above, during the three weeks immediately following the government shutdown, and while a bipartisan committee was tasked with negotiating a funding bill—*i.e.*, what ultimately became the CAA—President Trump's Administration repeatedly declared that the southern border wall "is going to be built, with or without Congress."[19] Indeed, President Trump stated that he was specifically considering declaring a national emergency at the southern border so that he could, in his view, unlock military construction funds pursuant to § 2808.[20] Congress's inclusion of § 739 in the CAA was clearly a direct response to the President's statement. Congress intended to appropriate only

---

[19] Andrew O'Reilly, *Mulvaney Says Border Wall Will Get Built, "With or Without" Funding from Congress*, Fox News (Feb. 10, 2019), https://perma.cc/NGM3-2FML

[20] *Remarks by President Trump During Roundtable Discussion with State, Local, and Community Leaders on Border Security and Safe Communities* (Jan. 12, 2019) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-congressional-leadership-border-security/; *see also*, *Remarks by President Trump in Meeting with Senate Minority Leader Chuck Schumer and House Speaker-Designate Nancy Pelosi*, The White House (Dec. 11, 2018, 11:40 A.M.), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-senate-minority-leader-chuck-schumer-house-speaker-designate-nancy-pelosi/

19

$1.37 billion to border barrier construction and it included § 739 in the CAA to prevent the President from circumventing its funding limitation by obtaining funding outside the appropriations process. In other words, § 739 is a reassertion of Congress's spending authority, authority that is exclusively Congress's under the Constitution. U.S. Const., art. I, § 9, cl. 7; *Nevada v. Dep't of Energy*, 400 F.3d 9, 13 (D.C. Cir. 2005) (noting that the Appropriations Clause vests in Congress the exclusive power over the federal purse).

Here, in accordance with its constitutional spending authority, Congress saw fit to appropriate $88.96 million to the Bangor Project. It further saw fit to limit funding for border barrier construction to $1.37 billion all in accordance with its exclusive spending power. Washington alleges that Defendants seek to circumvent Congress's spending authority by procuring funds outside the appropriation framework, an action that Washington alleges is specifically prohibited by § 739 of the CAA. Washington further alleges that such action will injure it both in terms of lost tax revenue and loss of the Bangor Project. Such alleged injuries fall squarely within the zone of interests CAA was meant to protect. Thus, Washington satisfies the zone-of-interests requirement. *See Cook v. Billington*, 737 F.3d 767, 771 (D.C. Cir. 2013) (Kavanaugh, J.) ("A plaintiff with Article III standing satisfies the [zone-of-interests] requirement unless his interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be reasonably assumed that Congress intended to permit the suit.") (quotation omitted)).

> **2.    10 U.S.C. § 2808 Does Not Authorize Defendants to Reprogram the Funds**

The State argues that Defendants' actions violate the APA for the additional reason that those actions are "in excess of statutory … authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Defendants rely on 10 U.S.C. § 2808 for authority to reprogram the funds.

However, § 2808 authorizes Defendants to "undertake military construction projects, not otherwise authorized by law," only under certain prescribed conditions. Specifically, the statute requires the following: (1) that a national emergency "that requires use of the armed forces" has been declared by the President in accordance with the National Emergencies Act, (2) that the funds be used for "military construction projects," and (3) that the military construction projects are "necessary to support such use of the armed forces." *Id.*[21]

The State argues that Defendants' diversion of military construction funds is neither for "military construction," nor "necessary to support [the] use of the armed forces," both criteria that are explicitly required by § 2808. According to the State, the diversion is not, therefore, authorized under the statute, as Defendants claim. For the reasons discussed below, the Court finds that Defendants' actions fail to meet the requirements of § 2808, and concludes that § 2808 does not authorize Defendants' proposed use of the funds. Furthermore, Defendants' actions, being unauthorized, violate the APA. *See* 5 U.S.C. § 706(2)(C).

### a.     The Border Wall Does Not Meet the Definition of "Military Construction" Under § 2808

The parties agree that the eleven proposed border barrier projects constitute "construction"; the dispute is whether the projects constitute "*military* construction" as the term is used in § 2808. In order to qualify as "military construction," the statute requires that the construction be "carried out with respect to a military installation." 10 U.S.C. § 2801(a). A "military installation" is defined as "a base, camp, post, station, yard center, or other activity

---

[21] U.S. Section 2808's military construction authority has been invoked only twice since it was enacted in 1982, and only once for a military construction project located in the United States. That project involved securing facilities holding weapons of mass destruction shortly after the September 11, 2001 attacks. *See Sierra Club v. Trump*, 379 F. Supp. 3d 883, 902 (N.D. Cal. May 24, 2019); *California v. Trump*, 407 F.Supp.3d 869, 877 (N.D. Cal. 2019). The other authorization was for emergency construction funding "to deal with the threat to the national security and foreign policy of the United States caused by the invasion of Kuwait by Iraq." *Sierra Club,* at 902. (quoting Exec. Order No. 12,734, 55 Fed. Reg, 48,099 (Nov. 14, 1990)).

under the jurisdiction of the Secretary of a military department[.]" § 2801(c)(4). In other words, to be authorized under § 2808, the construction to which funds are diverted must be "carried out with respect to" a "base, camp, post. . . or other activity under the jurisdiction of the Secretary of a military department." *Id*.

Defendants do not argue that border barrier projects are "being carried out with respect to" a "base, camp, post, station, [or] yard center." *See Sierra Club*, 379 F. Supp. 3d at 920 ("Defendants make no attempt to characterize the U.S.-Mexico border or a border barrier as a 'base, camp, post, station, yard [or] center.' *Nor could they*.") (emphasis added). Instead, Defendants argue that the eleven border barrier projects "fall squarely within the definition of 'military installation'" for two reasons. Dkt. No. 47 at 10. First, Defendants claim that the eleven projects constitute "military installations" under § 2801(c)(4) because each project "fall[s] within the broad scope" of the purported catch-all category, "any other activity." *Id*. Second, Defendants point out that two of the projects are located on the Barry M. Goldwater Range, a preexisting military installation in Arizona, and that the other nine will be on land that has recently been administratively assigned to Fort Bliss, a military installation near El Paso, Texas. Therefore, as Defendants' second argument goes, all eleven projects are "under the jurisdiction" of a military "base" and thus satisfy the definition of "military installation" under § 2801(c)(4). The Court concludes that neither argument is availing.

### (i)     Defendants' Proposed Definition of "Any Other Activity" Is Unduly Broad

As to the first argument, while the Court recognizes that the two barrier projects located on the Goldwater Range meet the statute's definition of "military installation," the Court finds that the remaining nine projects do not satisfy that requirement. In reaching this decision, the Court rejects Defendants' unduly expansive reading of "other activity" in § 2801(c)(4)'s

definition of "military installation." Under "the familiar interpretive canon *noscitur a sociis*, 'a word is known by the company it keeps.'" *McDonnell v. United States*, ___ U.S. ___, 136 S. Ct. 2355, 2368 (2016) (quoting *Jarecki v. G.G. Searle & Co.*, 367 U.S. 303, 307 (1961)); *see also*, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) ("[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (quotation omitted)). The canon is "wisely applied where a word [in a statute] is capable of many meanings in order to avoid" giving "unintended breadth to the Acts of Congress." *Ibid*.

Applying this principle to the phrase "other activity" as it is used in § 2801(c)(4), the Court concludes that the terms "base, camp, post, station, yard [or] center" that precede "other activity" in the definition of "military installation" provide a contextual limitation to the meaning of "other activity" as it is used in the statute. That limitation is that the "other activity" must be similar in nature or scope to "a base, camp, post, station, yard, [or] center." Indeed, "[h]ad Congress intended for 'other activity' in Section 2801(c)(4) to be so broad as to transform literally any activity conducted by the Secretary of a military department into a 'military installation,' there would have been no reason to include a list of specific, discrete military locations." *Sierra Club*, 379 F. Supp. 3d at 921(citing *Yates v. United States*, ⸺ U.S. ⸺, 135 S.Ct. 1074, 1087 (2015) ("Had Congress intended 'tangible object' in § 1519 to be interpreted so generically as to capture physical objects as dissimilar as documents and fish, Congress would

23

have had no reason to refer specifically to 'record' or 'document.' The Government's unbounded reading of 'tangible object' would render those words misleading surplusage.")).

### (ii) The Projects Are Not "Carried Out With Respect to a Military Installation" Merely Because They Are on Land that Has Been or Will Be Administratively Assigned to Fort Bliss

The Court also rejects Defendants' second argument: that so long as the projects are on land that is "under the jurisdiction of the Secretary of a military department," the projects fall within the definition of "military installation." Here, two of the projects will be located on the Goldwater Range. As to the remaining nine projects, of the proposed projects that are located on federal land, the Trump Administration intends to transfer that land to the Department of Defense. For the proposed projects that are not on federal land, the Trump Administration intends to have the Department of Defense acquire or condemn the private land. Once the land for all nine proposed projects is in the possession of the Department of Defense, it will then administratively assign the land to Fort Bliss. *See* AR at 3. Therefore, Defendants argue, each of the projects will be on land "under the jurisdiction" of the Department of Defense.

As stated earlier, this Court agrees that the two projects located at the Goldwater Range fall within the definition of "military installation" because they are located on an existing military facility under the jurisdiction of the Department of Defense. As to the remaining nine projects, however, the Court cannot accept Defendants' claim that Congress intended land to fall within the definition of "military installation" whenever the Department of Defense expresses an intent to obtain land or administratively assigns land to a military facility. Under Defendants' proposed interpretation of "military installation," there would theoretically be no limit to what could be considered a military installation. This Court declines to conclude that Congress intended to grant the Department of Defense "boundless authority to reallocate military

24

construction funds to build anything [it] want[s], anywhere [it] want[s], provided that [it] first

obtain[s] jurisdiction over the land where the construction will occur." *California v. Trump*, 407

F. Supp. 3d at 893.

In reaching this conclusion, the Court finds relevant the circumstances in which

Defendants' actions arise. As outlined more fully above, Congress repeatedly and deliberately

declined to appropriate the full funds the President requested for a border wall along the southern

border of the United States. The President, in response, repeatedly threatened to declare a

national emergency at the southern border so that, in his view, he could invoke § 2808 to obtain

the funding Congress refused to provide him. Thus, under Defendants' expansive definition of

"military installation," § 2808 would allow the Executive Branch to redirect billions of dollars

from projects to which Congress appropriated funds to projects that Congress specifically

*declined* to fund. Such an interpretation defies not only the text of the statute, but logic itself. As

Justice Field wrote more than a century ago, a court cannot shut its "eyes to matters of public

notoriety and general cognizance. When we take our seats on the bench we are not struck with

blindness, and forbidden to know as judges what we see as men." *Ho Ah Kow v. Nunan*, 12 F.

Cas. 252, 255 (C.C.D. Cal. 1879).

Nor is the Court persuaded by Defendants' reliance on the Supreme Court's decision in

*United States v. Apel*, 571 U.S. 359 (2014). In *Apel*, the Supreme Court was asked to determine

whether the term "military installation" as it is used in a trespass statute, means property that the

military has exclusive use, possession, or control over. *Apel* involved a case in which an anti-war

protestor was arrested for trespassing in a designated protest area on Vandenberg Air Force Base.

The designated area was located on an easement for right-of-way that the Base had granted to the

County of Santa Barbara. The protestor challenged his arrest, arguing that the designated area

was not part of a "military installation" within the meaning of the trespass statute because the Air Force did not exercise exclusive control over it. The Supreme Court rejected the protestor's argument, holding that the term "military installation" as it is used in the trespass statute does not require that the military retain exclusive control over the property at all times. In doing so, the Court noted that "'military duty' and 'military protection' are synonymous with the exercise of *military jurisdiction*," and that the term "'military installation' is used [that way] elsewhere in the federal law." *Id*. at 368 (emphasis in original). While the Supreme Court cited to the language of 10 U.S.C. § 2801(c)(4) as an example of the term "military installation" in another statute, the Court did not engage in any analysis whatsoever of the statute and it is disingenuous for Defendants to suggest otherwise. Simply put, the Court declines to accept Defendants' invitation to stretch an illustrative comment by the Supreme Court to binding precedent in this case.

In sum, as Judge Gilliam stated in *California v. Trump*, "Section 2808 was [not] intended to be used to resolve policy disputes with Congress or to provide the Executive Branch with unchecked power to transform the responsibilities assigned by law to a civilian agency into military ones by reclassifying large swaths of the southern border as 'military installations.' Such an interpretation defies both the text and spirit of the statute." 407 F.Supp.3d at 896. Accordingly, the Court concludes that with the exception of the two Goldwater Range projects, the proposed border barrier projects do not meet the definition of "military construction" set forth in the statute.

**b.     The Border Wall Is Not "Necessary to Support Such Use of Armed Forces" Under § 2808**

The Court also concludes that Defendants' redirection of funds is not authorized under § 2808 for a second, independently sufficient reason.  Even if Defendants had established that all

1    eleven of the proposed barrier projects constitute "military construction" within the meaning of

2    §2808, Defendants would still have to demonstrate that the projects "are necessary to support

3    such use of the armed forces" along the southern border. Defendants rely on a lengthy

4    administrative record that they claim establishes that the projects are necessary to provide such

5    support. However, even crediting the facts and giving due deference to the military

6    determinations in the administrative record, this Court finds that Defendants have failed to meet

7    their burden.

8          On April 4, 2018, the President directed the Secretary of Defense to support the

9    Department of Homeland Security "in securing the southern border and taking other necessary

10   actions" due to "[t]he crisis at our southern border." *California v. Trump*, 407 F. Supp. 3d at 869.

11   Accordingly, as of August 13, 2019, approximately 5,500 Department of Defense personnel have

12   been sent to the southern border. *Id*. The Department of Defense personnel are primarily serving

13   in "support roles that relieve [Department of Homeland Security] personnel of non-law

14   enforcement duties," such as "logistics, planning, and intelligence analysis," as well as providing

15   "monitoring and detection support" through the use of "mobile surveillance camera units" or

16   "aerial reconnaissance." *Id*. Defendants argue that the proposed border barrier projects "would

17   improve the effectiveness and efficiency of [these 5,500 Department of Defense] personnel by

18   allowing them to shift away from providing such support to frequent, low risk border incursions

19   and instead concentrate on monitoring, tracking, and responding to a smaller, more focused set

20   of higher risk activities at the border." Dkt. No. 43 at 27 (citing AR 57) *see also* Preliminary

21   Assessment from the Chairman of the Joint Chiefs of Staff, AR 119-24 (concluding that

22   constructing the physical barriers in areas where Department of Defense personnel are deployed

23   would allow those forces to be re-prioritized to other missions in support of the Department of

24

25

Homeland Security). Defendants further assert that the proposed barrier projects will "serv[e] as a force multiplier for the [Department of Homeland Security]" and thereby "reduce reliance by [the Department of Homeland Security] on [the Department of Defense] for force protection, surveillance support, engineering support, and air support[.]" *Id*. at 27-28. Defendants also claim that the proposed barrier projects "would give a distinct and enduring advantage to the Border Patrol as a force multiplier, and would provide agents with capabilities to respond more quickly to illicit activities." *Id*. (citing AR 56-57). Lastly, Defendants point out that the Secretary of Defense selected the eleven proposed projects because he concluded that those projects in particular "will deter illegal entry, increase the vanishing time of those illegally crossing the border, and channel migrants to ports of entry." *Id*. at 29 (citing AR 9).

The foregoing portions of the Administrative Record highlighted by Defendants clearly demonstrate that the purpose of the eleven border barrier projects is to help secure the southern border which, of course, is the responsibility of domestic law enforcement—specifically the Department of Homeland Security and Customs and Border Patrol—*not* the Department of Defense. *See* 6 U.S.C § 202 (empowering the Department of Homeland Security "to [s]ecur[e] the borders, territorial waters ports, terminals, waterways, and air, land, and sea transportation systems of the United States"); 8 U.S.C. §§ 1103(a)(5) (charging the Secretary of Homeland Security with "the power and duty to control and guard the boundaries and borders of the United States"); *City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000) ("Securing the border … [is], of course, law enforcement activit[y]."); *Snapshot: A Summary of CBP Facts and Figures*; U.S. Customs & Border Protection (Dec. 2018), http://perma.cc/H3JS-PH9C (Customs and Border

Patrol is the "largest federal law enforcement agency in the United States" and its mission is to "safeguard America's borders").

This distinction between the jurisdiction of domestic law enforcement and the Department of Defense is both historic, and critical to this case. Indeed, the military is expressly prohibited from making "direct active use of Federal troops" to execute domestic law enforcement under the Posse Comitatus Act, 18 U.S.C. § 1385. *See also Laird v. Tatum*, 408 U.S. 1, 15 (1972) (Chief Justice Burger noting that there is "a traditional and strong resistance of Americans to any military intrusion into civilian affairs" that "has deep roots in our history and found early expression, for example, in the Third Amendment's explicit prohibition against quartering soldiers in private homes without consent and in the constitutional provisions for civilian control of the military"); *United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015) (noting that the Posse Comitatus Act "prohibits Army and Air Force military personnel from participating in civilian law enforcement activities").

Defendants argue that the border barrier projects will "support" the armed forces at the border by reducing the amount of assistance they provide to the Department of Homeland Security. The problem with Defendants' argument is that the administrative record makes clear that the proposed projects are intended to support and benefit the Department of Homeland Security, a civilian agency, not the armed forces. That such border barrier projects may be beneficial to the Department of Defense in that the projects will relieve some of its personnel from assisting the Department of Homeland Security in meeting its mission does not establish that the projects are *necessary* to support the use of the armed forces at the southern border, which, of course, is the requirement set by Congress in § 2808. Indeed, when asked what the Department of Defense personnel are doing at the border that could not be performed by the

29

Department of Homeland Security, Admiral Michael Gilday, operations director for the Joint Staff, responded: "[n]one of the capabilities that we are providing [at the southern border] are combat capabilities. It's not a war zone along the border."[22] Simply put, the southern border is not a militarized zone; it is the responsibility of the Department of Homeland Security to ensure that the border is secure—a law enforcement function explicitly outside the purview of the Department of Defense. *See California v. Trump*, 407 F. Supp. 3d at 897-98 ("[T]he Court cannot blind itself to the plain reality presented in this case: the border projects Defendants now assert are 'necessary to support the use of the armed forces' are the very same projects Defendants sought—and failed—to build under DHS's civilian authority, because Congress would not appropriate the requested funds. Even where review is 'deferential,' courts are not required to exhibit a naivete from which ordinary citizens are free." (internal quotation omitted)). Accordingly, the Court finds that the border barrier projects are not necessary to support the armed forces within the meaning of § 2808.

### c.  The Court Rejects Defendants' Threshold Defenses to Plaintiff's Challenge to Defendants' Reliance on § 2808

The Court reaches the merits of Plaintiff's *ultra vires* challenge to Defendants' actions, as discussed above, because it rejects the two threshold defenses that Defendants have raised: (1) that Plaintiff's claims do not meet the "zone-of-interests" required of APA claimants; and (2) that Plaintiff's claims are not justiciable. Both defenses fail, for the reasons that follow.

### The "zone-of-interests" requirement

Defendants argue that Washington cannot pursue a claim under the APA because the State's alleged injuries fall outside the "zone of interests" protected by § 2808, a defense

---

[22] Heather Timmons, *The US Border Situation Isn't a National Emergency, Pentagon Officials Tell Congress*, Quartz (Jan. 29, 2019).

Defendants also raised with respect to Plaintiff's claim that Defendants' actions violate the CAA. *See supra*, § IV.B.1. As discussed more fully above, a plaintiff pursuing a challenge under the APA must show its interests fall within the "zone of interests" that the statute at issue was designed to protect. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 224.

The Court concludes that the zone-of-interests test does not apply to Plaintiff's challenge to Defendants' reliance on § 2808. As the Ninth Circuit recently noted in a case directly on point, it seems unlikely "that there could be a zone of interests requirement for a claim alleging that official action was taken in the absence of all authority." *Sierra Club v. Trump*, 929 F.3d 670, 700 (9th Cir. 2019); *see also Sierra Club v. Trump*, 379 F. Supp. 3d at 943; *El Paso County v. Trump*, 2019 WL 5092396, at *12, n.1 (both cases holding that the zone-of-interests requirement does not apply to *ultra vires* challenges against federal agency action).

### *Justiciability*

Defendants' second threshold defense of their reliance on § 2808 is that the use of military construction funds pursuant to § 2808 necessarily involves a nonjusticiable political question that is beyond the purview of this Court. Specifically, Defendants charge that President Trump's determination that a national emergency that requires the use of the armed forces at the southern border is not subject to judicial review by this Court. Defendants' argument is threefold. First, Defendants claim that the President's action is not reviewable under the APA. Second, the Defendants argue that the President's national emergency declaration is a nonjusticiable political question. Lastly, Defendants contend that Washington cannot challenge a statutorily authorized discretionary judgment of the President.

As an initial matter, it is important to note that—with respect to its challenge to Defendants' reliance on § 2808—Washington is not challenging the lawfulness of the President's

Proclamation itself. During oral argument, the State made clear that its challenge to § 2808 does not require this Court to set aside the Proclamation, nor question the President's deployment of the armed forces to the southern border. Rather, Washington is challenging whether the Secretary of Defense's action—*i.e.*, the decision to divert military construction funds from the Bangor Project to the eleven border barrier projects—is authorized by § 2808. Thus, this Court need not (and does not) consider the lawfulness of President Trump's Proclamation in order to determine whether the Secretary of Defense's action is in compliance with § 2808.

Put in this light, the Court finds that Defendants' justiciability argument does not hold water. Washington is not challenging the President's emergency declaration. It is challenging the actions of the Secretary of Defense in reprogramming the funds; and such agency actions are indisputably reviewable under the APA. *O.A. v. Trump*, 404 F. Supp. 3d 109, 148 (D.D.C. August 2, 2019) (that an agency action relies on "a presidential proclamation or other presidential order" does not insulate the action "from APA review"). Likewise, Washington is not challenging the President's determination that an emergency exists at the southern border that requires the use of armed forces. It is questioning whether the eleven border barrier projects meet the definition of "military construction" set forth in § 2801. Such statutory interpretation is well within the domain of this Court.[23] *See Sierra Club*, 929 F.3d at 687 (quoting *Zivotofsky ex*

---

[23] Defendants also argue that the Secretary of Defense's determination that the border barrier projects "are necessary to support such use of the armed forces" is "a military judgment committed to the Secretary" by law and, as such, beyond this Court's review. Dkt. No. 43 at 26. According to Defendants, there "is no meaningful standard by which the Court can review the Secretary of Defense's decision that the border barrier projects 'are necessary to support such use of the armed forces'" and, therefore, the decision is "committed to agency discretion by law." *Id.* (quoting 5 U.S.C. § 701(a)(2), 10 U.S.C. § 2808). Moreover, Defendants argue, even if the Secretary's decision was reviewable, it would be entitled "to substantial deference from this Court." *Id.* A decision is committed to agency discretion by law, and thus not subject to judicial review, when a court would have "no meaningful standard against which to judge the agency's exercise of discretion." *Perez v. Wolf*, 943 F.3d 853, 860 (9th Cir. 2019). However, that is not the case here. Rather, § 2808 provides "meaningful standards" for reviewing Defendants' actions by imposing clear limits on the Secretary's authority to reprogram the funds. Thus, § 2808 establishes clear statutory standards that constrain the Secretary's use of the statute and applying those statutory standards to the Secretary's actions "is a familiar judicial exercise." *Sierra Club v. Trump*, 929 F.3d at 687 (quoting *Zivotofsky ex rel. Zivotofsky v. Clinton*,

*rel. Zivotofsky v. Clinton*, 566 U.S. 189, 197 (2012) (determining whether Defendants'

"reprogramming of funds is consistent" with a statute "is a familiar judicial exercise").

### C.     Washington's Constitutional Claims

In addition to challenging Defendants' actions under the APA, Washington also argues

that Defendants' actions violate the Constitution, specifically the Presentment Clause (Article I,

Section 7, Clauses 2 and 3), the Appropriations Clause (Article I, Section 9, Clause 7), the Take

Care Clause (Article II, Section 3), and the nondelegation doctrine (rooted in Article I, Section

1). *See* Dkt. No. 15, Counts I-IV.

The Court is cognizant of the "well-established principle" that a court should not reach a

"constitutional question if there is some other ground upon which to dispose of the case." *Nw.*

*Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009). Given that this Court has

already determined that Defendants' funding plan violates the APA and, therefore, can dispose

of the case on that basis, the Court exercises restraint and declines to reach the constitutional

claims raised by Washington. *See Harmon v. Brucker*, 355 U.S. 579, 581 (1958) ("In keeping

with our duty to avoid deciding constitutional issues presented unless essential to propose

disposition of a case, we look first to petitioner's non-constitutional claim that respondent

[Secretary of the Army] acted in excess of powers granted him by Congress.").

### D.     Injunctive Relief

Having found that Defendants' redirection of military construction funds under § 2808

violates the APA, the Court next considers the State's request for injunctive relief. Washington

seeks an injunction that permanently enjoins Defendants from "diverting funds appropriated by

---

566 U.S. 189, 196 (2012)). Accordingly, the Secretary of Defense's invocation of § 2808 is subject to review by this Court.

Congress for military construction projects towards construction of a border wall." Dkt. No. 15 at ¶ 210. In other words, Washington requests that this Court issue an injunction that prohibits Defendants from diverting *any* funds through § 2808 to the border barrier construction projects, not just the $88.96 million appropriated for the Bangor Project.[24]

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Where, as here, the government is the defendant, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 32-33 (2008) (citing *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313 (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law")). Further, an injunction "should be no more burdensome to the defendant than necessary to provide complete relief" to the plaintiff. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Defendants do not challenge whether Washington has adequate available remedies at law. Instead, Defendants focus on the remaining two elements for injunctive relief, arguing that such

---

[24] In the amended complaint, Washington also requests a declaration that the President's national emergency Proclamation is invalid, that Defendants' attempt to divert pursuant to § 2808 previously appropriated military construction funds is invalid, and that the McCain NDAA that committed $88.96 million to the Bangor Project remains valid law. Dkt. No. 15 at ¶ 209. However, the parties do not address the merits of this request in the cross-motions for summary judgment, so the Court will decline to do so as well.

relief is not warranted because the State has failed to establish irreparable injury and because the government's compelling interests in constructing the border barrier projects outweigh Washington's interests. In arguing that the State has not established an irreparable injury, Defendants simply reiterate their claim that "the indirect effects of anticipated lost tax revenues" are insufficient for purposes of Article III standing, and therefore, "insufficient to establish an irreparable injury" for purposes of injunctive relief. Dkt. No. 43. For the same reasons that the Court concluded that Plaintiff has standing, *see supra* § IV.A., it concludes that loss of the Bangor Project and loss of the tax revenue associated with it is an irreparable injury warranting an injunction.

Next, Defendants argue that the balance of equities and public interest weigh in their favor because they have a compelling interest in the safety and integrity of our borders, and in ensuring that the armed forces "are properly supported and have the necessary resources" in their mission to support "[the Department of Homeland Security] at the southern border." Dkt. No. 43 at 38.  It can hardly be denied that the public has a strong interest both in the integrity of this country's borders and in ensuring that the armed forces are well-supported while deploying the missions. *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982). However, doing so cannot be done at the expense of our laws. *See East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (citing *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers) (noting that the public has an interest in ensuring that "statutes enacted by [their] representatives" are not imperiled by executive fiat). This Court has already determined that Defendants' attempt to divert previously appropriated military construction funds to the border barrier projects pursuant to § 2808 violates the APA. The Court concludes that the public's interest in ensuring that the

35

government abides by its laws outweighs the government's proffered interest in this case. Thus, Washington is entitled to a permanent injunction.

Next the Court addresses the scope of the injunction. As stated above, Washington requests that this Court enjoin Defendants from diverting any funds under § 2808 to the border barrier projects, not just the $88.96 million appropriated by Congress to the Bangor Project. The State argues that this Court "is not required to chop up the Secretary of Defense's single decision [to divert funds under § 2808] into 127 sub-decisions to accommodate Defendants' desire to carry on an illegal diversion of funding that cannot be undone." Dkt. No. 44 at 29.

The Court declines the State's request to enjoin the Defendants' redirection of all $3.6 billion in military construction funds, for two reasons. First, this Court is required to narrowly tailor the relief requested to fully address Washington's alleged injuries, but no more. *See Califano*, 442 U.S. at 702 (injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief" to the plaintiff). Enjoining Defendants from using the $88.96 million designated for the Bangor Project will fully remedy Washington's asserted harm and return the State to the same position it was in prior to Defendants' actions. No broader injunction is necessary to provide Washington with complete relief.

Second, the Court believes that an injunction narrowly tailored to the State-specific injuries alleged in this case need not be stayed pending appeal. As noted above, two sister courts have already enjoined the Defendants' actions as to the entire $3.6 billion in redirected funds. *See supra*, n. 16. Those injunctions have been stayed by various courts pending appeal. *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019); *El Paso Cnty. v. Trump*, No. 19-51144 (5th Cir. Jan. 8, 2020); *California v. Trump*, 407 F. Supp. 3d at 909. The Court concludes that an injunction relating to only the $88.96 million appropriated to the Bangor Project is not necessarily

36

controlled by or subject to the stays entered by the Supreme Court, the Fifth Circuit, or the Northern District of California. *Id.* That is because those cases involve different plaintiffs and materially different alleged injuries. The Supreme Court reversed the Ninth Circuit and granted Defendants' application for a stay, noting that "[a]mong the reasons is that the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." *Trump v. Sierra Club*, 140 S. Ct. at 1. Similarly, in granting the defendants' application for a stay of the injunction in *El Paso County,* the Fifth Circuit noted "the substantial likelihood that Appellees lack Article III standing." *El Paso Cnty. v. Trump*, No. 19-51144. These rationales do not apply to the instant case, which involves distinct causes of action, a different plaintiff, different alleged injuries, and a different basis for standing. Having distinguished the strength of the State's standing from those cases in which stays have been entered, the Court therefore also finds it appropriate to narrowly tailor the State's remedy.

## V.   CONCLUSION

For the foregoing reasons, the Court HEREBY GRANTS in part and DENIES in part Washington's motion for summary judgment. Dkt. No. 16. The Court DENIES Defendants' cross motion for summary judgment. Dkt. No. 43. The Court HEREBY ORDERS as follows:

(1) Defendants' decision to reprogram $88.96 million in military construction funds previously appropriated by Congress for the Bangor Project pursuant to 10 U.S.C. § 2808 is not authorized by the statute and violates the CAA. Therefore, the decision is VACATED and set aside in accordance with Administrative Procedures Act (5 U.S.C. § 706(c)) and

(2) Defendants Mark Esper, in his official capacity as Secretary of Defense and Chad F. Wolf, in his capacity as Acting Secretary of Homeland Security, and all persons acting under

their direction, are PERMANENTLY ENJOINED from redirecting the $88.96 million in military construction funds appropriated to the Bangor Project to fund any of the eleven proposed border barrier construction projects as outlined above.

Dated this 27th day of February, 2020.

Barbara Jacobs Rothstein
U.S. District Court Judge

38